Louis Blaustein and Others, Suing on Behalf of Themselves and on Behalf of All Stockholders of Pan American Petroleum & Transport Company Similarly Situated, Plaintiffs, and Fred C. Haas and Beatrice P. Barry, Plaintiffs, Intervenors, *v.* Pan American Petroleum & Transport Company, Standard Oil Company (Indiana), Standard Oil Company (N. J.), Standard Oil Company of New Jersey, Edward G. Seubert, Charles J. Barkdull, Louis L. Stephens, Edward G. McKeever, James A. Carroll, Jr., Robert E. Wilson, Allan Jackson, Edward J. Bullock and Walter C. Teagle, Defendants.

Supreme Court, Special Term, New York County, June 8, 1940.

*Winthrop, Stimson, Putnam & Roberts* [*Henry L. Stimson, Allen T. Klots, Kenneth M. Spence, Karl F. Steinman, Andre Maximov, Arthur E. Palmer, Jr., Charles P. Noyes* and *Willis L. M. Reese* of counsel], for the plaintiffs.

*Dwight, Harris, Koegel & Caskey* [*Ralph S. Harris, Harold R. Hanley, John R. McCullough, Frederick W. P. Lorenzen* and *John A. Wells* of counsel], for the defendant Standard Oil Company (Indiana).

*Kellogg, Emery & Innes-Brown* [*David Paine, George Koegler* and *James B. Gordon* of counsel], for the defendant directors.

*Davis, Polk, Wardwell, Gardiner & Reed* [*John W. Davis, Edwin F. Blair* and *Taggart Whipple* of counsel], for the defendants Standard Oil Company (N. J.), Standard Oil Company of New Jersey, and Walter C. Teagle.

*John F. Middlemiss* [*A. Lincoln Lavine* of counsel; *Abraham L. Pomerantz* and *Julius Levy* on the brief], for the plaintiff, intervenor, Fred C. Haas.

*David R. Logan,* for the plaintiff, intervenor, Beatrice P. Barry.

ROSENMAN, J. Counsel on both sides have waived findings of fact and conclusions of law. By reason of such waiver, it becomes necessary to discuss in some detail the complicated and multitudi-

nous facts and the conflicting evidence forming the basis of the legal conclusions reached. That explains the unusual length of this opinion. The complexities of the factual and legal disputes in this case are evident in the statement that the trial consumed seventy trial days; it involved the taking of 10,631 pages of stenographer's minutes, the introduction of 1,048 exhibits, many of which are voluminous and contain large collections of related documents, and some of which consist of hundreds of pages, the receipt in evidence of 2,686 additional printed pages of examinations before trial, and the submission during the trial and afterwards of about 2,900 pages of printed briefs.

Not all of the numerous questions of fact can be discussed in any detail, but the essential ones are set forth. As to many of these there was vigorous controversy; and the facts hereinafter stated are those which have been found by the court from the conflicting evidence and exhibits.

### The Parties.

The case involves many millions of dollars. It is a derivative action brought by plaintiffs as stockholders and directors of Pan American Petroleum & Transport Company (a Delaware corporation hereinafter referred to as " Pan Am "). It is based upon the alleged breach of fiduciary obligations by the majority directors of Pan Am and by its majority and dominant stockholder, the Standard Oil Company of Indiana, (an Indiana corporation hereinafter referred to as " Indiana ").

The claim is that the directors and Indiana frustrated the intended " integration " of Pan Am, and prevented its natural development as a self-sufficient oil business; that Indiana and the directors of Pan Am under the domination of Indiana, exploited Pan Am for the benefit of Indiana; that the defendant Standard Oil Company (N. J.) (a New Jersey corporation hereinafter referred to as " New Jersey "), and the Standard Oil Company of New Jersey (incorporated in Delaware), a subsidiary of New Jersey (hereinafter referred to as " New Jersey [Del.]"), were knowing participants in, and beneficiaries of, the alleged breaches of duty, and that they were conspirators with Indiana and with the Pan Am directors in a general scheme to secure benefits from certain transactions involving Pan Am which belonged in justice and equity to Pan Am itself.

The individual plaintiffs were, at the commencement of this action, president and first and executive vice-president respectively of Pan Am. The corporate plaintiff is wholly owned by the Blausteins. The action is unlike the general run of minority stockholders' actions, for the plaintiffs owned, between them, a substan-

tial interest in the corporation — approximately twenty per cent of the stock of Pan Am. The defendant Indiana owned about seventy-eight per cent thereof. The balance was held by the public. Since the commencement of this action, two stockholders have intervened. Louis Blaustein died during the pendency of the action; and at the commencement of the trial, his representatives were substituted as parties plaintiff in his stead.

The relationship between the plaintiffs and the various corporations involved in this controversy is quite complicated. It may best be shown by means of the following chart (p. 606). The chart shows the intercorporate structure as it came into being after March 28, 1933, under a plan of reorganization which forms the basis of this suit.

In addition to these corporations, and not a part of either the Indiana or Pan Am system, are the defendant New Jersey, its wholly owned subsidiary, New Jersey (Del.), and its seventy-two per cent owned subsidiary, Humble Oil & Refining Co. (a Texas corporation hereafter called "Humble"). Indiana owns about seven per cent of the stock of New Jersey. The defendant Teagle is president of New Jersey.

The various other corporations taking part in the transactions involved in this litigation will be referred to as follows:

"Pan Refining": Pan American Refining Corporation; incorporated in Delaware in 1933; a wholly owned subsidiary of Pan Am.

"PAPL": Pan American Pipe Line Company; incorporated in Delaware in 1933; a wholly owned subsidiary of Pan Am.

"Pan Production": Pan American Production Company; incorporated in Delaware in 1935; a wholly owned subsidiary of Pan Am.

"Amoco": The American Oil Company; incorporated in Maryland in 1922; all stock originally owned by Blausteins. Pan Am acquired fifty per cent of the stock in 1923 and the balance in 1933.

"Mexpet": Mexican Petroleum Corporation; incorporated in Maine in 1915; since 1933 a wholly owned subsidiary (except for qualifying shares) of Amoco.

"Lord Baltimore": Lord Baltimore Filling Stations, Inc.; incorporated in Maryland in 1921; since 1933 a wholly owned subsidiary of Amoco.

"Scop": Stanolind Crude Oil Purchasing Company, wholly owned subsidiary of Indiana since 1930; now being

## CHART I

CHART I

Indiana and Pan Am after reorganization of 1933 and as of to-day.

(1) This figure is now 99.15%.

(2) Stanolind Crude Oil Purchasing Co. was dissolved in 1933 and its Texas functions were taken over by Stanolind Oil Purchasing Corp., a newly organized corporation. In this opinion they are treated as one corporation.

(3) This figure was 70% in 1933 but by sale ("put") from Blaustein to Indiana it was raised to 78.64% as of to-day, and Item #

(4) was accordingly reduced from 28% as of 1933 to 20% as of to-day.

dissolved and its functions now being taken over by Stanolind Oil Purchasing Corp., also a wholly owned subsidiary of Indiana.

"SOP": Stanolind Oil Purchasing Company; incorporated in Delaware in 1938; wholly owned subsidiary of Indiana.

"SPL": Stanolind Pipe Line Company; incorporated in Maine; a wholly owned subsidiary of Indiana since 1930.

"SO&G": Stanolind Oil & Gas Company; incorporated in Delaware in 1930; stock ownership shown in Chart I, *supra*.

"HPL": Humble Pipe Line Co.; wholly owned subsidiary of Humble.

"Petro": Petroleum Heat & Power Company; incorporated in Delaware in 1919; Pan Am owns fifty per cent (represented by voting trust certificates) of the stock of Petro.

Of the individual defendants, Jackson & Bullock were not served.

The board of directors of Pan Am consists of nine members. The remaining individual defendants are all the majority directors of Pan Am, and were all nominated to the board by Indiana, the majority stockholder of Pan Am. They have all been directors of Pan Am since February 17, 1933, which is the date after which the actionable wrongs are alleged to have been committed, except Stephens who became a director on May 9, 1933, and Wilson who became a director on November 26, 1934. These gentlemen, in addition to being directors of Pan Am, held or hold offices and directorships in the Pan Am subsidiary companies. Some of them also held offices and directorships in Indiana and in its wholly owned subsidiaries included in the column on the left in the chart above. Since the claim is that the interests of the Indiana group and the interests of the Pan Am group were diverse, and that Indiana as the then seventy per cent (now seventy-eight per cent) stockholder of Pan Am dominated the majority of the Pan Am board to the detriment of Pan Am and for the benefit of Indiana, it is important to note some of the positions which each of the defendants held in some of the corporations in the two groups. They are as follows:

*Pan Am Group.*

Seubert: (1) Member of executive committee of Pan Am since 1927.

(2) Chairman of the board of Pan Am since March 28, 1933.

(3) Director, chairman of the board and member of executive committee of Pan Refining from date of incorporation, March 28, 1933, to date, with about one month's interruption.

(4) Director, chairman of the board and member of the executive committee of Pan Production from date of incorporation May 2, 1935, to date.

### Indiana Group.

A. Director and president of Indiana.

B. Director, chairman of the board and vice-president of SPL.

C. Director (since 1930) and vice-president (since April 8, 1935) of SCOP.

### Pan Am Group.

Barkdull: (1) Director of Pan Am and member of executive committee of Pan Am since 1929.

(2) Director and member of executive committee of Pan Production from date of incorporation, May 2, 1935, to date.

(3) Director and member of executive committee of Pan Refining from date of incorporation, March 28, 1933, to date, with about one month's interruption.

### Indiana Group.

A. Vice-president and treasurer of Indiana since 1928.

B. Director and officer of SCOP since January 1, 1933.

C. Director and officer of SPL since January 1, 1933.

### Pan Am Group.

Stephens: (1) Director and member of executive committee of Pan Am since May 9, 1933.

(2) Director and member of executive committee of Pan Production since May 21, 1935.

### Indiana Group.

A. Director of Indiana from May, 1928, to May, 1929, and from May 11, 1931, to date.

B. Director of SCOP since April 8, 1935.

C. Director of SPL since January 1, 1933.

### Pan Am Group.

McKeever: (1) Director of Pan Am since May 23, 1932.

(2) Various offices in Pan Am since 1932.

    (3)  Director and officer of Pan Refining since 1933 and member of executive committee since March 28, 1933.

    (4)  Director, officer and member of executive committee of PAPL from July 28, 1933, to date.

    (5)  Director, officer and member of executive committee of Pan Production since date of incorporation, May 2, 1935.

### *Indiana Group.*

A.  President of Pan Am Southern.

### *Pan Am Group.*

Wilson:  (1)  Director and member of executive committee of Pan Am since November 26, 1934; president since April 13, 1937; vice-chairman from December 19, 1934, to April 13, 1937.

    (2)  Director and member of executive committee of Pan Refining since December 19, 1934; vice-chairman from December 19, 1934, to March 29, 1937, and president since March 29, 1937.

    (3)  Director and member of executive committee of PAPL since December 19, 1934; chairman from December 19, 1934, to March 29, 1937, and president since March 29, 1937.

    (4)  Director of Pan Production since April 27, 1935; member of executive committee from May 2, 1935, to date; vice-chairman from May 2, 1935, to March 29, 1937, and president since March 29, 1937.

### *Indiana Group.*

A.  Director of Indiana from May 11, 1931, to December 31, 1934.

B.  Vice-president of Indiana from January 1, 1933, to December 31, 1934.

### *Pan Am Group.*

Carroll:  (1)  Director, officer and member of executive committee of Pan Am from 1932.

    (2)  Director, officer and member of executive committee of Pan Refining to date since 1933.

    (3)  Director, member of executive committee, vice-president and treasurer of PAPL since 1933.

    (4)  Director and vice-president and treasurer of Pan Production since May 2, 1935; member of execu-

tive committee from May 2, 1935, to May 21, 1935.

The facts will be discussed with reference to three separate periods of time in chronological order; (1) 1910 to 1923; (2) 1923 to 1932; (3) 1933 to the commencement of this action in January, 1937, each period being relevant to various contentions urged by both plaintiffs and defendants.

### 1910 TO 1923.

The plaintiffs Blaustein began the business of selling gasoline and kerosene at retail in the city of Baltimore, Md., in 1910 under the trade name of American Oil Company. In comparatively few years their retail marketing activities extended over large portions of Maryland, Pennsylvania, the District of Columbia and northern Virginia. Their marketing ability was evidenced almost from the moment they began. Their pioneering and constructive methods led them to produce a blended anti-knock gasoline which they sold under brand names of " Amoco " and " American Strate." They also were among the first to sell such premium gasoline in distinctive color and from visual pumps in regular filling stations.

In 1922 the Blausteins incorporated their business under the name of " American Oil Company " and distributed their products through another wholly owned corporation, Lord Baltimore. In that year their business had so increased that the gross receipts had reached a total of about $4,000,000. However, they experienced difficulty in the conduct of their business. Their principal product was gasoline which they would buy at wholesale from other oil companies and sell at retail. They had no source of supply except companies who were at the same time also competitors of Amoco in retail selling.

Nearly all of these competitors were large oil companies which had their own crude oil fields, and their own pipe lines running from the oil fields to their own refineries, where the crude oil was refined to produce gasoline and other products. These products were then shipped from the refineries to storage tanks owned by the same company located at strategic points. From there the products were transported in their own tank cars (by rail) and tankers (by boat) to various points throughout the United States, and then by their trucks to the various marketing places which they also owned, such as filling stations and garages, and thus sold to the public. Such companies are known in the oil business as " integrated " companies, since they comprise, through subsidiary corporations or departments, a complete cycle and unit from the ownership of crude oil lands to the eventual sale of the finished product to the buying public.

Crude oil is generally refined to produce four principal products: gasoline, kerosene, heating oil and Bunker C or heavy fuel oil; and all of these products are generally produced and marketed by the integrated companies. These integrated companies furnished great competition to Amoco and Lord Baltimore (Amoco's retail distributor) because of their ability to produce at a lower cost than that at which the Blaustein companies could purchase the gasoline.

The largest of these integrated companies was New Jersey, which offered direct competition in the retail sales of its products in Lord Baltimore's territory. From it Amoco was buying nearly all of its products. Consequently the Blausteins sought to become allied with some oil company which had sufficient crude oil reserves, refining and transportation facilities to supply them with their needs, in order that they might compete on a more equal basis with the other integrated companies. It was at that time (1923) that Pan Am came into the situation for the first time.

### 1923 TO 1933.

In 1923, when the Blausteins sought to become affiliated with it, Pan Am was an integrated oil company, although it owned only relatively small marketing facilities for gasoline. It was wholly independent of any of the defendant corporations; and was then one of the leading oil companies of the world. Pan Am had reserves of crude oil both in the United States and Mexico. It also had oil lands in Venezuela. Its refineries were located in Mexico, Louisiana and California; and in 1929 it had completed one of the largest refineries in the world on the island of Aruba in the Dutch West Indies. Pan Am, in addition, owned a large tanker fleet, with convenient ocean terminals on the Atlantic seaboard. Its retail and wholesale marketing business was, for the most part, the sale of fuel oil; its retail sale of gasoline was comparatively a minor part of its business. But even in the gasoline field, it did not compete in the territory covered by the Blausteins. Amoco, on the other hand, sold very little fuel oil at that time, but a great deal of gasoline. Thus it appeared that the union of both corporations would be advantageous to each; since each would supply the deficiencies of the other, and together make a soundly integrated company.

In June, 1923, therefore, the Blausteins, Amoco and Pan Am entered into an affiliation by a contract which, in substance, provided: (a) Pan Am, by its subsidiary Mexpet, agreed to supply Amoco with its entire requirement of gasoline for ten years, ending December 31, 1933, at a price fixed at five and one-quarter cents "under the prevailing tank wagon market price" in Baltimore, Norfolk and Philadelphia at the time of delivery; (b) the Blausteins

sold to Pan Am fifty per cent of their stock ownership in Amoco and Lord Baltimore corporations, the arrangement taking the following form: The stock of Amoco was changed to Class A and Class B, equally; the Blausteins retained the Class B stock, with the right to elect the president and vice-president and general manager of Amoco (thus keeping control in the Blausteins of the marketing business); Pan Am received all of the Class A stock, with the attendant right to elect the secretary and treasurer of Amoco. The board of directors and the executive committee of Amoco were to be divided equally between Pan Am and the Blausteins; (3) during the lives of the Blausteins, each party to the contract had the option to purchase from the other such stock as that party wished to sell. The Blausteins acquired no stock interest in Pan Am at that time.

By means of the contract the two companies together became wholly integrated. Pan Am had the crude reserves, the refineries, the transportation. Amoco had the marketing facilities.

The beneficial effect of this integration was far-reaching. The two Blaustein corporations (Amoco and Lord Baltimore) began to flourish. Their marketing territory was expanded in Maryland, Pennsylvania, Virginia and the District of Columbia and in addition spread into West Virginia, Delaware, North Carolina, South Carolina, Ohio and the southern portion of New Jersey. The sales of crude oil products of those two corporations increased from 32,887,886 gallons in 1924 to 278,050,719 gallons in 1932. Profits rose annually from $353,097 in 1923 to $4,149,200 in 1932.

During the last few years of this arrangement between Amoco and Pan Am, Pan Am produced the crude oil mainly from its reserves in the Lake Maracaibo region of Venezuela. This oil was transported in Pan Am's tankers to its refinery in Aruba. After refining, the gasoline and other products were transported in Pan Am's tankers to its terminals on the eastern seaboard, where Amoco took the gasoline to its various marketing and distributing points for sale. Pan Am took for its own markets along the seaboard, which were rather extensive, the fuel oil and Bunker C oil. As a result Amoco became a vigorous competitor of New Jersey in the sale of gasoline; and Pan Am became a vigorous competitor of New Jersey in the sale of fuel oil.

In 1925 Indiana appeared on the scene. Under Col. R. W. Stewart, Indiana began a policy of expansion and began to buy the stock of Pan Am. In 1927 it acquired control of Pan Am, and by 1929 owned over ninety per cent of the stock of Pan Am. Indiana, therefore, through its subsidiaries Pan Am and Amoco, was competing with New Jersey in the eastern States.

As a result of this purchase by Indiana the corporate structure of Pan Am and Amoco in relation to Indiana and the Blausteins assumed the following form, Chart 2, which continued substantially unchanged until the reorganization of March 28, 1933, later discussed and heretofore illustrated by Chart 1. (See p. 606.)

### CHART 2

**Pan Am intercorporate structure prior to reorganization of 1933**

In March, 1929, after a conspicuous controversy and proxy fight Col. R. W. Stewart was removed as the head of Indiana, and the defendant Seubert became and still is its executive head.

The plaintiff has urged that this was brought about by large stockholders of New Jersey who were also large stockholders of Indiana, viz., the Rockefeller interests, in order to stifle the policy of expansion of Indiana and competition between Indiana and New Jersey. The defendants deny this; and contend that the fight against Colonel Stewart and his removal was occasioned solely by reason of certain charges made against him in connection with the Continental Trading Company, which were then under investigation by a Congressional committee.

Indiana, in July, 1931, caused Pan Am to sell its United States crude oil resources, reserves and pipe lines to two subsidiary corporations of Indiana, SO&G and SPL, for which Pan Am received twenty-five per cent of the stock of SO&G.

During the next year (1932) Indiana also sold to New Jersey the foreign properties of Pan Am, Pan Am's Venezuela crude reserves, Pan Am's refinery at Aruba and Pan Am's tanker fleet.

This sale of Pan Am's foreign properties to New Jersey is stressed by the plaintiffs as one of the major items of a program followed by Indiana, showing a sinister purpose on the part of both Indiana and New Jersey to reduce Pan Am to the status of a mere marketing business, bereft of the necessary means of providing itself with its own crude and refined supplies, to stifle the competition of Pan Am as against New Jersey, and to strangle Pan Am in its efforts to be a self-sufficient company.

The defendants, however, maintain that the sale was the result of business necessity and judgment entered into in good faith for the best interests of Pan Am. As early as 1930 there was agitation in the oil industry to petition the Federal government to place an embargo upon the importation from abroad of petroleum and petroleum products. The campaign for such legislation continued the following year. It caused grave concern to the directors of Pan Am and to Indiana, its ninety-six per cent stockholder. The prospect of a prohibitive excise tax upon Pan Am's importation of its products from its own producing lands and refinery outside of the United States presented an unpleasant picture of the value to Pan Am of its foreign producing and refining facilities. Pan Am's entry into foreign markets had not been entirely successful; and its main source of supply of refined products for its domestic markets would seriously be curtailed, if not entirely destroyed, by such an embargo.

During that year, 1931, therefore, negotiations were commenced by Pan Am with other major oil companies having large American production of crude oil, for the purpose of exploring the possibility of obtaining from them its domestic requirements of crude oil

refined products until further permanent provision could be made therefor. Among the companies approached by Pan Am was New Jersey.

From the negotiations looking toward a supply contract evolved the proposal for the sale to New Jersey of the Pan Am foreign properties which were no longer going to be able to supply the domestic markets of Pan Am if the embargo were passed by the Congress, and which were not necessary to supply the limited Pan Am foreign markets. These suggestions crystallized in the proposed sale at a meeting held at Sea View, N. J., in April, 1932, between representatives of New Jersey, Indiana and Pan Am. At this meeting, which lasted for several days, it became apparent that if Pan Am divested itself of its main source of refined supplies by the sale of its foreign properties, including its production, refining and transportation facilities, it would be necessary for New Jersey to supply Pan Am with sufficient refined products to enable Pan Am in turn to meet its contractual engagements with Amoco made in 1923 until at least the expiration thereof in December, 1933. Agreement thereon was reached. Toward that end various memoranda were drawn embodying the meeting of the minds of the parties as to the particulars of the sale of the foreign properties and the supplies of fuel oil and gasoline.

The first memorandum provided, in substance, that a corporation (later known as Pan American Foreign Corporation) was to be formed whose shares of capital stock would be identical in number with the amount of Pan Am stock then issued and outstanding. To this new corporation, in exchange for all of its issued capital stock, would be transferred all of the foreign assets of Pan Am (whether held through subsidiaries or directly). Thereupon a capital distribution of such shares of the stock of the new corporation would be made to the stockholders of Pan Am, share for share. This would enable Indiana to receive ninety-six per cent of the stock of the new corporation (since it then owned ninety-six per cent of the shares of Pan Am). Indiana would then transfer this Pan Am Foreign Corporation stock to New Jersey for approximately $50,000,000 in cash and about seven per cent of New Jersey stock.

Another memorandum related to New Jersey's agreement to supply Pan Am with its gasoline requirements from May 1, 1932, to December 31, 1933.

A third memorandum related to New Jersey's agreement to sell to Pan Am sufficient quantity of fuel oil to cover the latter's existing commitments for a period of five years and from year to year thereafter, subject to termination by either party upon one year's notice.

Later, formal contracts embodying the substance of those memo-

randa were executed; and the acts agreed upon were, in fact, consummated. The contracts for the sale of gasoline and fuel oil were executed by New Jersey (Del.) and Mexpet.

Two other memoranda were contemporaneously drawn at the Sea View conference. These memoranda, which plaintiffs characterize as " secret options," were disclosed to plaintiffs, they say, for the first time upon their examination of defendant New Jersey before trial in this action.

They were initialled by defendants Teagle and Seubert. The first of these so-called " secret options " provided that New Jersey was to have the option to purchase Pan Am's " domestic retail marketing facilities in the Northern Division and/or Southern Division at their depreciated book value as of the date of the exercise of the option." The option ran until December 31, 1933, but was not to be construed to prevent " a sale or merger or consolidation agreement with " Amoco. In the event of New Jersey's not taking up the option it would, at Pan Am's request, aid in making a sale thereof to others. The second of these " secret options " provided that New Jersey was to have an option, for a period of five years from May 1, 1932, to purchase Pan Am's " domestic fuel oil facilities (including refineries) * * * at the depreciated book value thereof at the time such option is exercised." If at the end of the five-year period, Pan Am still had them, New Jersey agreed to purchase them at their depreciated book value.

The claim of the plaintiffs is that the sale of the foreign properties and the resulting fuel oil and gasoline contracts were not induced by the impending tariff on imported petroleum products legislation but that the main purpose and motive were the disposing by Indiana to New Jersey of the means by which effective competition by Pan Am could be stifled; that the options for the gasoline marketing and domestic fuel oil facilities of Pan Am, once exercised after the sale of the foreign properties, would practically put Pan Am out of business.

On the other hand, the defendants claim that these options were memoranda only and were not considered binding agreements; that they were never reduced to formal contracts as were the other memoranda. It was thought by New Jersey to be but a trading point for Pan Am in the event the fuel oil and gasoline contracts were not renewed by New Jersey, in view of the fact that the Pan Am domestic fuel oil properties would then be quite valueless to Pan Am. In any event, they say that during the later merger negotiations between Pan Am and Amoco, these memoranda options were voluntarily surrendered, leaving those parties free to complete any arrangements they wished without hindrance from New Jersey;

and that the first " secret " memorandum specifically so provided. In addition, the defendants claim that the Blausteins knew of these options at the time; and that consequently these memoranda had no effect upon the real purposes for the sale of the foreign properties, namely, to overcome the effect of the possible embargo, and to insure Pan Am a source of supply adequate to the fulfilment of its domestic marketing needs.

The Congress, soon after the Sea View conference was implemented, did enact an import duty of one-half cent per gallon of crude and heavy fuel oil and two and one-half cents per gallon of gasoline, reducing to a minimum the importation of these products from foreign countries.

The picture presented after these various transactions was: (1) New Jersey was to satisfy Pan Am's gasoline requirements, up to 18,000,000 barrels, for the period from May 1, 1932, to December 31, 1933; (2) New Jersey was to supply Pan Am with its Bunker C fuel oil commitments up to 16,500,000 barrels per year for the period of five years from May 1, 1932 (with a partial extension by option until August 1, 1940); (3) Pan Am no longer had its foreign producing properties, refinery or tanker fleet; (4) at the end of the fuel oil and gasoline contracts Pan Am would be compelled to make other arrangements for its supplies; (5) Pan Am was no longer an independent, integrated oil company even in collaboration with Amoco and Lord Baltimore; and Amoco (and the Blausteins) were once more dependent upon New Jersey which remained its biggest competitor.

In the early part of May, 1932, the Blausteins claim they learned of the proposed sale of Pan Am's foreign properties through press announcements. They knew that it would break up the contractual integration between Pan Am and Amoco which had contributed so much to the success of Amoco. Upon learning that a stockholders' meeting was to be called for May 23, 1932, for the purpose of ratifying such sale, the Blausteins, who had in April, 1932, bought a small quantity of Pan Am stock, retained counsel for the purpose of instituting an action to prevent the consummation of the deal. Thereafter, and on or about May 20, 1932, a conference was had between the Blausteins, defendants Barkdull and Jackson, R. G. Stewart, and the attorneys representing the various parties concerned, in order that the whole situation be discussed and straightened out. Although tentative proposals for settlement were reached and embodied in a letter of that date, nothing definite was accomplished.

Controversial negotiations continued, however. In July, 1932, a meeting was held at White Sulphur Springs between Jacob

Blaustein, his lawyer Steinman, Stephens, Barkdull, Seubert, McKeever and Tappen, an attorney for Pan Am. This meeting, which covered about a week of discussion, culminated in the signing of the so-called "White Sulphur Agreement" of July 15, 1932, between Indiana, Pan Am and the Blausteins.

It provided for a consolidation of Pan Am and Amoco by which the Blausteins would receive about twenty-six per cent and Indiana about seventy per cent of Pan Am stock. It also provided for the construction by the new company of a refinery with a 40,000-barrel per day capacity of crude oil and for the acquisition of necessary crude oil properties. It specified equal representation on the boards and committees of the new company for the Blausteins and Indiana, etc. Three days later this agreement was approved by the board of directors of Indiana.

However, controversy arose in connection with this White Sulphur agreement, and the agreement was canceled by mutual consent in an exchange of letters dated October 18 and 22, 1932, between Indiana and the Blausteins.

In November of 1932 there was a renewal of negotiations. Finally an agreement was signed on February 17, 1933. This agreement was the beginning of the third period in the history of this controversy.

1933 TO JANUARY 1, 1937, THE COMMENCEMENT OF THIS ACTION.

On February 17, 1933, Indiana (by defendant Barkdull, its vice-president), Pan Am (by defendant McKeever, its president), Amoco (by Louis Blaustein, its president), and Lord Baltimore (by Alvin Thalheimer, its president), signed an agreement (hereinafter referred to as the "definitive agreement") relating to the merger of Pan Am and Amoco. Its execution was dated as of January 1, 1933, and was "subject to approval of the Boards of Directors of Indiana and Pan Am by February 21, 1933."

The salient parts of this contract are substantially as follows:

(1) The named corporations, other than Indiana, were to be reorganized. "The purpose of this agreement is to effect a reorganization of Pan-Am (including subsidiaries), American [Amoco] and Lord Baltimore, to form a complete cycle and unit in the oil business which will acquire property and produce therefrom its own sufficient reserves of crude oil and raw products, refine and manufacture same into gasoline and other derivatives and combinations and, within the limits of continental United States, market the various products." In other words, Pan Am was to become an integrated company.

(2) Pan Am was to acquire from the Blausteins the balance of the stock of Amoco, so that it would become the sole owner of Amoco and Lord Baltimore.

(3) The Blausteins were to have the right to name respectively three and two members of the board of directors and executive committee of Pan Am, which were to consist respectively of nine and seven members. This right of representation by the Blausteins was also to apply proportionately to all subsidiaries of Pan Am.

By virtue of its stock ownership, Indiana, of course, named the remaining six and five members respectively.

The Blausteins were to become president and first and executive vice-president respectively of Pan Am, to hold those positions so long as the management contract (thereinafter provided for) should continue.

(4) Pan Am agreed " to provide a refining capacity (including necessary cracking units) for a thru-put of 40,000 barrels of crude oil per calendar day, making a maximum efficient yield of gasoline." The details in this agreement with respect to refining are discussed hereafter under the subject of the refinery.

(5) Pan Am was to " actively proceed to secure its own sufficient crude oil production as a reserve for the requirements of Pan-Am and for such purpose shall immediately allocate an initial sum of $3,000,000.00, to be expended under the supervision of the Board of Directors for the acquisition of crude oil producing properties." All parties agreed " to use their best efforts, resources and personnel to propose, establish and carry out a program for the establishment and maintenance of a backlog of crude oil properties sufficient for the operation of Pan-Am." Budgets for crude oil and raw products were also provided for.

(6) The Blausteins were to direct and mar age all marketing operations of Pan Am for four years at specified salaries, and they were to be the chairman of the board and president and general manager respectively of Amoco, which became the chief marketing subsidiary of the reorganized corporation.

(7) The Blausteins received 1,286,876 shares of Pan Am stock of the total issued, i. e., 4,702,945, as the result of the reorganization of Pan Am and the affiliated corporations.

(8) Under specified conditions, the Blausteins were empowered to demand from Indiana that it purchase their stock at the book value thereof plus $1, but not less than $13.52 per share.

(9) There were certain properties of Pan Am excluded from the reorganization which were transferred to a corporation to be formed (Pan American Southern Corporation), and were not part of this definitive agreement.

The definitive agreement was ratified by the directors of Indiana and Pan Am on February 20, 1933. Pursuant to a call for a stockholders' meeting for the purpose of ratifying the reorganization, a stockholders' meeting of Pan Am was held on March 27, 1933. At that meeting both Mr. Seubert, president of Indiana, and Mr. McKeever, president of Pan Am, spoke on behalf of the ratification, pointing out the advantages in merging the corporations. The plan of merger and reorganization was fully presented to the meeting and discussed; but the precise terms of the definitive contract were not submitted to the meeting. The stockholders voted overwhelmingly in favor of the ratification.

The plaintiffs claim that this definitive agreement should have been the guide for future action to be followed by the board of directors with respect to the integration of Pan Am. They do not claim, nor can they, that this contract was to be the sole motivating guide in the actions to be taken by the directors. They urge that it did express the then existing best business judgment of all the signatories and of their boards of directors, as to what constituted the best policy for the advancement of the well-being of Pan Am. Their complaint is that the defendants disregarded that agreement, and that what defendants did after its execution was not in furtherance of the interests of Pan Am, but was for the benefit of Indiana and the other defendants. The defendants, on the other hand, claim that they adhered to the basic principles underlying that agreement; but that economic, legal and other factual conditions arose after its execution which made it impossible to carry out its terms as therein set out; and that they used their best business judgment in acting as they did.

THE ROLE OF THE DEFINITIVE AGREEMENT OF FEBRUARY 17, 1933.

The fact is that Indiana and the board of directors of Pan Am did not carry out the provisions of the definitive agreement as they agreed. This is, however, not an action *ex contractu* by the Blausteins as a party to the contract. Instead of bringing an action on the contract, they have elected to bring this derivative suit as minority stockholders and directors of Pan Am, against the majority stockholder (Indiana) and the majority directors of Pan Am, on the ground of fraud, conspiracy, waste, negligence and breach of trust. The New Jersey defendants have been made parties on the theory that they knowingly participated in, and profited by, the fraud and breach of trust.

The suit must, therefore, be considered in the same light as if it had been brought by any other minority stockholder who, unlike the Blausteins, was not a party to the definitive contract and who

had no individual rights under it. The definitive contract in such a suit would be admissible in evidence, but not as the basis of a contractual action. The same result follows here.

The plan of reorganization, which was submitted to the stockholders of Pan Am and approved, as well as the definitive agreement itself, called for a fully integrated Pan Am corporation. Integration was particularly significant since Pan Am had just recently (April 30, 1932) been disintegrated by reason of the sale to New Jersey of its crude oil supplies, refinery and transportation facilities, and had been left with only its own marketing facilities and those of Amoco—dependent for supplies, refinery and transportation upon a competitor.

The definitive agreement, therefore, was a general statement, approved by Indiana and most of the defendants, and subscribed by Indiana and by others, as to what were the best interests of, and policies for, Pan Am, as of February 17, 1933, the date of its execution. Such a statement, of course, does not mean that the plan of the agreement had to be followed to the letter, in so far as legal rights and duties in this stockholder's action are concerned. Nor does it mean that it could not be deviated from in the future, should conditions change.

In view of the fact that it is determined elsewhere in this opinion that Indiana became a fiduciary of Pan Am by reason of its domination and control as a majority stockholder, the definitive agreement is also significant as outlining the affirmative obligation which the fiduciary assumed to the *cestui*. It was a declaration of independence for Pan Am by Indiana, its trustee — a guaranty that Indiana would not use Pan Am for its own benefit, as a part of its own empire, but would treat it as an independent entity. Of course, as later pointed out, this is only the duty owing by any dominant stockholder to minority stockholders. In this case, however, there was not only this duty imposed by equity and principles of fair dealing; there was a duty emphasized and reinforced by solemn contract.

The agreement is also important as indicating that all of the elements of integration — production, purchasing, transportation, refining and marketing — were functions which legitimately and logically belonged to Pan Am. The carrying out of these functions was, therefore, a business opportunity of Pan Am, which Pan Am should have been allowed to perform on its own account, unless some justification existed for Indiana to take them over as the plaintiffs allege they did.

In four respects it is claimed that the defendants broke the letter or the spirit of the agreement. As to (1) the refinery and (2) the

purchase of crude reserves, the express provisions of the contract were disregarded; as to (3) crude oil purchasing, and (4) pipe line transportation, necessary to the full integration of Pan Am, the implied intention and avowed purpose of the agreement and reorganization was violated. Each of these separate charges and the defenses urged by the defendants as to each will be discussed seriatim.

REFINERY.

The first act of the defendants about which the plaintiffs complain, as constituting not only a breach of the definitive agreement but also a refusal to reintegrate Pan Am in accordance with the plan of reorganization, was in connection with the refinery for Pan Am.

The definitive agreement was very clear and explicit in this connection. It stated that Pan Am agreed to provide a refinery " for a thru-put of 40,000 barrels of crude oil per calendar day, making a maximum efficient yield of gasoline." The final date of completion was fixed at February 10, 1934, " provided such date of completion is reasonably possible." The definitive agreement also provided that the construction and allotment of contracts for the refinery " shall be under the direction of Indiana." In case the refining units were not completed on the dates specified in the estimates, Indiana agreed " to indemnify Pan-Am for the difference (if any) in the price Pan-Am is required to pay for products purchased and the prices at which the estimates fixed the cost of products."

The capacity of the refinery was figured on the basis of the known marketing needs of Pan Am for gasoline at that time, which were 10,000,000 barrels of gasoline per year. A refinery " making a maximum efficient yield of gasoline " is a refinery which produces only two products from the crude oil, namely, gasoline and Bunker C fuel oil. A refinery which is run so as to produce the usual four refined products of crude oil, namely, gasoline, kerosene, No. 2 heating oil and Bunker C or heavy fuel oil, does not make the maximum yield of gasoline from the crude. When a refinery runs on four products, it will, therefore, require a larger number of barrels of crude oil to make the same amount of gasoline than a refinery which runs to produce only two products. In view of the fact that the refinery to be constructed by Pan Am contemplated four products, it was generally assumed that the capacity of the refinery mentioned in the definitive agreement was to be 48,000 barrels of crude oil per calendar day.

In 1933, instead of constructing a refinery large enough to provide this amount of gasoline, the board of Pan Am decided to construct a refinery of approximately half that size; and to make a contract

with Humble for three years, whereby Humble agreed to process the remaining half of the Pan Am needs from crude to be delivered by Pan Am to Humble's own refinery at Baytown, Tex.

The refinery unit that was constructed by Pan Am (hereinafter referred to as the No. 1 Unit) was completed by April, 1934, with a capacity of producing approximately 5,000,000 barrels of gasoline per year, only one-half of Pan Am's gasoline requirements. The plaintiffs' contention is that two such units should have been constructed as required in the definitive agreement, so as to produce the full 10,000,000 barrels needed by Pan Am for its business.

They claim that the cost of processing the remaining estimated 5,000,000 barrels for the three-year period was approximately $3,000,000 more than the cost to Pan Am would have been if it had constructed a second unit like the first and had operated it for the three years during which the processing contract was in effect. The plaintiffs' position is that, if the board of Pan Am had constructed a refinery of the capacity provided for by the definitive agreement either in one unit of 48,000 barrels capacity or in two units of 24,000 barrels capacity each, this excess cost of processing would have been saved; and that the acts of the board in making the processing contract, over the objection of the three Blaustein directors, were acts of misfeasance, violation of duty, and waste, for which the directors are liable.

The plaintiffs claim that, pursuant to a general conspiracy between Indiana and New Jersey to help New Jersey and to give it profitable business opportunities at the expense of Pan Am, the six majority members of the board of Pan Am who had been nominated by Indiana and who were dominated by it, voted to award this processing contract to Humble, the subsidiary of New Jersey. They point to the fact that the contract entered into on April 30, 1932, between New Jersey (Del.) and Mexpet, the subsidiary of Pan Am, whereby New Jersey (Del.) was selling to Mexpet all of the requirements of Amoco, was about to expire on December 31, 1933; that by reason of the fact that New Jersey's foreign sales were now being largely filled from the foreign properties which it had lately acquired from Pan Am in 1932, it would be quite a problem for New Jersey to find a new domestic customer for this large quantity of gasoline after December 31, 1933, if Pan Am should construct its own refinery. The contention is, therefore, that this arrangement was made between Indiana and New Jersey, presumably at the suggestion of common large holders of stock in both corporations, for the purpose of taking care of the loss of Pan Am as a customer through Mexpet which threatened New Jersey at the end of that year.

The defendants' contention, on the other hand, is that they used their best business judgment in coming to the conclusion that it was better for the interests of Pan Am to go slowly in its new construction program and to build only one-half of the contemplated refinery capacity at a time. The various considerations which influenced their decision will be described in greater detail, but in general they were: (1) The economic conditions which prevailed through the United States during March and April of 1933, particularly the national bank holiday declared on March 6, 1933, and the complete and chaotic demoralization of the entire petroleum industry; (2) the feeling that the Federal government would step in to regulate the petroleum industry in some way, as was later borne out by the National Industrial Recovery Act, and the petroleum code thereunder; (3) doubts as to the efficiency and flexibility of so large a unit as even a 24,000-barrel unit which at that time was larger than any refinery unit in the entire world.

Starting with the White Sulphur agreement of July, 1932, all of the negotiations between the Blausteins and the representatives of Indiana and Pan Am had treated the refinery as one of the fundamental items of the proposed merger. The refinery under contemplation during all this period was a refinery of the size finally provided for in the definitive agreement. Even before the definitive agreement was signed, a refinery for Pan Am had also been considered independently by the directors of Pan Am, without relation either to the agreement or to the Blausteins. For, after the sale of the Pan Am foreign properties, which included the refineries from which the Pan Am requirements had been obtained, it had become absolutely necessary for Pan Am to look around for a new refinery.

Starting in August, 1932, long before the merger of Pan Am and Amoco, various estimates were made by the personnel of Pan Am and of Indiana (its ninety-six per cent stockholder) with respect to the construction of new refinery capacity. After the White Sulphur agreement was definitely rescinded, there was increased activity along these lines on the part of the technical refinery experts of Pan Am and of Indiana.

These plans for a contemplated new refinery reached the ears of the officers of New Jersey before the definitive agreement was signed. At this time New Jersey through New Jersey (Del.) had a contract to furnish Pan Am (through Mexpet, its 100 per cent subsidiary) with all its gasoline requirements up to the end of 1933 and its Bunker C fuel oil requirements up to May, 1937. New Jersey approached Pan Am and Indiana with the suggestion that New Jersey (through its subsidiary, Humble) might process some or all

of the Pan Am requirements in the Humble refinery at Baytown so that the new refinery for Pan Am might be reduced in proposed size or eliminated altogether. Pan Am, which was purchasing nearly all its gasoline from New Jersey, appeared willing to make a processing contract if such an arrangement would enable them to get their gasoline more cheaply than they were buying it. Under the suggested processing arrangement, Pan Am would deliver its own crude to the Humble refinery at Baytown, Texas; there it would be refined into refined products as specified, which would then be taken away by Pan Am and delivered to its own markets. Humble would be paid only for its services in processing Pan Am's crude oil into those refined products.

Accordingly, even before the definitive agreement was signed, a meeting was held on January 11 and 12, 1933, between the refining experts of New Jersey (Del.), Humble, Pan Am and Indiana to explore the possibility of such a contract, and to compare the relative cost to Pan Am of processing by Humble on the one hand, and building a refinery by Pan Am on the other hand, to do its own refining. A proposal by the New Jersey representatives was there made to process at thirty-three cents per barrel. A second conference was held in Chicago on February 10, 11 and 13, 1933, to discuss in detail this figure. The Pan Am and Indiana experts, during this period, were contending that the processing figure of Humble was too high; and the New Jersey representatives were endeavoring to show the others that their refining figures were too low.

No agreement was reached, and these discussions came to an end when the definitive agreement was signed.

At the same time the negotiations were being carried on between Indiana, Pan Am and the Blausteins, which finally led to the definitive agreement. The Blausteins complain that they were not being advised of the separate negotiations being carried on contemporaneously between Indiana and New Jersey. The explanation offered is that there was no reason why either New Jersey or Blausteins should be informed of the negotiations being conducted by Indiana with the other. Seubert's testimony is that there was nothing definite as yet with either side; that they were trying to protect the Indiana interest in Pan Am, and that if negotiations with the one failed, they could look to the other. The explanation is a valid one under the circumstances.

After the definitive agreement was signed on February 17, 1933, the banking situation in the United States, which had become serious, quickly worked to a climax on March 6, 1933, when the national bank holiday was declared by the President. Other symptoms of a chaotic state of business depression were apparent.

On the next day, March 7, and on March 8, 1933, the directors of Pan Am had their first meeting with the Blausteins since the execution of the definitive agreement. Seubert, Barkdull and McKeever testified that during that meeting Seubert discussed the chaotic conditions then prevalent and raised the question as to whether it was advisable to go ahead with the building of a refinery in the light of those conditions, particularly in the oil business.

This is denied by Jacob Blaustein, who testified that the first time they ever heard about any hesitation or doubt with respect to the construction of the refinery was on March 28, 1933, after the stockholders of Pan Am had agreed to the reorganization provided for in connection with the definitive agreement, and after the Blausteins had surrendered their Amoco stock in exchange for a minority of Pan Am stock as provided in the reorganization plan.

There is conflicting evidence on this point. My finding is that the first time that the Blausteins were informed by Seubert or any one that there was serious question in the minds of the directors about the size of the refinery was at the meeting of March 28, 1933.

On March 18, 1933, Seubert, then on a business and inspection trip with other members of the American Petroleum Institute, met Teagle, the president of New Jersey, in Tulsa. Teagle expressed grave concern that Pan Am should be building a new refinery at a time when business in general, and the petroleum business in particular, was in such a demoralized state. Teagle wanted to get a contract for Humble to process some or all of Pan Am's crude. Seubert told him that there was a contract in existence with the Blausteins with respect to this refinery, and that he could not come to any final understanding with Teagle without the Blausteins' presence. When Seubert returned from his trip, a meeting was arranged for March 30, 1933, between the Blausteins, Seubert and Teagle.

Although the evidence is conflicting, I find that the Blausteins knew at least by March twenty-first what the subject of the proposed meeting with Teagle was going to be, although they did not know before the meeting of March twenty-eighth that Seubert was actually in favor of any processing arrangement or had any serious doubts in his own mind as to the size of the refinery.

At this meeting of March twenty-eighth, which followed the formal completion of the reorganization, Seubert discussed the general economic conditions in the country and the unsettled situation in the petroleum industry in particular. He raised the question as to whether the financial condition of the reorganized Pan Am and the general economic conditions warranted the capital investment required for acquisition of crude properties, refinery construc-

tion and marketing expansion. He also referred to recent negotiations with representatives of New Jersey with respect to the processing contract which would provide gasoline at a cost below their existing contract, and would at the same time approach the price at which they could themselves refine crude in their own plant. He suggested that they meet with Teagle. The Blausteins agreed.

The meeting with Teagle and Stewart of New Jersey was held March 30, 1933; and was attended by the Blausteins, Seubert and some of the other directors of Pan Am. At this meeting Teagle referred also to the disastrous conditions in the oil industry, stating that he had just come from Washington where he and other oil men and representatives of Governors of the various oil States had been attempting to work out some solution. He mentioned the over-expansion and over-development in the oil industry including production, manufacturing, marketing, refineries, etc. He pointed out that if the oil industry did not put its own house in order the majority of people in Washington felt that the industry was facing Federal control; that refinery capacity was then operating on a sixty per cent basis. He also stated that if Pan Am built a large refinery in the Gulf, New Jersey would have an excess of 10,000,000 barrels of gasoline produced in connection with their contract to supply the fuel oil for Pan Am until 1937, and that this gasoline would have to be dumped upon the market. There was a general discussion on the subject. Seubert stated that the proposed processing price of thirty-three cents per barrel was too high; but that the general economic and business conditions should be given their due consideration; and that his mind was still open on the subject. The Blausteins pointed out the necessity of Pan Am being integrated instead of buying its gasoline or having it processed by a competitor; and suggested that Pan Am might relieve New Jersey of its fuel oil commitments to the extent that fuel oil would be produced by the new Pan Am refinery in producing Pan Am's gasoline requirements.

New Jersey offered to process at twenty-five cents per barrel for the full 40,000 barrels per day or twenty-eight cents per barrel for the half capacity or 20,000 barrels per day.

After the New Jersey representatives withdrew from the meeting, Seubert stated that in view of the present economic conditions, the earnings of the company, the amount of funds available, and the disruption of the markets which would come from the dumping which Teagle had threatened, he was not certain that the company should proceed with the full program of refinery construction. He was inclined to take the middle road, although he had not yet made up his mind. The other nominees of Indiana on the board of Pan

Am agreed with him; but nothing definite was done about it. Seubert later testified that although he agreed at the time with Teagle's views as expressed at that meeting, he regarded Teagle's threat with respect to dumping surplus gasoline as merely a sales talk by which Teagle and Stewart were trying to sell Pan Am a processing contract.

At the next meeting of the Pan Am board on April 5 and 6, 1933, there was further discussion of the processing contract. It was finally voted that a 24,000-barrel refinery be constructed at Houston, Texas (subsequently changed to Texas City because of title difficulties) and that efforts be made to make a processing contract for the balance of the 24,000. The Indiana nominees on the Pan Am board all voted for this proposal; and the Blausteins' three nominees all voted against it.

At this meeting the minutes indicate that Seubert stated that the refinery matter had been discussed in detail at a full meeting of the Indiana board in Chicago on April 3, 1933, and that he was ready to advise the Pan Am board of the views of the Indiana board on the matter. This, Seubert claims, is an error; and that he merely took it up with some of his Indiana associates. The minutes of the Indiana meeting of that date bear him out. This is illuminating on the question of domination by Indiana of Pan Am even though it was not discussed at a full formal meeting of the Indiana board as the plaintiffs claim.

Between April tenth and April twentieth an offer was received by Seubert from Stewart for processing by Humble at twenty-two and one-half cents per barrel of crude oil. On April 20, 1933, the next meeting of the directors of Pan Am, the board authorized the making of a contract at this price over the negative votes of the Blaustein directors. The contract was formally approved at the meeting of Pan Refining on July 28, 1933, after numerous and protracted conferences between the experts of the various companies.

Under the processing contract (which expired December 31, 1936, and was renewed by exercising options until July 1, 1937), Pan Am agreed to deliver to Humble for processing at its refinery at Baytown, 20,000 to 28,000 barrels of crude per calendar day from January 1, 1934, to December 21, 1936, at twenty-two and one-half cents per barrel, subject to increase in case the price of labor or materials increased. The percentages of gasoline, kerosene, No. 2 fuel oil, and Bunker C fuel oil, respectively to be produced from the crude, were all set forth in the contract. Changes in these percentages or in the described quality of the products might be made on revised prices.

The first unit of 24,000 barrels capacity was finished and went into operation in April, 1934, with full capacity achieved two months later.

On April 15, 1936, Pan Refining voted to proceed with plans for the construction of a new refinery unit, unit No. 2. It was built and went into operation in February, 1937. It was of larger capacity than No. 1 unit, and made higher octane gasoline since it was adaptable to Gulf Coast crude which produced a higher octane gas than the crude from the East Texas field for which unit No. 1 was designed. Unit No. 2 contained other technical improvements in the art of refinery construction not possible in 1933 when unit No 1 was built. Nor could unit No. 1 be remodeled to equal unit No 2 except at considerable outlay of money varying, according to the defendants' experts, from $500,000 to $1,000,000.

The demand for refining capacity increased and on November 24, 1936, a third unit was authorized (Blausteins not voting).

In addition to these three combination units and necessary appurtenances, there have been constructed and placed in operation at the Texas City refinery:

1. A polymerization plant which makes very high octane polymer gasoline out of gas which either would have been burned as fuel or wasted.

2. A No. 1 pipe still, used to manufacture a high quality furnace oil.

3. A No 2 pipe still, used to handle heavy (Cayuga) crude for Pan Am Refining's asphalt refineries.

Pan Refining is also now building a catalytic reforming unit, a very large unit further to improve the octane of gasoline by a still different process.

Thus, to date, Pan Refining has erected, in addition to the necessary auxiliary equipment, and now has in operation:

1. No. 1 unit which ran about 33,0C0 barrels per calendar day during 1939.

2. No. 2 unit which ran about 35,000 barrels per calendar day during 1939.

3. No. 3 unit which ran about 12,000 barrels per calendar day during 1939.

4. The polymerization plant which made 1,800 barrels of polymer gasoline per calendar day during 1939.

5. No. 1 and No. 2 pipe stills.

Wilson testified: "We are planning, though it has not been definitely approved, the construction of a lubricating oil plant, in the space between the office building and the vacuum tank farm. The total refinery occupies an area of about 750 acres, and we are

currently running about 88,000 barrels of crude per calendar day. After June 1st, when we are making some changes and building a new heater for No. 1 unit, we will raise that to about 93,000 barrels per day."

Referring again to the original No. 1 unit authorization, it is clear that Indiana and the defendant directors of Pan Am knew in March and April, 1933, that the failure to build the second half of the refinery mentioned in the definitive agreement and the substitution of a processing contract for half of Pan Am's requirements would cost Pan Am a great deal of money each year that the processing contract continued. The plaintiffs claim that the loss was in excess of $1,000,000 per year. The estimates prepared by Indiana experts and submitted to Seubert before the final action of the board, indicated that the second unit of the refinery could have been built for only $3,506,000 and that on a basis of twenty-two and one-half cents per barrel charge; the additional investment necessary to build the second half of the refinery would have been completely paid out in about three years on the money saved by its own refining instead of having its oil processed elsewhere. The estimates showed a contemplated cost of operation for the second half of the refinery for three years to be $2,000,000. Adding this to the proposed cost of construction gives $5,506,000. As against this, the minimum commitment to Humble (20,000 barrels per day), multiplied by twenty-two and one-half, amounted to $5,000,000 per year.

With respect to these estimates the defendants argue that the experts were figuring operating costs in a proposed unit larger than any existing unit in the world. They sufficiently point out that a safety factor of ten per cent to twenty per cent should have been added, which would have increased the payout period beyond that claimed by the plaintiffs. Furthermore, the kind of yields in the estimate were not beyond doubt of realization in this unprecedented refinery. The defendants also urge that owing to rapid obsolescence in refinery equipment, a payout of three years is not always to be deemed very attractive; and one of their refinery experts so testified.

The damages claimed on this part of the complaint is about $3,000,000 or about $1,000,000 excess cost of processing over refining for each year of the three-year processing contract.

### CRUDE PRODUCING PROPERTIES.

The second respect in which the plaintiffs claim that the definitive agreement was broken, and the second specification on which they claim that the directors and Indiana violated their duties relative to the interests of Pan Am, is in connection with the acquisition of crude oil producing real estate.

The definitive agreement was very clear on the question of crude oil reserves.

It provided that Pan Am should " actively proceed to secure its own sufficient crude oil production as a reserve for the requirements of Pan-Am, and for such purpose shall immediately allocate an initial sum of $3,000,000 to be expended under the supervision of the Board of Directors for the acquisition of crude oil producing properties." It further provided that all the parties to the agreement (which include Indiana) were " to use their best efforts, resources and personnel to propose, establish and carry out a program for the establishment and maintenance of a backlog of crude oil properties sufficient for the operations of Pan-Am." It further specified that until Pan Am succeeded in accumulating a reserve necessary for its requirements it should have the option to require Indiana to supply, and Indiana agreed to supply, any deficiency at " 'average prevailing field prices' to the extent of its ability and without loss to itself."

It is generally conceded that an oil company which has its own crude oil producing properties from which it may receive a steady stream of supply has a great advantage over competitors who do not have such independence of supply, and who have to go out and buy their crude. It is one of the important elements of integration in the oil industry. All of the large integrated companies have adopted the policy of acquiring a large backlog of crude oil reserves of their own.

It was particularly important for Pan Am immediately upon reorganization to begin to obtain crude oil properties, because it had, during 1931 and 1932, been separated from its foreign and domestic reserves of crude. At the time of the reorganization, Pan Am no longer owned any consequential independent oil producing properties. Therefore, the definitive agreement, in addition to its contractual implications, would seem to be a fair statement of at least a *prima facie* obligation in this regard imposed upon the directors of Pan Am. In the memorandum of July 15, 1932 (the White Sulphur agreement), similar provision had been made to proceed actively and promptly in the acquisition of crude oil properties. The various written drafts of the definitive agreement contained the same agreements for acquiring crude oil properties for Pan Am. The definitive agreement does not mention the proposed locale of the properties which the parties had in mind; but the inference is clear that all of the parties intended principally the oil fields of East Texas and the Gulf Coast.

Although the definitive agreement and the best interests of Pan Am required immediate and active acquisition of oil-producing

properties, the fact is that no subsidiary of Pan Am was organized to acquire such property until May, 1935 (Pan Production), and no actual properties were purchased until September, 1935. The only reason advanced by the defendant directors and Indiana for the failure sooner to approve the acquisition of crude properties or to organize a subsidiary for that purpose, was a legal opinion advanced by Stephens on which they all relied, that the Texas anti-trust laws made it illegal for Pan Am to engage in the business of producing crude oil required for its contemplated refinery, or to organize a subsidiary for that purpose.

During all of the preliminary negotiations leading up to the final definitive agreement of February 17, 1933, lasting over seven months, one of the fundamentals insisted upon by the plaintiffs was the acquisition of crude oil properties and the production of crude oil therefrom, generally along the lines of the provisions which were finally included in the definitive agreement.

In all of the written memoranda, drafts and letters throughout this period and up until March 28, 1933, there was no intimation by the defendants, or by any one representing them, that there was any serious question in their minds as to the legality of the proposal under the Texas anti-trust laws. I also find that up to March 28, 1933, there was no oral statement or warning made by the defendants or their representatives to the plaintiffs with respect to this subject.

The defendants claim that during the conference at White Sulphur the representatives of Indiana did point out the doubt which was in their minds with respect to these Texas statutes, although they admit that no written record of it was made. It is difficult to believe that, in a transaction of such importance, this one very fundamental question would have been allowed to remain doubtful even up to the time of the signing of the agreement; or at least, that no reservation would have been made in writing with respect to such doubts, especially in view of paragraph IX-L excluding oral representations or warranties. It is my finding that when the definitive agreement was executed and up to the time that the plaintiffs surrendered their stock, no question had been expressed by the defendants to the plaintiffs with respect to the acquisition of producing properties based on any fear of the Texas anti-trust laws.

While it is true that the plaintiffs in this derivative action should not be accorded any advantage by reason of this concealment from them, this finding of fact is important in passing upon the genuineness of the claim later raised by the defendants that crude production and the purchase of crude reserves by Pan Am were impossible because of the Texas statutes.

After the definitive agreement was signed and during the period when the directors of Pan Am and Indiana were formally ratifying it, and were drafting, executing and approving the plan of reorganization and all the necessary accompanying documents, and even at the meeting at which the formal approval of the stockholders was being obtained, no mention was made in any of the documents as to any possible illegality. During this period, however, there was some discussion between counsel for Pan Am (Tappen), and counsel for the Blausteins (Steinman), as to whether the proposed production subsidiary of Pan Am should be incorporated in Delaware or in Texas. The considerations there involved, however, were solely with respect to the organization tax and technical corporate procedure; and did not refer to any claim of illegality by reason of any anti-trust laws.

On March seventh, however, the question of the anti-trust laws of Texas was being considered by Seubert and Barkdull and by Indiana counsel (Fellingham, assistant to Stephens) and Pan Am counsel (Tappen). The question of law involved was whether Pan Am could engage in producing crude oil in Texas through a subsidiary corporation, in spite of the fact that Indiana already had an almost wholly owned subsidiary corporation (SO&G) which was likewise engaged in producing crude oil in Texas. Since seventy per cent of the stock of Pan Am was owned by Indiana, would it be illegal for a Pan Am subsidiary, which would in turn be a subsidiary of Indiana, to engage in the production of crude oil in Texas, where another almost wholly owned subsidiary of Indiana was engaged in the same business?

There are certain statements, and communications between some of the parties, which do refer to the fact that the question of the incorporation of a Pan Am production subsidiary had been submitted to Texas counsel; but these do not specifically refer to the anti-trust laws and might well refer to the matter which the Blausteins knew was under consideration, namely, whether, for tax and corporate purposes, the corporation should be organized in Texas or in Delaware.

The fact is, however, whether the Blausteins were informed of it or not, that on March 8, 1933, a formal inquiry was made by Fellingham of Stone, a Texas lawyer, asking for his opinion as to whether or not it would be legal for a Pan Am subsidiary to go into the production business in Texas and obtain a backlog of crude. An answer was received by Fellingham from Stone giving certain legal conclusions based upon his understanding of the facts which were detailed in an attached memorandum. On March 22, 1933, Indiana counsel (Fellingham) replied; pointed out that some of

the facts in Stone's memorandum were incorrect; and corrected them.

On March 25, 1933, Indiana counsel (Fellingham) received an answer to his letter of the twenty-second (not from Stone but from his partner Agerton) giving the opinion of both Stone and Agerton that it would be legal under the anti-trust laws for Pan Am to organize a corporation for the business of producing crude in Texas. Although the meeting of stockholders of Pan Am to approve the reorganization was held on March twenty-seventh and was addressed by Seubert, no mention was made of any legal difficulties involved; nor were the Blausteins or their counsel, Steinman, informed of these various communications with Stone.

The general counsel for Indiana was the defendant Stephens; but this matter was being handled by his assistant, Fellingham, because Stephens had been in the hospital from February twenty-fifth to April third. On April third Fellingham left for his vacation, and turned the matter over to Stephens. Stephens as counsel had not only the legal problem of the absence or suppression of competition as between these two subsidiaries (SO&G and Pan Am Production) of one parent company (Indiana), but he also had the legal problem of common management of the various companies through interlocking directors. This latter problem also involved the refining companies of the Pan Am group and the refining companies of the Indiana group as well. Accordingly, on April eighth, he wrote to Stone again, asking for his views as to whether the directors of Indiana who were also directors of Indiana subsidiaries could legally serve as directors of the proposed Pan Am subsidiaries, pointing out that Indiana owned the majority of the stock of Pan Am.

In the answer from Stone to his question a legal opinion was given that there could be such common directors. After weighing all of these letters, Stephens on April 27, 1933, wrote Seubert a letter, of which the following is an extract:

" After due consideration of the entire file I agree with Judge Stone, and it is therefore my opinion that directors of Stanolind Pipe Line Company, Stanolind Crude Oil Purchasing Company or Stanolind Oil and Gas Company may serve as directors of Pan American Refining Company or the producing company proposed to be organized to operate in Texas under the Pan American-American Oil consolidation, without violation of the anti-trust laws of the state of Texas.

" I am today advising Mr. Louis Blaustein of this situation, as per attached letter to him."

He also wrote Blaustein to the same effect on the same date.

Although the defendants urge that all that Stephens had in mind was the question of interlocking directors, I find this to be a specific statement of Stephens' opinion on April 27, 1933, that it would be legal for Pan Am to organize a producing subsidiary.

Nothing further was done, however, about the producing subsidiary company for Pan Am for several months, although the Blausteins kept insisting from time to time that it be organized.

In the meantime other disputes arose between the majority directors of Pan Am nominated by Indiana, and the Blaustein minority directors.

One significant fact, on which much reliance is placed by the plaintiff, is that during this period, the Indiana subsidiary SCOP tried to obtain from Pan Am a contract under which Pan Am for three years would have to purchase all its crude oil requirements through SCOP from the other Indiana subsidiary SO&G. Of course the consummation of such an arrangement would have made it useless for Pan Am to buy any crude oil producing properties or to go into production at all, because it would have had to buy all its crude oil requirements from the Indiana subsidiary anyway. This proposal came up at the meeting of July 28, 1933. Blaustein strenuously objected and pointed out that the proposal would do away with the very foundation of Pan Am's integration viz., its crude oil reserves. The Pan Am board yielded on this matter; and in the purchasing contract finally adopted Pan Am was permitted to purchase crude elsewhere if it could be obtained more cheaply.

It is not important to decide whether the frustration of this attempt to get Pan Am to buy all its crude oil requirements from the Indiana subsidiary for three years was, as the plaintiffs claim, the proximate cause of the subsequent change of legal opinion by Stephens, which had the effect of keeping Pan Am out of procuring its own crude oil reserves for several years, and compelling it as a practical matter to buy its requirements from the Indiana subsidiary. The defendants' contention that Stephens did not draft the proposed purchasing contract, and that he even joined Blaustein in his objections, would not of itself necessarily overcome the inference sought to be drawn by the plaintiffs with respect to cause and effect in the matter of production.

Whether it was the cause for the change of events or not, the change came.

On August eighth Stephens wrote Seubert a letter stating that in his opinion the Texas anti-trust statutes prohibited Pan Am from going into the production business because of the stock owner-

ship and control by Indiana of both Pan Am and SO&G; and stating also that his prior letter of approval of April twenty-seventh related solely to the question of interlocking directorates and not to the question of restraint of competition under the anti-trust laws.

On August twenty-second he wrote Seubert a second letter which repeated substantially his letter of August eighth.

I find that these letters of August eighth and twenty-second indicate a complete reversal of Stephens' legal opinion rendered on April twenty-seventh.

In the meantime, however, he had not obtained further opinion from any Texas lawyers; nor had he had any conference with them. Apparently he had only discussed the matter with his own assistant, Fellingham. In his letter of August eighth Stephens did not state it would be improper for Pan Am to have a pipe line subsidiary, even though Indiana also had a pipe line subsidiary in Texas; he only stated his opinion that there should not be common directors of the two pipe line subsidiaries.

At a meeting of August 24, 1933, Barkdull announced that because of these legal difficulties, nothing would be done in respect to organizing a production company in Texas "until legal difficulties could be cleared up to the satisfaction of Indiana counsel."

At the meeting of September 19, 1933, Blaustein and his counsel, Steinman, again insisted upon the organization of a production company, and attempted to argue the question of anti-trust laws involved in the matter. At that meeting it was stated by Stephens that in addition to the legal difficulties Pan Am would not have any crude oil production for "policy reasons," and that Indiana would not consent to Pan Am going into the crude production business.

At the meeting of October 18, 1933, Seubert read a prepared statement defending the Indiana position with respect to the proposed production activity of Pan Am. He stated that Pan Am had taken the best Texas legal advice on the subject, and that the legal difficulties were due to Blaustein's connection with the Crown Central Refinery in which he had an interest as well as to the common parenthood of Indiana. There had been no additional Texas legal advice taken since Stephens' letter of April twenty-seventh; and the advice which had been taken up to that time had resulted in a legal opinion directly contrary to the one which Seubert was urging. It should also be pointed out that in Stephens' letters of August eighth and twenty-second, no mention had been made of any difficulty arising out of Blausteins' ownership of an interest in Crown Central Refinery.

The most important fact in this course of corporate events is that Pan Am's own counsel was not authoritatively consulted in the

matter; nor was Pan Am permitted to obtain the advice of any independent counsel. The opinion upon which the Indiana nominees on the board were consistently acting to keep Pan Am out of the production business in Texas came only from the general counsel of Indiana. In fact it was definitely stated by Barkdull that Indiana counsel would have to be satisfied as to legality before production activities could start.

Stephens was an officer, director and general counsel of Indiana, whose subsidiary, SO&G, was going to have to face the competition of the proposed Pan Am subsidiary if it was ever organized. The vice of this attitude of the defendant directors in relying exclusively upon the opinion of one of its directors who was so closely connected with an interest adverse to Pan Am, becomes even more apparent in the light of the fact, later discussed, that Indiana by its subsidiary SO&G was, itself, during this very time, engaged in acquiring crude oil producing properties, from which it expected to, and later did, sell crude oil at a profit to its subsidiary Pan Am.

Because of the other difficulties arising between the Blausteins and the Indiana nominees, Barkdull on June 6, 1934, suggested that a meeting be held for the purpose of discussing the controversies between them. He inclosed a proposed agenda for this meeting. The agenda indicates that Indiana was not only advancing the legal objection as of that date, but that they were considering from a policy standpoint " the advisability of entering upon production activity if same is legally possible."

After a long controversy which lasted more than a year, on August 21, 1934, it was decided to submit the question of legality anew to two Texas lawyers, one to be selected by each side. Stephens selected Judge Batts, and Steinman selected Mr. Weems, both well-known counsel in Texas. The submission was by joint letter on October 3, 1934. The opinion of these two gentlemen was submitted on November 6, 1934; and definitely stated that it would be legal for a subsidiary to be organized by Pan Am to go into the production business in Texas in spite of the Texas anti-trust laws.

On November 22, 1934, Stephens wrote Judge Batts about clearing up one paragraph of the opinion; and this was done by Judge Batts and Mr. Weems on November 27, 1934.

The subsidiary corporation, Pan Production, was, however, not organized until May, 1935. On July 1, 1935, a Mr. Turner was employed by it to manage its production activities. It was not until September, 1935, that the first piece of producing oil property was purchased. This was ten months after the second Batts-Weems opinion had been received indicating that the legal road was clear.

During all the time that the question of the legality of production in Texas was being considered, no effort was made to acquire for Pan Am any producing property in Louisiana, which was a proper source of supply for the refinery then being built at Texas City, Texas. No claim had ever been made by any one that there would be any illegality in going into production of oil in Louisiana at the time. Many companies were exploring Louisiana fields for oil, very actively. Indiana itself was exploring in Louisiana through its subsidiary SO&G.

While Pan Am was kept from the production business, that is from 1933 to July, 1935, there were many opportunities in Texas for the acquisition of valuable crude oil properties which would be advantageous to Pan Am. First, there was the East Texas field which had been discovered in 1930, and which by 1931 had come to be recognized as the largest field ever discovered in the United States. By 1933 it had been so developed as to make investment in leases there substantially safe.

Secondly, in the Gulf Coast area in the years 1933, 1934 and 1935 there was a great deal of exploration, discovery and activity. By means of the use of new geophysical instruments of exploration, new fields of great value were being discovered. Many of the large oil companies were exploring and acquiring leases in that area. By 1935, when Pan Am Production was finally organized, the desirable properties in the Gulf Coast near the Texas City refinery had been largely acquired by other companies; and opportunities in that field were becoming scarce.

Indiana, through its practically wholly owned subsidiary, SO&G, was itself engaged, during this time, in an aggressive campaign of leasing crude properties in both the East Texas and the Gulf Coast fields, expending several millions of dollars for such purpose.

These leases, both in the East Texas field and in the Gulf Coast area, are of substantial value, and have been profitable to SO&G. The record indicates that Indiana itself authorized these purchases, as well as many other deals which were not consummated. Sometimes the purchases were the subject of specific authorization, and sometimes were made pursuant to general authorizations.

The defendants testified that in authorizing and making these purchases in East Texas, SO&G did not have in mind the proposed Texas City refinery of Pan Am as a possible purchaser for the crude oil which was to come from the fields. The inference is very clear from the evidence, however, that much of the motivating influence for these purchases was the fact that there was to be built a refinery particularly designed for East Texas crude; and that a processing contract was being entered into calling for that type of crude. In

fact the representatives of SO&G, as indicated in Exhibit 195, were looking forward to the Pan Am refinery as holding out some promise of realizing a substantial return on all of the money which SO&G had spent in " remaining in the picture " in East Texas.

Indiana was also familiar with the exploration and purchasing activity of its subsidiary, SO&G, in the Gulf Coast area of Texas and Louisiana. The approval of the Indiana board was formally obtained for many of these. Budgets covering proposed purchases were sent by SO&G to Indiana, and authorizations were made by Indiana for such purchases. The inference is clear that here, too, the SO&G executives had clearly in mind the Texas City refinery as a prospective market for this crude.

After Indiana had obtained these properties in the East Texas field, and even while it was preventing Pan Am from obtaining properties of its own there, it sold to Pan Am at a profit substantially all of the crude coming from these properties, for use by Pan Am in its refineries. In the same way nearly all of the oil produced from certain of the fields in the Gulf Coast area acquired by SO&G was also sold to Pan Am at a substantial profit.

Up to January 1, 1937, the original $3,000,000 which was mentioned in the definitive agreement as the initial amount to be allocated by Pan Am for crude oil properties, had not yet been invested. The daily net production of Pan Production had by that date reached only 1,850 barrels. The evidence would indicate that Turner, who was managing the production activities of the subsidiary corporation, was finding it difficult to obtain satisfactory properties, and was also under the impression that Pan Am directors were not backing him up enthusiastically in a production program.

As of January 1, 1940, even considering the increased activity which came after the institution of the present litigation in January, 1937, the producing properties of Pan Am were still yielding only 5,354 barrels per day, which is less than ten per cent of its refining requirements. It has now invested over $9,000,000 of capital, but of this, $4,000,000 consist of profits put back in the company.

It is clear, therefore, that as a result of the delay in commencing a production program in earnest in 1933, Pan Am now finds itself without an adequate backlog of crude reserves.

The defendants urge that, in any event, Pan Am would not have been able physically or financially in 1933 to carry on the organization and exploration work and purchasing necessary to develop its own backlog of crude reserves. As will be indicated later, this inability, even if true, would not justify its fiduciary, Indiana, in undertaking the business itself, and then selling the crude therefrom to the *cestui*, Pan Am, at a profit. But apart from such legal

conclusion, Pan Am could have done the job or a good part of it, if it had been permitted to do so. In the first place, under the definitive agreement, Indiana was obligated to use its best efforts, resources and personnel to help Pan Am do it. Secondly, it could have hired one of the several exploration companies active at that time to do the geophysical work. Besides, the fact is that within six months after Pan Production was finally organized, it was doing its own seismographic work. Its financial condition would have made it possible, especially since many purchases of land could have been made on a part cash and part oil payment basis.

With respect to production matters the plaintiffs seek an accounting from Indiana and from the defendant directors of all the profits which Indiana made by selling crude to Pan Am from those crude properties which it purchased itself during the time it prevented Pan Am from purchasing any crude properties on its own account. The plaintiffs also seek to have a trust in favor of Pan Am impressed upon the properties themselves. The value of these lands and the profits therefrom run into many millions of dollars.

### Pipe Line Transportation and Crude Connections.

The third specification in the plaintiffs' charge that the defendant directors failed to integrate Pan Am and failed to promote its best interests, involves the pipe line facilities for the transportation of its crude oil. A pipe line is a physical auxiliary of major importance to an oil company. Through a gathering system the company collects the crude from the various wells in the oil field; it then runs the oil into a major trunk line, through which the oil passes to the refinery where it is to be processed. It is the cheapest form of land transportation for oil, and is a necessary and vital part of any major integrated oil company. Of the fifteen companies producing substantial amounts of oil in the East Texas field in 1933, fourteen of them had their own gathering systems and their own pipe line outlets from the field, or, at least, a part interest in such an outlet.

The ownership and control of a pipe line system not only provides much cheaper crude oil transportation than paying the posted traffic rates to some pipe line company; it also insures a steady supply, and renders the company independent of others for continuous movement of its crude oil. Physically, through its gathering systems and spur lines, it has the further advantage of giving the company a direct contact with independent oil well owners in the field.

In March and April, 1933, Pan Am was contemplating the construction of a huge refinery on the Texas Gulf Coast. It was

generally understood by all the parties that one of the main sources of supply of crude oil for the refinery was to be the East Texas oil field about 200 miles away in a direct line. When Pan Am began to negotiate the processing contract with Humble, it was likewise contemplated that the crude oil to be processed would be moved principally from the East Texas field down to the Humble refinery at Baytown, which was near Texas City. It seems obvious, therefore, that the natural and cheapest thing for Pan Am to have done was to construct a pipe line running about 200 miles directly from the East Texas field down to Texas City (the site of Pan Am's proposed refinery) and Baytown.

The construction of such a pipe line was voted down, however, by the majority of the board of directors of Pan Am. Instead, the majority directors, over the opposition of the Blaustein directors, made contractual arrangements to transport its crude over two existing pipe lines, one owned by a subsidiary of Humble, HPL, and the other by SPL, a subsidiary of Indiana. This arrangement has resulted in a substantial loss to Pan Am, and a substantial profit to Indiana through its subsidiary SPL.

There are innumerable pipe lines running in all directions through Texas to take the crude from the various oil fields in the State to refineries or points of shipment both within and without the State. Some of them are several hundreds of miles long. A map in evidence of the pipe lines of Texas shows that a pipe line of 200 miles is a comparatively small enterprise.

The following map (p. 642) indicates the portions of the pipe lines involved in the present controversy, and the location and distances between the various points. The pipe lines do not stop at Mexia as shown on the map; but only the parts indicated are material to this litigation.

SPL owned a pipe line running down from Whiting, Ind., to Mexia and from Mexia to Sinco. That part of the line from Mexia to Sinco, 166 miles long, was not used by the Indiana refineries themselves, but was at this time under contract to carry approximately 25,000 barrels of crude oil per day for the Sinclair Oil Company to the Sinclair refinery at Sinco. This contract to carry Sinclair oil was to terminate in September of 1933; and Sinclair was building its own new and larger pipe line from Mexia to Sinco to take care of transporting this oil. The evidence indicates that the reasonable assumption was that this contract was not going to be renewed by Sinclair in September. Therefore, for business for this part of its pipe line, SPL would have to look elsewhere.

Humble, through its wholly owned subsidiary, HPL, owned a gathering system in the East Texas oil field, and a trunk line from

MAP SHOWING HUMBLE, STANOLIND
AND PAN AM PIPE LINES
EAST TEXAS TO TEXAS CITY
AND BAYTOWN

HUMBLE 1-2
STANOLIND 2-3
PAN AM 3-4

that field which ran to Mexia, 127 miles away, and on beyond Mexia toward the western part of Texas. SPL did not own a gathering system in the East Texas field; and did not own any pipe line running out of the East Texas field.

At Mexia (Bullock) SCOP owned a large tank farm which in March of 1933 had a total capacity of 5,000,000 barrels. SO&G owned some oil properties in the East Texas field which it had bought in 1931. This oil was being purchased by SCOP, gathered by HPL, and transported by HPL to SCOP's tanks at Mexia. There some of it was stored, and some of it was sold to the Sinclair Oil Company and transported through the SPL line from Mexia to Sinco.

After the signing of the definitive agreement, it became necessary to consider how to transport all the crude oil from the East Texas field necessary for the proposed 48,000-barrel refinery. It first came up at the first informal meeting of March 7–8, 1933, at which time Seubert stated that if the SPL pipe line was used they would have to charge the regular full pipe line tariff. At the meeting of April 5–6, 1933, the board requested Peake to make a study of the pipe line and crude oil supply situation, in so far as it affected Pan Am, and to report on it at a later meeting.

Peake, although present at this meeting, was not a director of Pan Am. He was, however, a director of Indiana. He was also a director of SCOP; later (1934) became its vice-president, and subsequently (1935) the chairman of its board; he was also a director of SPL; later (1934) became its vice-president, and in 1935 chairman of its board. In 1935 he became director and chairman of the board of SO&G. Therefore, Peake was closely connected with the management and with the policy-making of Indiana and of its three major subsidiaries; but had no formal connection with Pan Am.

The result of Peake's investigation was communicated by him in letters to Seubert dated, respectively, May 24 and May 25, 1933. Before writing them he had negotiated with the representatives of Humble. In these letters Peake made several alternative recommendations as to how to transport the crude from East Texas to the Pan Am refinery at Texas City and to the Humble refinery at Baytown. None of these recommendations included the construction of an independent pipe line by Pan Am out of East Texas. They all involved the use of the Humble gathering system and pipe line from the East Texas field to Mexia, and the SPL pipe line from Mexia to Sinco, with the construction by Pan Am of two spurs from Sinco to Texas City and to Baytown respectively. Peake admitted that it would be cheaper to build a new pipe line from East Texas to Sinco with spurs to Baytown and Texas City; but urged that

Pan Am would not be able to get sufficient connections to the wells in the East Texas field to give them their necessary refinery requirement of 48,000 barrels per day. On the other hand, he represented that, if they would enter into a pipe line arrangement with Humble which would employ the HPL pipe line to Mexia, Humble would, in consideration thereof, turn over to Pan Am a sufficient number of well connections to insure the 48,000-barrel per day supply.

A " connection," as that term is used in the oil industry, means a physical contact by means of a pipe running into a small tank on a leasehold. This tank contains the oil which has been poured into it directly from the several oil wells on the leasehold. A number of such pipe lines constitute a gathering system; and the oil from a gathering system runs into some main pipe line outlet from the field.

The word " connection " is also used to include the legal relationship between the purchaser of the oil and the owner or lessee of the well who is the producer of the oil. It involves an agreement between them, terminable at the will of either party, whereby the purchaser buys each day the allowable oil produced from the well by the operator, which is pumped into the gathering system. From time to time these connections are changed so that a well, instead of being connected with one pipe line and one purchaser, gets connected with another pipe line and another purchaser. It is the number of connections which determines the amount of crude oil running into a gathering system or a pipe line. The more connections a pipe line gathering system has, the more crude oil it collects.

The task of the directors of Pan Am in the spring of 1933 was not only to provide transportation for the crude oil, but also to make sure that it was connected by a gathering system to enough wells, so that it could collect the necessary amount of crude and have it flow to the refinery in a steady stream through a pipe line outlet from the field.

The amount of crude oil which can be obtained from a well connection is not a constant one over a period of time. Although the natural flow of oil from any one well may be fairly constant, the laws of Texas do not permit the collection of all that a well will produce during a day. This limitation is called " proration;" and the amount which can legally be removed from each well per day is called the " allowable " for that well. Any oil produced from a well in excess of the allowable is illegal, and is known as " hot oil."

The Texas Railroad Commission was the State agency charged with the responsibility of fixing the amount of oil which could be

removed each day from the East Texas field, and of dividing that amount equitably among the different wells on the field. The purpose of vesting such power in the Railroad Commission was twofold: (1) To conserve the oil resources of the State from waste, and (2) to balance, in some measure, the supply of the crude with the demand for it, in order to avoid a complete collapse in the price structure of oil.

Over-production of oil in the East Texas field had resulted in this form of statutory restriction and conservation. At times the over-production reached such levels that the wells were all shut down for days at a time. The amount of allowable oil changed quite drastically through the year 1933. Assuming that a company had a steady requirement for a certain amount of crude oil per day, that supply might be readily obtainable from the connections which it had when the allowable was high; but if the allowable was reduced, the same number of connections would give the company a much smaller quantity of crude oil, because only a smaller amount of oil could be lawfully taken from each well connection.

At the meeting of May 31–June 1, 1933, Mr. Peake was presented to the meeting by Mr. Seubert, and he announced to the meeting a tentative arrangement made with Humble by which Humble agreed to turn over to SCOP the required additional barrels per day of connections, if the proposed pipe line arrangement were made with HPL. No final decision was reached.

There was authority given, however, immediately to begin to construct a pipe line for Pan Am from Sinco to Texas City, and also from Sinco to Baytown as soon as the processing contract was completed. The construction of these spurs would be necessary in any event, whether an independent line was built from East Texas to Sinco or whether the Humble-SPL lines were used. Peake was also directed to obtain a definite proposition from Humble; and to obtain data as to what it would cost Pan Am to put its own gathering system in the field and build a trunk line itself from East Texas, so as to avoid paying Humble for gathering and transporting.

At this same meeting the question of the contract for purchasing crude oil was discussed. Peake had urged that SCOP be permitted to do all of the purchasing of crude for Pan Am at a marketing charge of five cents per barrel. Blaustein objected, stating that Pan Am should have its own crude oil purchasing department and, besides, that the rate was far too high. It was finally arranged that for the interim period up to the end of 1933, SCOP should act as a purchasing agent for Pan Am at a marketing charge of five cents per barrel.

The next meeting of the board at which there was a discussion of the pipe line situation was on June 28, 1933. Peake reported the result of his investigation. His estimates presented at that meeting, if analyzed, show that the saving to Pan Am which would have resulted from building and operating a gathering system and a direct pipe line from East Texas to the refinery at Texas City, including depreciation and interest on the capital investment, would have been $1,000,000 per year as compared with using the Humble and SPL lines (excluding the cost of storage). However, Peake again stated that it would be impossible to obtain connections to get the required crude if the direct line were constructed.

Under the definitive agreement, Pan Am had the right to call upon Indiana to furnish whatever crude it could not get elsewhere, and Indiana agreed to furnish it up to the extent of its ability, at the prevailing prices, without loss to itself. At this time SCOP itself had connections amounting to 40,000 barrels of crude per day and, therefore, needed an additional 10,000 per day. Peake reported that it would be impossible to obtain connections in that amount from any source other than Humble, and that Humble would not turn them over unless the pipe line arrangement was entered into with HPL.

Parenthetically, it seemed to be assumed at this meeting, by failure to consider the fact in any estimates submitted to the meeting, that Pan Am was not going to buy any crude properties for itself, to which it would of course be connected, even though Stephens' opinion of August eighth had, of course, not yet been delivered.

On this representation by Peake that the connections would be otherwise unavailable, Blaustein agreed to the proposal of the joint Humble-SPL arrangement; but insisted upon presentment of the formal contracts at a later meeting for approval.

The next meeting was on July 28, 1933. The formal pipe line contracts which had been drawn up were presented. This was the meeting at which was also presented the proposed contract mentioned on pages 635 and 657 of this opinion, between SCOP and Pan Refining which provided that for a period of three years the latter should buy from SCOP all the crude oil which Pan Am would need or use in its refinery.

This proposed purchasing contract violated not only the definitive agreement, but was inconsistent with the understanding which had been reached at the previous meeting. Under it, Pan Am for three years would have had to buy all of its crude from SCOP; it could not have gone into the business of crude oil production or purchasing crude oil properties; and it could not have undertaken for that period to purchase crude oil or to transport it on its own account.

It was not merely a temporary arrangement, but a binding agreement for three years. It did not make SCOP only a purchasing agent on the basis of a five-cent marketing charge; it provided that SCOP could actually sell all the crude oil which Pan Am would need, at the posted price as of the date of delivery of the oil, irrespective of what SCOP had paid or would pay for the oil. This would give SCOP a profit on all the oil that had been bought by it at distress prices and stored by it at Bullock (Mexia), and on any oil that it might buy later and put in storage, on which the posted price might thereafter rise.

In view of the fact that the purchasing contract was intimately bound up with the pipe line transportation contracts, the Blaustein directors voted against all of them. However, the contracts providing for pipe line arrangements were approved over their opposition; and the crude oil purchasing contract was postponed to another meeting. It will be discussed further in connection with that part of the opinion which deals with crude oil purchasing.

The contracts which were thus adopted to carry out the pipe line arrangements were substantially as follows:

(1) An agreement between SCOP and HPL that the latter should for five years gather in the East Texas field and transport to Mexia all the East Texas crude which SCOP might purchase, up to a maximum of 48,000 barrels per day.

(2) A joint pipe line traffic agreement between SPL and HPL for a period of five years beginning July 18, 1933. By it, HPL was to receive as its participation for gathering the crude oil in the East Texas field and transporting it to Mexia, a flat rate of ten and one-quarter cents per barrel (later voluntarily reduced by it on September 1, 1935, to nine and one-quarter cents per barrel).

(3) An assignment by SPL to PAPL of the interest of SPL under the aforesaid joint pipe line traffic agreement for three years; by which PAPL assumed all responsibility for the operations under the traffic agreement.

(4) A lease by SPL to PAPL for three years beginning September 24, 1933, of the SPL 166 miles of pipe line from Mexia to Sinco. That portion of this line which runs from Hufsmith to Sinco was leased to PAPL for an additional period of two years. The rental to be paid by PAPL to SPL was to consist of 12.95 per cent of the total of the following sums: (a) $3,000,000, the agreed value of the entire pipe line leased, for the first three years, and $720,000, the agreed value of the Hufsmith-Sinco line, for the last two years; (b) the cost of such additional trunk line and gathering facilities as SPL agreed to install. The taxes and repairs were to be paid by PAPL.

(5) An agreement between PAPL and SPL whereby PAPL employed SPL to operate the pipe line system for five years beginning September 24, 1933. The cost of this to PAPL was to be the actual cost of SPL's services for labor, supervision, insurance, etc., plus an overhead charge of $2,500 per month ($2,000 per month during the last two years).

PAPL constructed at its own expense the spur lines from Sinco to Texas City and from Sinco (Dawes Junction) to Baytown, which lines became and still are the property of PAPL.

The principal justification advanced by the defendants for entering into these contracts which cost Pan Am approximately $1,000,000 per year (excluding storage costs) more to transport its crude than it would have cost upon constructing its own pipe line, is the claim that, without them, it would have been impossible, by January 1, 1934, when the refinery was supposed to have been finished, to have acquired the 48,000 barrels of connections per day.

In their answering brief, the defendants rely upon two other points of justification for not voting for an independent Pan Am pipe line. One was the flexibility of the pipe line arrangement with respect to types and quality of oil, since the line could pick up, as it passed through other oil fields, crude of a different quality from East Texas crude. The other was the inadvisability of making the large capital investment required by the construction of a new pipe line. The first was raised incidentally at a board meeting of Pan Am but not seriously considered by the directors. The second was never even raised at any board meeting.

The main question of fact to determine, therefore, is whether or not the chief defense urged by the defendants has been proved, namely, the unavailability of crude oil connections for its refinery, if it had not made the pipe line deal with Humble, as a *quid pro quo* for which Humble turned over several thousand barrels per day of its own connections to SCOP for Pan Am.

The burden of proof here is upon Indiana and upon its nominees on Pan Am's board, to prove such impossibility of obtaining connections. This burden of proof devolves upon these defendants from the facts that Indiana, as a dominating and controlling majority stockholder, was a fiduciary of Pan Am, that it prevented Pan Am from constructing its own pipe line, and with the co-operation of the directors caused Pan Am to enter into pipe line arrangements with Indiana itself (through its subsidiaries, SPL and SCOP), which were profitable to Indiana. The showing of these facts, as will be discussed later in detail, casts upon the defendants, the trustees, the burden of justifying their conduct toward the *cestui*.

I find that the burden has not been sustained.

What were the requirements in the way of additional connections which had to be provided for Pan Am? Although, as the defendants point out in their answering brief, the provision in the definitive agreement requiring Indiana to supply Pan Am's deficiency in crude oil needs to the extent of Indiana's ability, does not mention connections, all of the parties assumed that Indiana would make available to Pan Am all of the connections which Indiana then had in the East Texas field, both free and controlled. In no other way could Indiana adequately perform its obligation under the definitive agreement. On May thirty-first, SCOP was connected to 489 wells with an allowable on that date of 37,845 barrels; and on June 14, 1933, according to the letter of that date from Peake's assistant, Soper, Indiana was connected to 530 wells with a daily allowable, as of that date, of 40,094 barrels. The problem of the directors, therefore, during May and June, 1933, was to determine whether or not Pan Am could obtain sufficient additional connections in the East Texas field to supply their refinery with 48,000 barrels per day.

Included in these connections as of each date were approximately 143, with 11,000 daily allowable, which had been turned over by Humble to SCOP on May 16, 1933. The defendants' contention is that SCOP had agreed to return these 143 connections if a contract was not finally entered into with Humble for the transportation by HPL to Mexia of the East Texas crude intended for the Pan Am refinery. The plaintiffs contend that these 143 connections had been turned over by Humble on May 16, 1933, without any such condition.

My conclusion from the evidence is that there was no such condition attached by Humble to the transfer of these 143 connections to SCOP on May 16, 1933. The oral testimony introduced by the defendants on this point does not overcome the natural inferences to be drawn from the written documents in the case. For example, the letter from Humble to SCOP dated May 19, 1933, referring to the connections turned over, does not mention any such conditions. Mr. Peake in his letters of May 24 and 25, 1933, to Mr. Seubert, speaks of Humble's willingness to turn over " additional " East Texas connections. There is no intimation that there had been any condition requiring a retransfer of the connections already turned over by Humble. At the meeting of May 31 and June 1, 1933, the minutes indicate that " Humble has made a tentative proposition of releasing to Stanolind [SCOP] an additional 10,000 barrels per day," of connections. There is here no implication that there had been any condition attached to the prior turn over of the connections by Humble to SCOP. The memoranda made by Peake of conferences with the Humble representatives on this subject,

dated June 12 and June 20, 1933, contain no intimations with respect to the return of the original 10,000 barrels of connections. The formal estimate made by Soper on June 14, 1933, to determine the amount of crude which could be obtained without the pipe line agreement with HPL — the estimate which Peake presented to the Pan Am board on June twenty-eighth — indicates that these 10,000 barrels of connections taken over from Humble in May were the property of SCOP and would not have to be turned back to Humble even if a direct pipe line were built by Pan Am.

According to Soper's estimate submitted to the board, the amount of additional connections which Humble would have to turn over was 132 in order to get an additional 10,000 barrels. These, added to the existing 40,000 barrels, would produce the refinery's requirements.

Exhibit A 184 shows that the connections actually turned over by Humble to SCOP during 1933 were many more than Soper anticipated would be needed, and indeed more than Humble had promised in June, 1933, to turn over. The promise was only for 132 wells, with a call on an indefinite number of additional connections if they should be released by Standard of Louisiana. In fact, 532 connections actually were transferred before January 1, 1934, by Humble to SCOP with a daily allowable as of their dates of transfer of 26,000 barrels per day. By January 1, 1934, these allowables had shrunk to 16,000 per day, and, of course, the allowable of the connections with SCOP as of June 14, 1933, had shrunk correspondingly.

Even with this additional help from Humble, it was not until May, 1934, that the 48,000 barrels of connections were reached. The deficiency between the day the refinery started and May, 1934, was filled from accumulated storage in the field. The question is whether the directors could have done the same by May, 1934, without Humble.

I conclude from the evidence that in the East Texas field during 1933 Pan Am could have obtained the necessary additional connections of crude oil required by its refinery, or, at least, as many as it actually received from Humble as a result of the pipe line arrangement. It certainly could have obtained as many as were definitely promised by Humble in June, 1933, viz., 132.

The East Texas field, on May 1, 1933, was some forty-seven miles in length and between four and eight miles wide. At that time there were about 10,000 wells in operation, and the allowable for the field was about 810,000 barrels, or an average of about eighty-one barrels per well. During 1933 there were about thirteen major companies purchasing crude in the East Texas field. These

major companies or their affiliates owned about fifty per cent of the East Texas field's production, or about 5,000 wells; the remainder was owned by some 1,100 small independent producers.

The production from crude oil producing properties owned by the purchaser, or by one of its affiliates, is known as " controlled " production; and the production from all other properties is known as " free " production.

Out of the fifty per cent of the East Texas field's production which was owned by independent producers, about thirty-five per cent was sold to the major companies. Therefore, the major producers of crude in 1933 purchased and transported outside the field about eighty-five per cent of the production of the East Texas field.

Exhibit 503 shows that during 1933 the number of producing oil wells had gone up from 9,390 on January first to 11,891 at the end of December — an increase of 2,501 new wells. During that same period 263 new leases were developed. The number of free wells in April, 1933, was 4,789, according to the scout reports, a concededly reliable source of information gathered by representatives of the major oil companies called " scouts." This had increased to 5,486 by the end of December, 1933.

The average allowable for May, 1933, was about 813,000 barrels per day for the whole field, or about 81 per day per well; for June, 668,000 barrels, or 66 per well; for July, 561,000 barrels, or 55 per well; for August, 601,000 barrels, or 58 per well; for September, 516,000 barrels, or 48 per well. The allowable then gradually dropped so that on January 1, 1934, it was about 408,000, or 35 per well.

It appears, therefore, that approximately half the oil produced in the East Texas field was produced by the approximately 1,100 independent producers in the East Texas field; and this independent production ranged from about 400,000 barrels per day in May of 1933 to approximately 200,000 barrels per day at the end of the year. These independents were engaged only in producing oil, and were not interested in any of the major companies, which owned the remaining fifty per cent of the total allowable production. While substantially all of these independent producers were connected to purchasers at the time, the physical connection was simply the result of a business relationship between the buyer and producer which would be continued only so long as the arrangement was satisfactory to both parties. It is primarily from these free wells that Pan Am could have acquired connections, even though there were then connected to the major companies thirty-five per cent of the free field production. The task was to get some

of the wells to change their connections from the other companies to Pan Am; and also to get some of the remaining wells not connected with major companies to connect with Pan Am. In addition, Pan Am could have approached the major companies also for a transfer of some of their connections which they did not need.

An examination of the evidence shows that there were in fact a great many changes in connections during the year 1933. The scout reports show that practically every major company (except SCOP and two others) had fewer connections to leases at the end of 1933 than at the beginning of 1933. It is true, as pointed out in the defendants' answering brief, that the reports cover a whole year rather than the nine months of 1933 which lay ahead of the directors of Pan Am. 'The fact, however, remains that many changes in connections were being made in spite of the testimony of the defendants' connections witnesses that their companies were not giving up connections during 1933. I have also taken into consideration Hudnall's testimony that not every change in a pipe line connection necessarily means a shift in purchasers.

This loss of connections, in spite of the fact that new leases were being developed and new wells completed; the fact that most of the major companies had never paid any kind of premium to obtain a connection or to prevent the loss of one; the fact that the scout reports show that the smaller independent pipe line companies in the East Texas field were able practically to double their connections between April, 1933, and January 1, 1934, gaining about 650 wells; the fact that Sinclair Prairie Oil Marketing Co., which had to get additional connections because its contract with SCOP was to expire in September, 1933, and because it was building a larger pipe line, had succeeded, without the payment of any premium, in increasing its connections by 351 wells between April and October, 1933 (almost three times the amount Soper said it would be difficult to get without Humble's assistance) — all these facts added to those hereinbefore discussed, show that the defendants have not sustained their burden of proving that it was impossible under any circumstances to have obtained as many connections for Pan Am as they were promised by Humble, or even as many as they actually received from Humble.

In order to get connections, it was, of course, necessary for representatives of Pan Am to go out in active search for them. If need be, they should have been ready to offer inducements for them. Inducements could have been of several kinds, as described by the various witnesses at the trial. First of all, a premium could have been offered in price. Other possible inducements

were: paying for oil delivered while check was being made on the title; furnishing the producer with power with which to move his oil into the gathering systems; purchasing back allowable oil, which is legal oil stored as unsalable and later allowed to be sold in part; making loans to the producer; paying him a gathering charge for oil run from his wells; favoring him in the matter of drilling contracts and rig building contracts; paying him on the basis of one hundred per cent instead of ninety-eight per cent tank tables; paying for his necessary cleaning and maintenance of equipment; and helping to operate his lease.

The difficulty with Pan Am's endeavors was that the persons charged with the duty of going out into the field to solicit these connections were closely associated with a company which had a financial interest in seeing to it that the connections were not found. If the connections were obtained and a direct pipe line were built for Pan Am, it would have meant that the subsidiaries of Indiana would not have been able to make the profit which they did from Pan Am. Not only would SCOP have lost on purchasing; but SPL, whose pipe line agreement with Sinclair from Mexia to Sinco was going to expire next September, might not have obtained a steady customer like Pan Am.

Peake, the director and vice-president of Indiana, in his letters to Seubert of May 24 and May 25, 1933, indicated very clearly and frankly that his intention was to benefit the Indiana subsidiaries. He said: " The three Indiana subsidiaries, Stanolind Oil and Gas Company, Stanolind Crude Oil Purchasing Company, and Stanolind Pipe Line Company, have stayed in the East Texas and Gulf Coast picture, with production purchasing activities and pipe lines; have stored a great amount of crude in order to stay in the picture; have established contacts with the Humble which result in our being able to make favorable arrangements for the future; all of which things make possible the starting up of a 48,000 barrel refinery on the Gulf Coast with the initial crude supply assured and transportation to the refinery site provided at competitive rates. These things have been burdensome in the past and have caused the expenditure of money which would not otherwise have been made."

Soper, as Peake's assistant, naturally had the same interests. Dietler, who had been told to go out and get connections, was a director and vice-president of SCOP. Obviously it was to the interest of SCOP that the pipe line arrangement should be made with HPL, and that, therefore, the connections for a direct independent pipe line should not be found. The people whose employers' interest would be served by making the pipe line arrange-

ment with Humble were the very ones who were deputed by the majority of the Pan Am board, dominated by Indiana, to go out into the field and accomplish a task which, if successful, would hurt the interests of their own company.

It must also be remembered that it was not absolutely necessary that a full quota of 48,000 barrels of connections per day be furnished by January 1, 1934. The fact is that even with the Humble connections turned over, there were only 37,000 barrels available on January 1, 1934. Deficiencies in the meantime could have been made up in a number of ways, as they actually were. It was possible to purchase spot oil in the field. There was a large amount of spot oil available in 1933 that could have been purchased at the very low prices which prevailed during parts of 1933. This oil could have been stored in storage tanks, which could have been built awaiting the completion of the refinery in 1934. There were also in the field many independent gathering systems which had no major pipe line outlets. In July there were sixty-one such systems. The scout reports indicate that independent gathering systems were connected to approximately fifteen per cent of the wells in the field, and that a substantial portion of the oil from these connections was delivered to the major companies. Pan Am could have entered into arrangements with them, or could have bought out some of them. In these ways Pan Am might have obtained oil for delivery into its pipe lines during the interim period which was necessary to build up its actual connections.

It was not until May that any estimate was made of the actual cost of building a direct line from East Texas to the coast. However, for months prior to that time negotiations had been going on between the Indiana subsidiaries and Humble with reference to this pipe line.

Back in December, 1932, Humble was anxious to get rid of 20,000 barrels and was willing to offer these connections to any purchaser who would take them.

Early in April Dietler was instructed to make a survey of how many connections in the East Texas field could be obtained. On April sixth the East Texas field had been shut down, and remained shut until April twenty-fourth. On April twenty-fourth the field opened with allowables of 660,000 barrels per day, which were increased to 810,000 on May first. The price fell as low as ten cents per barrel.

During March and April and up to May 15, 1933, Humble followed the policy of purchasing and paying for only seventy-five per cent of the crude oil which it received from its connections and storing the rest for the producer's account. Humble also knew that it

was going to lose a considerable outlet for crude oil at the end of 1933, when the gasoline contract between Pan Am and New Jersey was to expire. It was during this same period that Sun Oil Company, for example, on May 19, 1933, stated that it was taking 57,000 barrels per day more than they wanted from their East Texas connections, and that others were worse off. With all the chaotic conditions existing in the East Texas field, it is impossible to believe that an active negotiator representing a financially able company like Pan Am with a large, steady demand, really interested in getting connections, could not have obtained them without paying a premium, or, if necessary, with the payment of a small premium. It is also impossible to believe that during such a period the policy of all the major companies suddenly changed from one of trying to get rid of connections in January, 1933, to one of holding on to connections by April, 1933, because of the fear of a decreased allowable. Exhibit 196 even indicates that Humble wanted to get rid of some of its connections sooner than SCOP intended to take them.

It is, therefore, found as a fact that the unavailability of connections as the justification for the pipe line arrangement with HPL has not been proven.

When the various pipe line agreements of 1933 expired, they were, with modifications, renewed from time to time. The Blaustein directors objected, in vain, to the renewals. Some of the modifications were in major details. It is not necessary to discuss them. The important fact is that no direct pipe line from East Texas to Sinco was every constructed for Pan Am; and its crude is still being transported over the same Humble-SPL lines.

I find also that as part of the 1933 pipe line arrangement, Indiana, through SPL, got for itself from Humble a reduction from twenty-one and five one-hundredths cents to fifteen cents in the cost of transporting Indiana crude from the Winkler field in West Texas to Whiting, Ind. The memorandum of the conference of June 27, 1933; the letter from Peake to Humble of September 9, 1933; the fact that the Winkler arrangement and the SPL-Humble pipe line agreement were discussed together and became effective the same day — all indicate that the one was part consideration for the other.

On this branch of the case, the relief demanded by the plaintiff is: (1) An accounting of the profits made by the Indiana subsidiary SPL on its pipe line operations; and (2) the damages caused to Pan Am by compelling it to pay out the alleged sum of $1,000,000 (less storage cost) each year from 1934 to date for transportation of its crude, in excess of what it would have cost over an independent Pan Am pipe line.

CRUDE OIL PURCHASING.

Crude purchasing is very closely allied with crude pipe line transportation. The purchasing department or the purchasing subsidiary of an integrated oil company has the function of locating sources of crude oil, and keeping in constant touch with them. It seeks to make the most advantageous purchases of oil for the requirements of the company. It takes care of securing connections and arranging for a gathering system and providing for transportation of the oil from the oil field to its refinery by a pipe line affiliate or by some other pipe line company.

Practically all of the large companies have purchasing departments or subsidiaries. They are generally considered parts of an integrated company. They not only furnish independence to a company, but they do the purchasing more cheaply than an outside organization would do it.

Under the definitive agreement and plan of reorganization which were arranged for the purpose of making Pan Am an integrated and independent oil company, it was certainly by inference intended that Pan Am should have its own purchasing department or subsidiary. The plaintiffs, at the various meetings following the signing of the definitive agreement, continually urged that such a department be organized. Peake, the vice-president and director of Indiana and a director of SCOP and SPL, who had been asked to make a survey of the crude oil supply situation, disclosed in his letters of May twenty-fourth and twenty-fifth to Seubert the plan to use the facilities of SCOP, the wholly owned subsidiary of Indiana, to supply the requirements of Pan Am. SCOP had an organization which was already purchasing crude oil in the East Texas field. It also had a large tank storage farm at Bullock which was on the pipe line of the SPL, another wholly owned subsidiary of Indiana. The capacity of this tank farm was over 5,000,000 barrels, and at the end of March there were stored therein about 4,275,000 barrels.

Peake's original proposal was that for five years SCOP should purchase all of Pan Am's requirements at a flat five cents per barrel marketing charge. This proposal, which would have been much more onerous than the contracts which were finally entered into, was withdrawn, as a result of the Blaustein objections at the meeting of May thirty-first. At that time the entire board agreed on the general policy that SCOP would " handle the purchase of all crude for Pan Am and subsidiaries on the basis of a charge of five cents per barrel until the end of 1933 " and then to be revised downward if it actually cost SCOP less or if Pan Am could do it for less. This

really would make SCOP a purchasing agent for Pan Am until the end of 1933, at a five cents per barrel charge.

At the next meeting, June 28, 1933, nothing was done about the purchasing contract.

At the July twenty-eighth meeting, however, a formal contract was submitted to the meeting which provided that for three years Pan Am would buy all of its requirements from SCOP. (See pp. 635 and 646 of this opinion.) Objection was made by Blaustein on the following grounds: (1) That this would keep Pan Am out of production of crude for three years since it would have to buy all its crude from SCOP; (2) that it bound Pan Am for three years instead of merely up to January 1, 1934, as had been understood at the meeting of May thirty-first; (3) that it did not make SCOP merely a purchasing agent; but that it also made SCOP a seller of crude, with opportunity to make a profit from Pan Am on the crude which it had bought and was buying.

Although there is dispute about it, I find that it was primarily these objections which caused the withdrawal of the contract for revision.

It was amended and finally passed at the September nineteenth meeting, again over Blaustein's objections. The final contract provided that SCOP should charge Pan Am a five-cent marketing charge for all the crude which it bought for Pan Am up to the end of 1933, and that thereafter it should charge Pan Am only the actual cost to SCOP of the purchasing operations. Pan Am was given the right to cancel the contract if it could do the purchasing more cheaply per barrel than SCOP would agree to do it. The contract provided, in effect, that whatever oil SCOP should purchase and store or had purchased and stored, could be sold to Pan Am at the posted price, thereby enabling SCOP to make a profit on the crude which it had bought or would buy at cheap prices. In this way, SCOP became a seller as well as a purchasing agent, could store oil at cheap prices and sell it to Pan Am when prices rose, and at the same time charge Pan Am the cost of purchasing the oil, including the cost of storing it.

SCOP in the meantime, between March and September, 1933, when the purchasing contract was made, kept buying oil at the cheap prices then prevailing and storing it at Bullock. The increase during those months in the stored oil at Bullock was over 1,500,000 barrels.

At the end of the three-year term the contract was renewed with slight modifications, over Blaustein's objections; and again renewed in 1938, over similar objection. As a result, Pan Am still does not have any crude purchasing department. Exhibit 232 shows

that out of the 88,000,000 barrels of crude purchased by Pan Am from 1933 through 1939, about 80,000,000 of them were purchased through SCOP. Even at the present time SCOP is selling Pan Am over fifty per cent of all its crude requirements, and practically all the crude it gets from East Texas, Hastings and South Houston.

The marketing charge was revised downward after January 1, 1934, from time to time in accordance with what SCOP claimed its actual cost of operation was. The average marketing charge paid by Pan Am to SCOP for its services from 1933 through 1937 was two dollars and twenty-four cents per barrel.

The inference is clear that a substantial profit was made by SCOP on the crude oil which it stored and sold to Pan Am at posted prices. Exhibit A 69 shows the prices which SCOP paid for oil as it went into storage at Bullock. Deducting this from the price it charged Pan Am leaves a handsome profit to SCOP.

On this branch of the case the relief demanded by the plaintiffs is: (1) An accounting of all the profits made by SCOP on its marketing charge; (2) an accounting of all its profits made on the sale of crude oil by it to Pan Am.

In connection with the foregong matters — refinery, production, pipe line, transportation, and crude purchasing — the plaintiffs seek relief against Indiana and the majority directors of Pan Am. In connection with the refinery and pipe line matters, relief is also asked against the New Jersey defendants and Teagle on the claim of conspiracy between them and the other defendants, and also on the ground that they were knowing participants in the breach of tiust by the other defendants and recipients of the profits made as a result thereof.

### Forum Non Conveniens.

*In limine*, objection is made to the whole cause of action under the doctrine of *forum non conveniens*. Pan Am, the nominal defendant but actual plaintiff, is a Delaware corporation; New Jersey is a New Jersey corporation; New Jersey (Del.) is a Delaware corporation; Indiana is an Indiana corporation. The plaintiffs Blaustein are residents of Maryland. On the ground that the courts of one State do not assume to pass upon or regulate the internal affairs of a corporation of another State, this court is asked not to assume jurisdiction of this suit.

The doctrine, however, is not one of jurisdiction but rather one of discretion, convenience and expediency. (*Levy* v. *Pacific Eastern Corporation*, 153 Misc. 488; *Rogers* v. *Guaranty Trust Co.*, 288 U. S. 123, 130, 131.) It is an instrument of justice; and one type of action where courts should be sparing in its application is a stockholders' action where fiduciaries are charged with breaches

of trust. (See dissenting opinions in *Rogers* v. *Guaranty Trust Co.*, *supra*, at pp. 149, 151; *Travis* v. *Knox Terpezone Co.*, 215 N. Y. 259, 264.) To adopt a rigid rule which would in all circumstances relegate a stockholder to a suit in some distant State would be often to delay, if not to obstruct, justice.

That the rule is one of convenience and expediency rather than one of jurisdiction appears from other authorities: *Williamson* v. *Missouri-Kansas Pipe Line Co.* (56 F. [2d] 503, 508); *American Creosote Works* v. *Powell* (298 Fed. 417, 419; certiorari denied, 265 U. S. 595); *Ernst* v. *Rutherford & B. S. Gas Co.* (38 App. Div. 388, 391, 392.)

In this jurisdiction it was possible to make service of process upon most of the necessary defendants, including Pan Am itself. It is doubtful whether the same could have occurred in any other State. Pan Am is itself doing business here. Certainly no jurisdictional obstacle could have been raised against a suit by it in this State against its own directors and Indiana. No objection should, therefore, be sustained against this action which, though nominally by the plaintiffs as stockholders and directors, is in essence a suit by, and for the benefit of, Pan Am.

## INDIANA'S DOMINATION AND CONTROL OF PAN AM.

The first question to be determined is the legal relationship between Indiana as a majority stockholder, and Pan Am, its subsidiary corporation. If the relationship were merely that of an investor or stockholder, then many of the transactions for which the plaintiffs charge that Indiana is liable to account, would not give rise to any liability. On the other hand, if Indiana took advantage of its stock ownership and its resulting power to nominate a majority of the board of Pan Am, and stretched out to manage and control and dominate Pan Am, then certain fiduciary obligations devolved upon Indiana which it could not with impunity violate.

The plaintiffs claim that Indiana did exercise that type of domination and control. They have the burden of establishing that contention by a preponderance of the evidence. I find that the burden has been sustained.

The domination of Pan Am by Indiana did not begin merely with the advent of the plaintiffs as minority stockholders in the reorganization of 1933. It had begun when Indiana acquired stock control of Pan Am in 1927 and commenced to expand into eastern markets. By 1932 Indiana's control had become so complete, with its ninety-six per cent stock ownership of Pan Am, that the negotiations concerning the sale of all of Pan Am's foreign properties were considered to be an Indiana matter rather than a Pan Am

matter. They were, in fact, conducted and consummated almost entirely by officers of Indiana, principally by Seubert.

The contract for this sale and the method of the sale show how thoroughly subservient Pan Am was, at that time, to the domination of Indiana. The contract was between Indiana and New Jersey; Pan Am was not even a party. By its terms, Indiana was to cause Pan Am to do certain things, which Pan Am subsequently did, viz., segregate its foreign properties into a new subsidiary, Pan Am Foreign; distribute the stock of Pan Am Foreign as a stock dividend so that ninety-six per cent of it went to Indiana. Indiana thereupon sold this stock to Jersey for some $50,000,000 in cash and stock of Jersey worth $106,000,000, all of which was retained by Indiana, and none of which went to Pan Am.

The White Sulphur agreement and the definitive agreement were negotiated, not by the officers of Pan Am, but by Seubert and Barkdull (directors but not officers of Pan Am at the time), and Stephens (neither an officer nor director of Pan Am at the time). McKeever, the titular president of Pan Am, was told about the White Sulphur agreement when it was all completed, and was then informed that he was to be superseded as president.

This domination has continued down to date. The disputes involving the refinery, the pipe line contracts, the crude oil purchasing arrangements, and the purchase of crude oil properties — all show how complete it has been. In each instance, the course of conduct urged by the plaintiffs would have been, at least immediately, to the advantage of Pan Am; other courses of conduct, however, were adopted by the majority directors nominated by Indiana; all of these courses, except with respect to the refinery, resulted in a substantial profit to Indiana which could have been made by Pan Am. In every one of them except the refinery, Indiana, through its Pan Am nominees, was allowed to appropriate business opportunities which belonged to Pan Am.

Under the definitive agreement of 1933, the Blausteins were permitted to name three directors. But the majority of six on the board of Pan Am were named and have ever since been named by Indiana by virtue of its majority stock ownership.

It is illuminating to detail the relationship to Indiana of the six members of the Pan Am board of directors who since the reorganization have been named by Indiana. In 1933 four of the six (Seubert, Barkdull, Jackson, and Bullock who was succeeded by Stephens on May 9, 1933) were at the same time also directors of Indiana. In addition to being directors, all of these, except Stephens, were high executive officers of Indiana; and Stephens was the general counsel of Indiana.

Seubert, while chairman of the board of Pan Am and a member of its executive committee, was at the same time president and a director of Indiana. There were only twelve members of the board of Indiana. His salary from Indiana was $110,000 while his salary from Pan Am was $5,400. He owns 16,000 shares of stock in Indiana, which is about fifty per cent more than he owned in 1933. He owned no stock in Pan Am in 1933, and still owns none.

Barkdull, who was a director, executive vice-president and treasurer of Indiana, was at the same time a director and member of the executive committee of Pan Am. His salary from Indiana was $45,000 in 1933 and now is $60,000; his salary from Pan Am was $5,000. He owned approximately 2,000 shares of stock of Indiana in 1933, and now owns about 3,850 shares. He owned no shares of Pan Am and still owns none.

Stephens was a director and general counsel of Indiana while he was a director and member of the executive committee of Pan Am. He received $45,000 per year from Indiana and no compensation from Pan Am. He owned 1,000 shares of stock in Indiana and none in Pan Am. He is now retired from Indiana on an employee annuity retirement fund.

It may be true, as testified by Seubert, Barkdull and Stephens, that the salaries they received from Indiana and Pan Am were not so disproportionate to each other as they appear, when the relative amount of time and work spent on the affairs of the two corporations is considered. But the fact is that here were the chief executive officer, the second chief executive officer and the general counsel of the parent corporation, serving in what was clearly a dominating position on the board of the subsidiary. It was the same, in effect, as if Indiana itself was on the board of Pan Am.

Bullock served until May 9, 1933, when he was succeeded by Stephens. He was during the same time a director, vice-president and stockholder of Indiana, receiving a salary. He owned no stock in Pan Am.

Carroll was a Pan Am vice-president and was on its executive committee. He had been the general auditor of Indiana. He joined Pan Am in 1927 and became a director, treasurer and vice-president and a member of the executive committee. However, for seven years, i. e., until 1934, he remained on the Indiana payroll. This was true of other Indiana employees who went to the Pan Am organization. The purpose of this arrangement was to permit them to take advantage of the Indiana stock purchase plan for employees. He is a stockholder of Indiana but not of Pan Am. He is also a director and treasurer of Pan Am Southern Corp., of which Indiana owns ninety-nine per cent of the stock and Pan Am owns none.

Robert E. Wilson had been a director and vice-president of Indiana, largely connected with its refining department. In November, 1934, he was elected to the board of Pan Am and to its executive committee. On December 31, 1934, he resigned from the board of Indiana. He had been with Indiana since 1922, and had acted as an expert for Pan Am in 1933, even while he was still a director and vice-president of Indiana and was attending operating conferences of SO&G.

All of the six members of the board of directors of Pan Am nominated by Indiana as of March 28, 1933, when the reorganization became effective, had been members of the Pan Am board in the years prior thereto, at a time when Indiana owned ninety-six per cent of its stock: Barkdull, since 1929; Bullock, since 1927; Carroll, since 1930; Jackson, since 1927; McKeever, since 1932; Seubert, since 1925.

It is a fair inference from the evidence that McKeever and Carroll were essentially dependent upon the good will of Seubert and Barkdull to keep their jobs. Neither of them, according to the minutes, ever expressed any independent, positive opinions on any Pan Am matter. Besides, McKeever was president of three other corporate subsidiaries of Indiana.

This interlocking set-up, alone, had all the potentialities of domination and control by Indiana. It would have been almost contrary to normal assumptions to expect that when a conflict in interest between Indiana and Pan Am arose, these six men would have divorced themselves from consideration of the welfare of Indiana and would have concentrated wholly on the interest of Pan Am. Relationships, such as these men bore to the dominant corporation, are realities motivating business conduct, which loom up clearly to any one intent on looking through the fog of intercorporate artificialities.

Although it is not even charged that Indiana has tried affirmatively to damage its subsidiary as was the fact in *Farmers' Loan & Trust Co.* v. *New York & Northern R. Co.* (150 N. Y. 410), some of the language used in the opinion in that case is appropriate to the relationship between Indiana, Seubert, Barkdull and Stephens on the one hand, and Pan Am on the other: " It is hardly to be supposed that a board of directors who was not under the control of another corporation would appoint three of the friends of the president of that corporation as directors of the company, and place the officers of that company in control of its financial affairs, especially when it was the owner of competing lines of railroad. The clear and legitimate inference to be drawn from the circumstances proved in this case is that after the New York Central and Hudson River

Railroad Company purchased a majority of the stock and bonds of the New York and Northern Railway Company, it controlled its officers and directors as fully and completely as though they had been elected by its votes " (pp. 424, 425).

The potentialities of the situation making for domination by Indiana over Pan Am, which had been effective even before the reorganization of March 28, 1933, continued to be equally effective after the Blausteins came on the board.

The votes on controversial matters of importance were nearly always unanimous among the directors named by Indiana. A reading of the corporate minutes of Pan Am, and of its subsidiaries, shows that at the meetings there were a leadership by Seubert and an acquiescence by the others, from which an inference is clear of domination by this chief executive officer of Indiana over the majority of the board of Pan Am.

The majority group in the board called upon, and relied almost exclusively upon, the expert and technical employees of Indiana, such as Wilson, Peake and Paulus, who were not at the time in the employ of Pan Am. This subservience was particularly apparent in the reliance of the Pan Am board upon Stephens' legal opinion, and by their insistence upon the necessity of satisfying this Indiana counsel on the Texas anti-trust question.

Reliance was complete even in matters where the interests of Indiana were clearly adverse to the interests of Pan Am, as in crude purchasing, transportation and production. The plans and estimates of the experts in the employ of Indiana were apparently received without question by the majority members of the board. Such doubts and suggestions for amendment as were made at the meetings were made by the Blaustein group. The Blausteins' request that an independent expert be called in for the pipe line and crude purchasing matters was refused.

This reliance was particularly striking with respect to the letter of April 14, 1933, which was supposed to be sent by Pan Am to the Blausteins, in accordance with the definitive agreement, in order to apprise the Blausteins of the plans for the refinery. But it was not Pan Am that drew up the letter. It was Paulus and his Indiana staff. After the letter was revised by Seubert, Wilson and Stephens, it was sent to McKeever to sign on behalf of Pan Am, and it was then sent to the Blausteins by McKeever without a change of a syllable.

In many instances the record shows that the entire Pan Am system and its operations were treated as a part of the Indiana system. This attitude is revealed, for example, in the correspondence between the Indiana representatives and the Texas lawyers, explain-

ing the corporate set-up of the various subsidiaries of Pan Am and Indiana in order to obtain their legal opinion on the Texas anti-trust laws. The exhibits indicate a proposed degree of domination by Indiana of Pan Am, which goes beyond any control which would come merely from stock ownership.

The accounting practices of Indiana and Pan Am, the furnishing of various reports from Pan Am officials to Indiana officials on management operations, the semi-monthly news letters, the exchange of refinery information, the contractual management by SPL of the pipe line and gathering system for crude for Pan Am, the presence of a number of Indiana subsidiaries in the Pan Am New York offices — all these and other bits of evidence, added to the foregoing discussion, confirm the conclusion that Pan Am was, for all the intents and purposes of the majority of its directors, a part of the Indiana system.

This was not the kind of control which can be explained or justified merely as protection of the investment of Indiana. It was actual managerial domination, exercised through its three leading executive officers and directors, Seubert, Barkdull and Stephens, and its other three nominees on the board of Pan Am.

There is, of course, nothing necessarily wrongful or illegal in the control by one corporation over the affairs of another which is exercised merely as an incident to stock ownership. That is the control which any individual majority stockholder usually has over his corporation by virtue of his power to name a majority of the board of directors and, through the board, the power to name the executive managers of the corporate affairs. But when that control is exercised, not merely as a stockholder, but as an active participant in the management, then the relationship is fraught with danger whenever the interests of the parent corporation come in conflict with those of the subsidiary. It is inconsistent with all human experience to expect that when Seubert, Barkdull and Stephens walked into a meeting of the board of Pan Am, or of any of its subsidiaries, they should forget that they were the directing heads of Indiana, which owned seventy per cent of all the stock of Pan Am, and to which its other three nominees on the board of Pan Am owed their positions. Even if they conscientiously set out to promote the welfare of Pan Am, they were at least just as much concerned in promoting the interest of Indiana. Indeed, from their relationship to Indiana it is natural to assume that their primary interest lay in the larger dominant corporation. But even if priority of Indiana interest be not assumed, their loyalties were obviously, in any event, divided. They were seeking to serve two masters. That road of service is hard to travel at any

time. It becomes impassable where the two masters develop interests which conflict with each other.

It is no answer to say that this type of relationship of interlocking directorates has become commonplace in modern corporate complexities. As corporate structures develop layers and layers of separate entities, pyramided in a form which centralizes control in the hands of a few and insulates the various enterprises from general liability or from taxation, a court of equity must become especially vigilant to protect the minority stockholder, whose money is in the control of those at the top but whose voice receives no attention through the maze.

The modern growth of the corporate form of business has been accompanied by ingenious and artificial legal devices designed to divorce the stockholder from any semblance of control over his investment. The more tenuous that vestige of control becomes, the more keen must be the eyes of equity to safeguard the investment in the hands of those who have the power to waste it.

Where the corporations in a corporate pyramid are all owned one hundred per cent by the parent as in two of the Stanolind organizations, and where there are no minority interests in the subsidiary corporations which require protection, the relationships between the parent and subsidiary, although they still involve important social and economic questions, do not involve the legal fiduciary problems which arise from the use by a parent corporation of " other peoples' money " invested in the subsidiary corporation.

In the case of Pan Am, however, there was a substantial minority interest of over twenty per cent. The dominant stockholder had agreed to protect Pan Am in its independent existence, so that it would not have to depend on others for its sustenance. Even without that agreement this parent corporation, having the full power of management of the subsidiary and freely exercising that power, must be governed by the same standards of conduct as those applied to any formal board of management of a corporation, even though it did not assume the actual title of management and even if it actually disclaims any conscious pretensions at management.

### Indiana As a Fiduciary of Pan Am.

The position and conduct of Indiana as a dominating and majority stockholder of Pan Am, assuming control of Pan Am's business and affairs in the manner just described, create the fiduciary relationship between Indiana and Pan Am spoken of in *Southern Pacific Co.* v. *Bogert* (250 U. S. 483); *Kavanaugh* v. *Kavanaugh Knitting Co.* (226 N. Y. 185); *Farmers Loan & Trust Co.* v. *New York & Northern R. Co.* (150 id. 410), and *Cleary* v. *Higley* (154 Misc. 158, 168, 169).

The corporation which actually induces management action in its subsidiary will be treated itself as manager, and will be made subject to all the fiduciary obligations toward the subsidiary which are imposed on corporate directors themselves.

In *Southern Pacific Ry. Co.* v. *Bogert* (*supra,* at p. 487) the doctrine was thus expressed: " The majority has the right to control; but when it does so, it occupies a fiduciary relation toward the minority, as much so as the corporation itself or its officers and directors."

The rule is stated to the same effect in *Wheeler* v. *Abilene National Bank Building Co.* (159 Fed. 391, 393), as follows: " The holder of a majority of the stock of a corporation has the power, by the election of biddable directors, and by the vote of his stock, to do everything the corporation can do. His power to control and direct the action of the corporation places him in its shoes, and constitutes him the actual, if not the technical, trustee for the holders of the minority of the stock. * * * They can act and contract regarding the corporate property, they can preserve and protect their interests in it, only through him and through the courts."

The duties of majority stockholders toward the minority are succinctly set out in *Hyams* v. *Calumet & Hecla Mining Co.* (221 Fed. 529, 537): " On the other hand, the rule, independently of State or National anti-trust statutes, is fundamental that one in control of a majority of the stock and of the board of directors of a corporation occupies a fiduciary relation towards the minority stockholders, and is charged with the duty of exercising a high degree of good faith, care, and diligence for the protection of such minority interests. Every act in its own interest to the detriment of the holders of minority stock becomes a breach of duty and of trust, and entitles to plenary relief from a court of equity." (Citing many cases.)

The indicia of a trust relationship are inherent in the control and management by the majority of the property and affairs of the corporation, all of which belong in good conscience to both the majority and the minority, and not to the majority alone.

" ' The law requires of the majority of the stockholders the utmost good faith in their control and management of the corporation as regards the minority, and in this respect the majority stand in much the same attitude towards * * * all the stockholders. Thus, where the majority are interested in another corporation, and the two corporations have contracts between them, it is fraudulent for that majority to manage the affairs of the first corporation for the benefit of the second. A court of equity will intervene and protect the minority upon an application by the latter.' * * *

" While the question in some of the cases cited arose between stockholders and the directors and officers of a company who as such held a position of trust as to the former, still, where, as in this case, a majority of the stock is owned by a corporation or a combination of individuals, and it assumes the control of another company's business and affairs through its control of the officers and directors of the corporation, it would seem that for all practical purposes it becomes the corporation of which it holds a majority of the stock, and assumes the same trust relation towards the minority stockholders that a corporation itself usually bears to its stockholders, and, therefore, under such circumstances, the rule stated in the *Sage* [*Sage* v. *Culver*, 147 N. Y. 241] and other similar cases applies to majority stockholders who control the affairs of the company, as well as to its directors or officers." (*Farmers' L. & T. Co.* v. *New York & Northern R. Co.*, 150 N. Y. 410, 430.)

The relationship has been defined in our own courts as follows: " When a number of stockholders constitute themselves  *  *  * the managers of corporate affairs or interests they stand in much the same attitude towards the other or minority stockholders that the directors sustain, generally, towards all the stockholders, and the law requires of them the utmost good faith." (*Kavanaugh* v. *Kavanaugh Knitting Co.*, 226 N. Y. 185, 195.) (See, also, to the same effect, *Jones* v. *Missouri-Edison Electric Co.*, 144 Fed. 765.)

Insulation from responsibility cannot be achieved through the expedient of interposing a separate board of directors. Indiana will be held, in a court of equity, to the same trustee relationship as is imposed upon its nominees whom it appointed to the board of Pan Am.

As was stated by Mr. Justice BRANDEIS in *Southern Pacific Railway Co.* v. *Bogert* (*supra*, at p. 492), passing upon the contention made by the Southern Pacific Company that it did not directly dominate the affairs of the controlled corporation, but only owned the majority of the stock of a subsidiary corporation, which, in turn, owned the majority of the stock of the dominated corporation: " But the doctrine by which the holders of a majority of the stock of a corporation who dominate its affairs are held to act as trustees for the minority, does not rest upon such technical distinctions. It is the fact of control of the common property held and exercised, not the particular means by which or manner in which the control is exercised, that creates the fiduciary obligation."

In some cases where the rule has been applied, the controlling corporation actually embarked upon a deliberate program of wrecking the subsidiary for its own selfish purposes, *e. g., Farmers' Loan & Trust Co.* v. *New York & Northern R. Co.* (150 N. Y. 410).

But the presence of such reprehensible motives is not necessary.

It is not damage or evil intention which creates the fiduciary relationship. It is the control, domination and active management which gives rise to it; and the trust persists through fair dealing and foul.

For example, in *Southern Pacific Co.* v. *Bogert* (*supra*, at p. 492), the court pointed out: " Equally unfounded is the contention that the Southern Pacific cannot be held liable because it was not guilty of fraud or mismanagement. The essential of the liability to account sought to be enforced in this suit lies not in fraud or mismanagement, but in the fact that, having become a fiduciary through taking control of the old Houston Company, the Southern Pacific has secured fruits which it has not shared with the minority. The wrong lay not in acquiring the stock, but in refusing to make a *pro rata* distribution on equal terms among the old Houston Company shareholders."

To the same effect is the opinion in *Hyams* v. *Calumet & Hecla Mining Co.* (*supra*, at p. 543): " Breach of duty and abuse of fiduciary obligation do not necessarily involve ' intentional moral delinquency.' If the act amounts to what the law considers a breach of trust, a disregard of duty, it is sufficient. *Dodge* v. *Woolsey*, 18 How, 331, 345; 15 L. Ed. 401. See *Pollock* v. *Farmers' Loan & Trust Co.*, 157 U. S. 429, 553; 15 Sup. Ct. 673; 39 L. Ed. 759. A breach of trust by one occupying a fiduciary relation, even while in the exercise of a lawful power, ' is as fatal in equity to the resultant act or contract as the absence of the power.' *Jones* v. *Electric Co.* (C. C. A. 8) 144 Fed. 765, 771; 75 C. C. A. 631; 3 Clark & Marshall on Corporations, page 2289."

What are the legal implications of this relationship?

Ordinarily the votes of the directors of a corporation are presumed to be fairly and honestly cast in good faith for the best interests of the corporation. (*Rathbone* v. *Ayer*, 196 N. Y. 503.)

" But where the majority is made up of a compact group in control, and especially where it can be shown that this group stands presently to benefit by a given result, the presumption disappears." (Berle & Means, The Modern Corporation and Private Property, p. 241.)

The fiduciary relationship occupied by Indiana to Pan Am obliterates the presumption that the votes of the majority directors were fair and honest; and requires them and Indiana affirmatively to prove that the transactions in which Indiana made a profit were justified, that they were " just and fair, and that he [it] has derived no unfair advantage from his fiduciary relation." (*Fisher* v. *Bishop*, 108 N. Y. 25, 29.)

" When it appears that the trustee or officer has violated the moral obligation to refrain from placing himself in relations which ordinarily produce a conflict between self-interest and integrity, there is in equity a presumption against the transaction, which he is required to explain." (*Sage* v. *Culver*, 147 N. Y. 241, 247.)

The nature of the burden of proof thus cast upon directors or dominant stockholders is discussed later in this opinion.

Where this fiduciary relationship exists, the duty of the trustee is to manage the property and affairs of the corporation with an eye single to the advantage of the corporation itself. The temptation is ever present to use the subsidiary in such a way that the parent will profit. Indeed, only too often subsidiaries are created solely for the purpose of profit and advantage for the parent. No one can complain of the dividends which it receives on the stock of a subsidiary which it owns. Those profits come solely out of the earnings which the subsidiary has itself made in its own business. But when profits are made by the parent on transactions between it and a subsidiary which it actually controls and dominates, the minority interests in the subsidiary are entitled to an explanation — to a showing that the transactions were justifiable, and that no undue advantage was taken of the subservient by the dominant corporation.

As was stated by the court in *Wheeler* v. *Abilene National Bank Building Co. (supra)* after discussing the relationship of the majority stockholder to the minority stockholders: " This devolution of unlimited power imposes on a single holder of the majority of the stock a correlative duty, the duty of a fiduciary or agent, to the holders of the minority of the stock, who can act only through him, the duty to exercise good faith, care, and diligence to make the property of the corporation produce the largest possible amount, to protect the interests of the holders of the minority of the stock, and to secure and pay over to them their just proportion of the income and of the proceeds of the corporate property. Any sale of the property of the corporation by him to himself for less than he could obtain for it from another, or any other acts in his interest to the detriment of the holders of the minority of the stock, becomes a breach of duty and of trust, renders the sale or act voidable at the election of the minority stockholders, and invokes plenary relief from a court of chancery." (Citing many cases.)

The decision of the United States Supreme Court in *Jackson* v. *Smith* (254 U. S. 586) indicates how far-reaching are the results which flow from the acts of a fiduciary in placing himself in an inconsistent position. One Ambrose had been appointed a receiver of a building association. Among the assets which came into his

possession as receiver was a note of one Schwab for $2,700 secured by a mortgage deed of trust. On default on the note the property was put up for sale at auction.

An agreement was made between Ambrose, one Wilson, and Smith who was counsel to the receiver, that if Wilson, in the exercise of his own judgment, should buy the property at auction, the three of them would share in the purchase price and expenses and become jointly interested in the property.

Wilson bid on the sale without any advice or interference from the receiver or from the counsel to the receiver, and became the successful bidder. There was no evidence of collusion or of any attempt by any one to prevent competition among bidders, or in any way to prefer Wilson in the bidding.

The property was thereafter sold by Wilson at a profit which was divided between Wilson, Ambrose and Smith.

Later, when the facts were disclosed, Ambrose resigned; this plaintiff was appointed substitute receiver; and he brought this suit against Wilson and Smith to recover all the profits which had been made by them and Ambrose.

The court held that Ambrose, as receiver, had the affirmative duty to realize the largest possible amount on the sale; and that by means of the agreement he had made with Wilson and Smith, "he placed himself in a position in which his personal interests were, or might be, antagonistic to those of his trust. * * * The course taken was one which a fiduciary could not legally pursue. *Magruder* v. *Drury*, 235 U. S. 106, 119, 120. Since he did pursue it and profits resulted the court made him accountable to the trust estate for all the profits obtained by him and those who were associated with him in the matter, although the estate may not have been injured thereby. *Magruder* v. *Drury*, 235 U. S. 106. And others who knowingly join a fiduciary in such an enterprise likewise become jointly and severally liable with him for such profits. *Emery* v. *Parrott*, 107 Massachusetts, 95, 103; *Zinc Carbonate Co.* v. *First National Bank*, 103 Wisconsin, 125, 134; *Lomita Land & Water Co.* v. *Robinson*, 154 California, 36. Wilson and Smith are therefore jointly and severally liable for all profits resulting from the purchase; the former although he had no other relation to the estate; the latter, without regard to the fact that he was also counsel for the receiver. * * * Smith and Wilson are held liable for knowingly confederating with one who, as receiver of the estate of the note holder, owed a duty to it, and who put himself in a position where his personal interest conflicted with his duty " (pp. 588, 589).

It thus appeared that even though the estate was not injured, since no higher bid could have been obtained; that even though

there were no prospective profits taken away from the *cestui;* that even though Wilson's bid was not influenced in any way by the trustee; the mere fact that the trustee had placed himself in a position where self-interest conflicted with the interest of the *cestui* was sufficient to cause the whole transaction to be set aside.

This conclusion of the court is important in connection with the argument advanced by the defendants in the case at bar, that the pipe line and purchasing contracts were fair and reasonable and would have cost Pan Am just as much or more if some one other than Indiana had assumed the undertaking.

It was pointed out by the court in *Jackson* v. *Smith (supra,* at p. 589) that a trustee cannot make profits out of his trust, even though "the estate may not have been injured thereby." That rule is even more forcibly expressed in the opinion in *Magruder* v. *Drury* (235 U. S. 106, 119, 120): " It is a well settled rule that a trustee can make no profit out of his trust. The rule in such cases springs from his duty to protect the interests of the estate, and not to permit his personal interest to any wise conflic' with his duty in that respect. The intention is to provide against any possible selfish interest exercising an influence which can interfere with the faithful discharge of the duty which is owing in a fiduciary capacity. * * * It makes no difference that the estate was not a loser in the transaction or that the commission was no more than the services were reasonably worth. It is the relation of the trustee to the estate which prevents his dealing in such way as to make a personal profit for himself. * * * While no wrong was intended, and none was in fact done to the estate, we think nevertheless that upon the principles governing the duty of a trustee, the contention that this profit could not be taken by Mr. Drury owing to his relation to the estate, should have been sustained."

As was said in *Hazzard* v. *Chase National Bank* (159 Misc. 57, 83, 84; affd., 257 App. Div. 950; affd., 282 N. Y. 652): " So strict is the rule of undivided loyalty to the beneficiary that the mere fact that a trustee has an interest inconsistent with the interest of his *cestui,* casts upon him the burdens of explanation and justification. (*Munson* v. *Syracuse, G. & C. R. R. Co.,* 103 N. Y. 58; *Globe Woolen Co.* v. *Utica Gas & Elec. Co.,* 224 id. 483.) "

The case of *Irving Trust Co.* v. *Deutsch* (73 F. [2d] 121; certiorari denied, 294 U. S. 708) shows how high a standard of conduct equity has set for corporate fiduciaries. It also measures the weight of the burden of explanation which is placed upon the trustees.

The plaintiff there was the trustee in bankruptcy of a corporation referred to in the opinion as Acoustic. The facts in the case are very complicated. (See opinion below, 2 F. Supp. 971.) Reduced

to its simplest form the following appears: Acoustic had to acquire rights to manufacture under certain basic patents in the radio business. One of the defendants, Reynolds, was in a position to furnish such rights, because he had a contract to purchase 600,000 shares of stock at fifty cents per share of the De Forest Radio Company, which owned these patents, and which was then itself in receivership. Reynolds expected as a result of this purchase to lift the receivership and reorganize the De Forest Radio Company.

Acoustic employed one of the defendants, Bell, to negotiate with Reynolds. Bell, with the assistance of another defendant, Biddle, a director of Acoustic, obtained an offer of a one-third participation in the said purchase of 600,000 shares, viz., 200,000 shares at 50 cents per share, or $100,000 cash.

The offer was in terms directed to Messrs. Biddle & Bell, but was clearly intended for Acoustic itself, for the offer stated it would be accepted " subject to the approval of your Board of Directors." The offer also provided that if the stock was taken, Acoustic could name four of the nine places on the board of De Forest Company; and that Acoustic could handle the De Forest products subject to the approval of the De Forest board. It was the handling of the products which was the chief aim of Acoustic.

This offer was presented to the Acoustic board. Its president, Deutsch, also a defendant, was instructed by the board to try to obtain sufficient funds to enable Acoustic to pay for this stock if it decided to accept the offer of participation. At the next meeting of the board, Deutsch reported he could not raise the money for the corporation, but stated that some individuals were willing to accept the proposition on their own behalf, and would be willing thereafter to extend to Acoustic all the benefits which Acoustic was to get under the original offer of participation. It was pointed out that if Acoustic would accept the offer and not be able financially to perform, these individuals would take over the contract from Acoustic, and would buy the stock themselves. A corporate resolution was thereupon adopted approving and authorizing acceptance of the Reynolds' offer on behalf of Acoustic.

While this was the formal action taken at the meeting of the board, the directors understood that if Acoustic was unable to finance the purchase when time for payment came, certain of the directors, including Biddle (called the Biddle Syndicate), would themselves put up the money and acquire the stock individually. The Biddle Syndicate consisted of six members, three of whom were directors of the corporation Acoustic, and one of whom was Bell, the agent who got the original offer from Reynolds.

Partial payment was made for the stock by the personal checks of the directors (the Biddle Syndicate), but Reynolds gave his

receipt for the money to Acoustic. The balance of the purchase price was paid a little later by the same individuals, and it was explained to Reynolds that Acoustic was without funds and that the stock was being purchased by the individuals themselves. Reynolds, therefore, had the stock certificates issued to the members of the Biddle syndicate. Later on, an active market developed in this stock, and the members of the syndicate made large profits by selling their shares.

The trustee sought by the suit to recover these profits made by the syndicate on the sale of their stock. The theory was that some of the syndicate were directors and, therefore, fiduciaries of the corporation; that they were legally unable to appropriate for themselves the right of Acoustic for these 200,000 shares, even though Acoustic did not have adequate funds to perform the contract itself, and even though the directors risked their own funds in the venture. As against those of the defendants who were not directors recovery was sought on the theory that any one who assists in a fiduciary's dereliction is likewise liable to account for any profits made by the fiduciary, under the doctrine enunciated in *Jackson* v. *Smith (supra)*.

The defendants' main defense was that Acoustic was unable to go through with the contract because of lack of funds and credit, and that the directors honestly believed that by buying the stock for themselves they could give Acoustic the merchandising advantages which it wished, at the same time taking a stock speculation for their own benefit.

The court, although it found that the corporation itself was financially unable to go through with the transaction, rejected that as a legal defense to the complaint. Basing its conclusion on the old maxim of equity, that " fiduciaries should not be permitted to assume a position in which their individual interests might be in conflict with those of the corporation," the court laid down the rule that the directors " may not substitute themselves for the corporation any place along the line and divert possible benefits into their own pockets," even though the corporation was not able to undertake the venture. It said (at p. 124): " If directors are permitted to justify their conduct on such a theory, there will be a temptation to refrain from exerting their strongest efforts on behalf of the corporation since, if it does not meet the obligations, an opportunity of profit will be open to them personally. Cf. *Trice* v. *Comstock*, 121 Fed. 620, 623. Indeed, in the present suit it is at least open to question whether a stronger effort might not have been made on the part of the management to procure for Acoustic the necessary funds or credit."

The court went further, and held that Bell, who was not a director and therefore not a fiduciary, would be required to disgorge his profits too on the principle " that one who knowingly joins a fiduciary in an enterprise where the personal interest of the latter is or may be antagonistic to his trust, becomes jointly and severally liable with him for the profits of the enterprise (*Jackson* v. *Smith,* 254 U. S. 586, 589)." On the other hand, another participant in the syndicate (not a director) was absolved, because " he is not shown to have had affirmative knowledge that the directors with whom he joined were pursuing a course which would make their personal interests antagonistic to those of Acoustic."

The court refused relief as against Reynolds, saying: " However, Reynolds & Co. had the right to sell to whomever it could, and, on being informed that Acoustic was not able to perform, it was justified on that information in making the sale to the syndicate. No right of Acoustic was violated in so doing, as Acoustic could demand the stock only on fulfilling its own obligation. Reynolds & Co. was not obliged to prejudice this opportunity to dispose of the stock nor to investigate scrupulously the intracorporate affairs of Acoustic. Since it received no benefit from the transaction aside from completing the sale of the stock and there is no proof that it acted in a conspiracy to deprive Acoustic of a valuable asset, it cannot be held to an accounting. See *Wendt* v. *Fischer,* 243 N. Y. 439, 444."

This case is particularly applicable to the contention raised by the defendants in the case at bar with respect to the crude production, pipe line, and crude purchasing matters. The claim is that Pan Am was not able, either financially, or as a matter of business efficiency and organization, to build a pipe line or organize a crude purchasing department, or enter into extensive purchasing of crude producing properties. The holding of the court in the *Deutsch* case, however, does not permit that inability, assuming it was proven, to be urged successfully as a defense to the charge that Indiana appropriated those functions to itself and made profits on them at the expense of Pan Am.

In the *Deutsch* case, too, the corporation suffered no damage, for the syndicate made arrangements to give Acoustic exactly the advantages which it was seeking. Nevertheless, the directors, in spite of their good faith, were directed to disgorge the incidental profits made by selling the stock.

In *Guth* v. *Loft, Inc.* (—— Del. ——; 5 A. [2d] 503) the court followed the principles of the earlier cases and carried them a logical step forward.

Appellant Guth was president of Loft, Inc., in 1931. Because of the high charge being made by Coca-Cola to Loft for its syrup,

Guth was looking for a substitute cola syrup. He was approached by one Megargel, who controlled a corporation (then going through bankruptcy) which owned the Pepsi-Cola secret formula and trademark.

Together they agreed to buy these assets of the bankrupt corporation and transfer them to a Pepsi-Cola Company to be organized by them, each to take 100,000 shares of stock of that corporation.

This was done; Guth gave Megargel $12,000 (of which $7,000 was a certified check of Loft, Inc., later repaid) and Guth's 100,000 shares were issued in the name of Grace Corporation, a syrup concern in Baltimore owned by Guth. Guth completely dominated Loft, Inc., having elected his own board of directors after a strenuous proxy fight. He used Loft's capital, plant facilities, materials, credit, employees, etc., to further Pepsi-Cola until 1935. The mixture was made in Loft's plant, sent to Grace at cost plus ten per cent, then sold and distributed by Grace to customers, including Loft, at a profit.

In 1933 Guth settled a claim of Megargel with Loft's money and got 97,500 shares of Megargel's stock, so that he owned in 1935 (together with Grace) ninety-one per cent of Pepsi-Cola. That year Guth resigned as president after a break with the majority of the board of Loft. They brought this action to impress a trust on the shares of stock of Pepsi-Cola owned by Guth and Grace, and for an accounting. From judgment for Loft, Guth appealed.

The Supreme Court affirmed on the ground that Guth had appropriated a business opportunity which belonged in equity to Loft, Inc., and had made profits therefrom to which Loft, Inc., was entitled. While the decision was also based on the fact that Guth had used Loft's facilities and money in the enterprise, that was not the sole basis. The court emphasizes the fact that the nature of the business of Loft, Inc., made the Pepsi-Cola business a logical, adaptable part of the Loft enterprise, and, therefore, a natural opportunity belonging in equity to Loft, Inc. The fact that it had at the time no existing property right in the opportunity was not held to be material.

The court said:

" Where a corporation is engaged in a certain business, and an opportunity is presented to it embracing an activity as to which it had fundamental knowledge, practical experience and ability to pursue, which, logically and naturally, is adaptable to its business having regard for its financial position, and is one that is consonant with its reasonable needs and aspirations for expansion, it may be properly said that the opportunity is in the line of the corporation's business. * * *

" It is urged that Loft had no interest or expectancy in the Pepsi-Cola opportunity. That it had no existing property right therein is manifest; but we cannot agree that it had no concern or expectancy in the opportunity within the protection of remedial equity. Loft had a practical and essential concern with respect to some cola syrup with an established formula and trade-mark. A cola beverage has come to be a business necessity for soft drink establishments; and it was essential to the success of Loft to serve at its soda fountains an acceptable five cent cola drink in order to attract into its stores the great multitude of people who have formed the habit of drinking cola beverages " (p. 514).

Such corporate opportunity could not be appropriated by Guth, the fiduciary, said the court:

" If an officer or director of a corporation, in violation of his duty as such, acquires gain or advantage for himself, the law charges the interest so acquired with a trust for the benefit of the corporation, at its election, while it denies to the betrayer all benefit and profit. The rule, inveterate and uncompromising in its rigidity, does not rest upon the narrow ground of injury or damage to the corporation resulting from a betrayal of confidence, but upon a broader foundation of a wise public policy that, for the purpose of removing all temptation, extinguishes all possibility of profit flowing from a breach of the confidence imposed by the fiduciary relation. Given the relation between the parties, a certain result follows; and a constructive trust is the remedial device through which precedence of self is compelled to give way to the stern demands of loyalty. [Citing cases.] * * *

" The rule, referred to briefly as the rule of corporate opportunity, is merely one of the manifestations of the general rule that demands of an officer or director the utmost good faith in his relation to the corporation which he represents. * * *

" If there is presented to a corporate officer or director a business opportunity which the corporation is financially able to undertake, is, from its nature, in the line of the corporation's business and is of practical advantage to it, is one in which the corporation has an interest or a reasonable expectancy, and, by embracing the opportunity, the self-interest of the officer or director will be brought into conflict with that of his corporation, the law will not permit him to seize the opportunity for himself. And, if, in such circumstances, the interests of the corporation are betrayed, the corporation may elect to claim all of the benefits of the transaction for itself, and the law will impress a trust in favor of the corporation upon the property, interests and profits so acquired " (pp. 510, 511).

This case is most relevant to the claims made by the plaintiffs in the case at bar: that the acquisition of crude properties, the construction of an independent pipe line and the purchasing of crude were all necessary adjuncts of an integrated oil company; that Indiana, in the definitive agreement, had actually agreed, expressly or impliedly, that Pan Am could engage in them as an independent company; but that in violation of its fiduciary and contractual duty it appropriated, by sheer voting force, all of these business opportunities for itself and made a profit on each of them at the expense of Pan Am.

The determinations reached in the *Guth* case are merely logical conclusions from the ancient principle of equity which demands of a trustee undeviating loyalty to his beneficiary. If it is a breach of duty for the trustee to take any part of the actual trust estate, it is equally disloyal to appropriate for himself the opportunities for profit which are inherent in the normal business of the beneficiary; and which the beneficiary should be allowed to develop for his own advantage. (See, also, in line with the principles of the *Guth* and *Deutsch* cases: *Beaudette* v. *Graham*, 267 Mass. 7; 165 N. E. 671; *New York Trust Co.* v. *American Realty Co.*, 244 N. Y. 209; *Red Top Cab Co.* v. *Hanchett*, 48 F. [2d] 236; *Blum* v. *Fleishhacker*, 21 F. Supp. 527; *Fox* v. *Simons*, 251 Ill. 316; 96 N. E. 233; 39 Col. L. Rev. 219.)

In such a situation it is not enough for the defendant to prove that the charges made by Indiana were the usual charges, that the terms of the arrangements between Indiana and Pan Am were fair and reasonable, and usual and ordinary, as the defendants have sought to do. While such proof is also essential, it must first be shown that the very act of taking over the normal business opportunities of Pan Am at a profit was justified. What constitutes justification will of course depend on the circumstances of each case. The *Deutsch* case has held that mere financial inability of Pan Am, for one thing, would not be sufficient excuse. But until justification is shown, the fairness of the deal does not obviate liability. Indiana and its nominees were attempting to serve the interests of Pan Am, but were at least equally interested in serving the interests of Indiana. In such a situation the language of Mr. Justice CARDOZO in *Wendt* v. *Fischer* (243 N. Y. 439, 443) is apt: " Finally we are told that the brokers acted in good faith, that the terms procured were the best obtainable at the moment, and that the wrong, if any, was unaccompanied by damage. This is no sufficient answer by a trustee forgetful of his duty. The law ' does not stop to inquire whether the contract or transaction was fair or unfair. It stops the inquiry when the relation is disclosed,

and sets aside the transaction or refuses to enforce it, at the instance of the party whom the fiduciary undertook to represent, without undertaking to deal with the question of abstract justice in the particular case ' (*Munson* v. *Syracuse, etc., R.R. Co., supra,* at p. 74; cf. *Dutton* v. *Willner,* 52 N. Y. 312, 319). Only by this uncompromising rigidity has the rule of undivided loyalty been maintained against disintegrating, erosion."

The rule is based upon the public policy of removing temptation completely from the office of a fiduciary, so that it will not be necessary to determine whether it was the interest of the trustee or his sense of duty which prevailed. Different courts have defined this rule in different words, but in unanimity of substance (*Dutton* v. *Willner,* 52 N. Y. 312, 318, 319): " It is a well settled and salutary rule that ' a person who undertakes to act for another in any matter shall not, in the same manner, act for himself.' It is only by a rigid adherence to this simple rule that all temptation can be removed from one acting in a fiduciary capacity to abuse his trust, or seek his own advantage in the position which it affords him. One consequence of a violation of the rule is that the agent must, at the option of his principal, account to him for any profit he may have made by the transaction. It matters not how fair the conduct of the agent may have been in the particular case, nor that the principal would have been no better off if the agent had strictly executed his power, nor that the principal was not in fact injured by the intervention of the agent for his own benefit. * * * The rule which places it beyond the power of the agent to profit by such transactions is founded upon considerations of policy, and is intended not merely to afford a remedy for discovered frauds, but to reach those which may be concealed; and also to prevent them, by removing from agents and trustees all inducements to attempt dealing for their own benefit in matters which they have undertaken for others, or to which their agency or trust relates [Citing many cases]."

*Pearson* v. *Concord Railroad Corporation, etc.* (62 N. H. 537, 543): " The reasons for the exclusion of all inquiry into the *bona fides* of the transaction are expressed in these cases with clearness and exactness. Mr. Justice FIELD said,—' The two positions impose different obligations, and their union would at once raise a conflict between interest and duty; and constituted as humanity is, in the majority of cases duty would be overborne in the struggle.' (*Wardell* v. *R. R. Co.,* 103 U. S. 651; *Marsh* v. *Whitmore,* 21 Wall. 178, 183.) ' It is to avoid the necessity of any such inquiry, in which justice might be balked, that the rule takes so general a form.' (*Jewett* v. *Miller,* 10 N. Y. 402, 405.) ' The rule is founded

in the known weakness of human nature, and the peril of permitting any sort of collision between the personal interests of the individual and his duties as trustee in his fiduciary character.' (*Duncomb* v. *R. R. Co.*, 84 N. Y. 190, 199.) "

*Michoud* v. *Girod* (4 How. [U. S.] 503, 555): "The general rule stands upon our great moral obligation to refrain from placing ourselves in relations which ordinarily excite a conflict between self-interest and integrity. * * * In this conflict of interest, the law wisely interposes. It acts not on the possibility, that, in some cases, the sense of that duty may prevail over the motives of self-interest, but it provides against the probability in many cases, and the danger in all cases, that the dictates of self-interest will exercise a predominant influence, and supersede that of duty."

## BURDEN OF PROOF.

The defendants stress the point that plaintiffs have the burden of proof " on every issue necessary to establish a cause of action " and that that burden remains with the plaintiff at all times and on all questions of fact throughout the trial. They concede that once " the plaintiffs have established a *prima facie* case, the burden is upon the defendants to come forward with evidence to meet that case." They claim, however, that no matter how the burden of going forward may shift from plaintiffs to defendants during the course of the trial, the plaintiffs must ultimately sustain their burden by a preponderance of the evidence in order to succeed in all branches of this case. This would mean, of course, that the plaintiffs would have to prove that the acts of the defendants were not justified, instead of placing the burden on the defendants of showing affirmatively that the transactions were justified.

It has been said that " the phrase ' burden of proof ' is one of double meaning, which circumstances has been the cause of confusion. * * * The ambiguity lies in the indiscriminate use of the phrase ' burden of proof,' as meaning either: First, the necessity of establishing the existence of a certain fact or set of facts by evidence which preponderates to a legally required extent; or second, the necessity which rests on a party at any particular time during a trial to create a *prima facie* case in his own favor or to overthrow one when created against him." (22 C. J. § 13, pp. 67, 68.) As aptly stated by Surrogate FOWLER: The " *onus probandi*, burden of proof, is an equivocal term of art, denoting primarily the obligation to establish an allegation by preponderating proofs, and secondarily the necessity of taking up and proceeding with the evidence in a given cause at a particular point of time. It is not always easy to determine the various senses in which this

term ' burden of proof ' is employed by judges in the adjudicated cases in this State." (*Matter of Gedney*, 142 N. Y. Supp. 157, 161 [not officially reported].) The term " burden of proof " is the more appropriate phrase to describe the first part of both definitions, and the term " burden of going forward " to define the shifting requirement of producing evidence.

As heretofore discussed, Indiana, through its domination and control of Pan Am, became a fiduciary of Pan Am. The plaintiffs had the complete burden of proving this relationship as part of their case, as in any case where a party relies upon the existence of a confidential or trust relationship. (*Cowee* v. *Cornell*, 75 N. Y. 91, 101; *Roecher* v. *Story*, 91 Mont. 28; 5 P. [2d] 205.) But once that trust relationship was established, a burden was at that moment placed upon the trustee to justify certain of its actions — a burden of proof, and not merely a burden of going forward with evidence. The transactions for which the defendants (except New Jersey and Teagle) have the burden of justification are those which resulted in a profit to Indiana, the trustee, at the expense of Pan Am, the beneficiary, *viz.*: the purchase of crude properties, the pipe line contracts, and the crude oil purchasing arrangements.

In *Sage* v. *Culver* (147 N. Y. 241) the court said: " When it appears that the trustee or officer has violated the moral obligation to refrain from placing himself in relations which ordinarily produce a conflict between self-interest and integrity, there is in equity a presumption against the transaction, which he is required to explain " (p. 247). One of the cases relied upon in the opinion for this statement of the law is *Gibson* v. *Jeyes* (6 Ves. Ch. 266, 278). In that case it was sought to set aside the sale of an annuity by an attorney to his client, by which, it was claimed, the attorney profited. Lord Chancellor ELDON laid down the following principles: " An attorney buying from his client can never support it; unless he can prove, that his diligence to do the best for the vendor has been as great, as if he was only an attorney, dealing for that vendor with a stranger. That must be the rule. * * * But, from the general danger, the Court must hold, that if the attorney does mix himself with the character of vendor, he must show to demonstration, for that must not be left in doubt, that no industry he was bound to exert would have got a better bargain (p. 271). * * * It is necessary to say broadly, that those, who meddle with such transactions, take upon themselves the whole proof, that the thing is righteous (p. 276). * * * It is asked, where is that rule to be found? I answer, in that great rule of the Court, that he, who bargains in matter of advantage with a person placing confidence in him, is bound to show, that a reasonable use has been

made of that confidence; a rule applying to trustees, attorneys, or any one else " (p. 278).

Elsewhere the same meaning is manifest: " The law presumes in the case of guardian and ward, trustee and *cestui que trust*, attorney and client, and perhaps physician and patient, from the relation of the parties itself that their situation is unequal and of the character I have defined; and that relation appearing itself throws the burden upon the trustee, guardian or attorney of showing the fairness of his dealings." (*Cowee* v. *Cornell, supra*, p. 100.) It has also been thus expressed: " The burden is on the defendants to convincingly establish every element that will reveal their action was not in violation of a fiduciary relation." (*Gallagher* v. *Perot*, 122 Misc. 845, 850.)

The rule relating to the burden of proof devolving upon trustees is clarified in *Barnard* v. *Gantz* (140 N. Y. 249, at p. 257), quoting Judge ANDREWS in *Matter of Smith* (95 id. 516, 522): " Transactions between guardian and ward, attorney and client, trustee and *cestui que trust*, or persons one of whom is dependent upon and subject to the control of the other, are illustrations of this doctrine. Dealings between parties thus situated, resulting in a benefit conferred upon, or an advantage gained by the one holding the dominating situation, naturally excite suspicion, and when the situation is shown, then there is cast upon the party claiming the benefit or advantage, the burden of relieving himself from the suspicion thus engendered   *   *   *.  This rule does not proceed upon a presumption of invalidity of the particular transaction, without proof.  The proof is made in the first instance when the relation and the personal intervention of the party claiming the benefit is shown.  The law is not so impracticable as to refuse to take notice of the influence of greed and selfishness upon human conduct, and in the case supposed it wisely interposes by adjusting the quality and measure of proof to the circumstances, to protect the weaker party and, as far as may be, to make it certain that trust and confidence have not been perverted or abused."

In accord is the case of *Belden* v. *Belden* (139 App. Div. 437, 443, 445), where the court said: " It seems to us that the burden is upon the beneficiary (the gainer in the transaction not the *cestui*) of satisfying the court of his good faith and entire fairness.   *   *   *   In a court of equity the relation of the parties and their comparative condition is of utmost importance, and when a *prima facie* case is made of a fiduciary relation the burden is shifted to the fiduciary to satisfy the conscience of the court.  Then the doctrine of *uberrima fides* becomes applicable.".

More explicit is the expression of the court in *Fisher* v. *Bishop* (108 N. Y. 25, 29): " When this relation is shown to exist it imposes the burden of proof upon the person taking securities, or making contracts enuring to his benefit, to show that the transaction is just and fair, and that he has derived no unfair advantage from his fiduciary relation." (See, also, *Fox* v. *Simons, supra.*)

Consistency in this view of burden of proof is shown by such cases as *Nesbit* v. *Lockman* (34 N. Y. 167, 169): " The presumption is against the propriety of the transaction, and the *onus* of establishing the gift or bargain to have been fair, voluntary and well understood, rests upon the party claiming." *Meeker* v. *Winthrop Iron Co.* (17 Fed. 48, 51): " If a majority of stockholders can, in any event and under any circumstances, thus vote away the corporate property to their individual uses,—a question that need not be decided in this case,— they could only do so upon the clearest and most satisfactory evidence of good faith, and for an adequate consideration; and the burden of proof is upon the parties thus acting and claiming the enforcement of such a contract. All doubts in relation to adequacy of consideration and good faith ought to be resolved in favor of the principal." *Pepper* v. *Litton* (308 U. S. 295, 306): " A director is a fiduciary. (*Twin-Lick Oil Co.* v. *Marbury*, 91 U. S. 587, 588.) So is a dominant or controlling stockholder or group of stockholders. (*Southern Pacific Co.* v. *Bogert*, 250 U. S. 483, 492.) Their powers are powers in trust. (See *Jackson* v. *Ludeling*, 21 Wall. 616, 624.) Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein." *O'Donoghue* v. *Boies* (159 N. Y. 87, 102): " The burden was on the defendant to show that the purchase was for the benefit of the infants, if such was the fact."

None of the cases cited by defendants is to the contrary. For example, the cases of *St. Andrassy* v. *Mooney* (262 N. Y. 368) and *Kay* v. *Metropolitan Street R. Co.* (163 id. 447) are negligence cases, wherein the law is well settled that the burden of proof of defendant's negligence and plaintiff's freedom from contributory negligence, except in death cases, always remains with plaintiff despite initial relief from offering such proof by reason of a presumption or some helpful evidentiary device such as *res ipsa loquitur.* They do not in any way involve fiduciary relations. The same reasoning applies to *Farmers L. & T. Co.* v. *Siefke* (144 N. Y. 354), which was an action on a note, and *Heinemann* v. *Heard* (62 id. 448),

which was an action based on negligence in carrying out a contract to purchase. The cases of *Stoddard* v. *Schwab* (255 App. Div. 556; affd., 281 N. Y. 586); *Bown* v. *Ramsdell* (139 Misc. 360); *Ludlam* v. *Riverhead Bond & Mortgage Corp.* (244 App. Div. 113) and *Gallin* v. *National City Bank of New York* (152 Misc. 679) are all cases relating to the negligent waste of assets by directors. These are situations entirely different from matters where a fiduciary deals with its *cestui* at a profit. In cases involving negligence by the directors, the plaintiff has the burden of proof throughout of showing the negligence and the waste or damage.

But as to all matters wherein Indiana had dealings with Pan Am as a result of which a profit has been made by the former, the burden of proof is upon Indiana to justify them and also to show that they were fair and reasonable.

### Conclusions As to the Crude Producing Properties.

The trustee (Indiana) by the votes of its nominees on the board of the *cestui* (Pan Am) prevented Pan Am from entering into production of crude from 1933 to July, 1935, when Pan Production was organized and a manager employed. During the same time the trustee proceeded to purchase for itself new crude oil properties within the East Texas and Gulf Coast districts, a substantial portion of the output of which it sold to Pan Am at a profit to fill the requirements of Pan Am's refinery.

In other words, the situation is here presented of a trustee in control of its *cestui*, preventing the *cestui* from going into legitimate activities essential to the *cestui's* business, although the trustee had formally promised the *cestui* it would help the *cestui* undertake these activities. At the same time the trustee itself took advantage of these opportunities, acquired properties itself, and sold the output of them to the *cestui*.

The very showing of such circumstances is by itself sufficient to make the trustee account for these profits unless the trustee can adequately justify its conduct.

The only justification urged here for the acts of the trustee is that the anti-trust laws of Texas made the entry into production of crude by Pan Am illegal.

The defendants have not sustained their burden of proving that the Texas anti-trust laws rendered the proposed production activities by a subsidiary of Pan Am illegal. On the contrary, I find nothing in the Texas anti-trust laws which made it illegal.

Strictly speaking, of course, the determination by this court of the effect of the Texas anti-trust laws is one of fact, since it involves a question of the law of another State. (Richardson, Law of

Evidence, § 195; Civ. Prac. Act, § 391.) On this question of fact much evidence was introduced on behalf of the plaintiff, and more testimony on behalf of the defendants, including the testimony and opinions of eminent Texas counsel, citations of cases decided in the Texas appellate courts and opinions of various Attorneys-General of the State of Texas.

The anti-trust laws of Texas, so far as here material, are contained principally in articles 7426 and 7427 of the Texas Civil Statutes. Article 7426 defines a trust as a "combination of capital, skill or acts by two or more persons, firms, corporations or associations of persons * * * for either, any or all of the following purposes." The enumerated forbidden purposes include creating or tending to create "restrictions in trade or commerce" or "in the free pursuit of any business," and preventing or lessening competition. Article 7427 defines a monopoly as a combination or consolidation of two or more corporations when effected "for the purpose of producing, or where such common management or control tends to create a trust" as defined in article 7426. The statutes thereupon declare that any trust or monopoly, as therein defined, is prohibited and illegal.

From the face of the statutes it appears obvious that in order to violate article 7426 it is necessary for two independent entities to enter into a combination for one of the prohibited purposes. It is clear also that article 7427 refers to two or more corporations which combine or consolidate for the purpose of preventing or lessening competition.

In the situation proposed for Pan Am there was involved the creation of a new company which would proceed to compete with an old company, SO&G. It is true that both of these competing companies would be subsidiary, so far as stock ownership is concerned, to a common parent, Indiana. But mere stock ownership and control would not of itself constitute a violation of the Texas anti-trust laws.

The purpose of the definitive agreement and of the reorganization plan was to make Pan Am an independent and integrated company. The purpose of the arrangement was to increase competition on the part of Pan Am rather than to suppress it. In interpreting the applicability of the statutes, it would be improper to assume that the two companies would undertake not to compete with each other, either by express or by implied agreement. Any such agreement would, of course, immediately bring them within the terms of the statute. The applicability of the statute to the situation must be gauged by a conception of these two companies as really independent agencies, having no relationship or communi-

cation with each other, except those which would arise in normal business intercourse between corporations which are total strangers to each other in a legal sense. There is a vast difference between taking two independent competing agencies and bringing them under one management with implied agreements against competition, on the one hand, and, on the other, creating a new company and permitting it to compete actively with an existing company already engaged in the field. The fears expressed by some of the defendants' expert legal witnesses that many suspicious things might happen which would produce a jury question as to violation, are beside the point. There is no reason why these things should happen, if both companies were to decide to enter into *bona fide* competition with each other.

Although at the trial, article 1502 of the Texas Civil Statutes was advanced by the defendants as another possible bar to the incorporation of a production subsidiary of Pan Am, that article could not be applicable to a corporation organized under article 1302. Both Pan Production and SO&G were qualified to do business under article 1302. In fact, the point about article 1502 was never raised in any of the legal opinions by Stephens or others, up to the time the defendant Indiana moved to amend its answer with respect thereto in November, 1939.

It was the clear duty of Indiana and of the directors of Pan Am to furnish Pan Am with independent legal advice in a matter so important to the prosperity of the company as the acquisition of crude properties. Instead, the entire matter was left to Stephens, who was a director, officer and general counsel for Indiana. Pan Am did have its own counsel at that time; but obviously the only authoritative opinion, so far as the Indiana nominees were concerned, was that of Indiana counsel. Even the retention of Texas counsel and the seeking of Texas legal advice were handled through the legal department of Indiana — through Stephens and his assistant, Fellingham, rather than through the nominal attorneys for Pan Am. It was definitely stated by Barkdull to the Pan Am meeting of August 24, 1933, that all legal difficulties would have to be cleared up to the satisfaction of Indiana counsel, and that until that was done nothing would be attempted toward integrating Pan Am in respect to crude producing properties. All of the majority directors to Pan Am, according to their own testimony, did in fact rely upon Stephens' opinion.

This neglect of duty by the directors was particularly culpable because during this time Indiana was making plans to purchase new crude properties and was actually buying them. It was pro-

posing, through its own subsidiary, SCOP, to sell to Pan Am at a profit all of the crude that Pan Am required in its refinery.

It was obviously, therefore, in the interest of Indiana that Pan Am did not go into the production business and produce its own crude. If it did, it would be lost to Pan Am as a prospective customer. This diversity of interest was not obscure; it must have been evident to all concerned. The actual contracts for the purchase of crude by Pan Am from SCOP and for its transportation through the pipe lines of SPL were being considered by the board. They all knew of Indiana's interest in the matter of Pan Am's backlog of crude reserves. Stephens was, therefore, rendering a legal opinion in a situation in which there were conflicting interests between two corporations, in both of which he was a director. Stephens' legal conclusion was going to affect very materially the profits of both the parent and the subsidiary corporation, no matter how he decided the question. With these conflicting interests the directors should have insisted on an opinion from counsel who was independent of both sides. Stephens was, in legal effect, a trustee for both corporations, and should have disqualified himself, especially since the one independent legal opinion obtained by him from Texas counsel in April, 1933, was contrary to his own as expressed by him in August. Indiana, the trustee, was flying in the face of the opinion rendered by the Texas lawyers whom it had consulted, and was insisting upon blind adherence to a legal conclusion which had been rendered by its own general counsel, which benefited itself and harmed its *cestui*.

I do not find that the opinion of Stephens was prepared as a crass subterfuge to provide an excuse for the refusal of Indiana to permit Pan Am to enter into the producing business. However, the opinion was written by one who was not an impartial counsel for Pan Am, but was counsel for Indiana as well. I do not believe that Stephens was actually of a contrary legal opinion from the one actually written by him. On the other hand, the opinion was written by a partisan representative of Indiana, which at that time was engaged in a controversy with the minority directors of Pan Am, and the interest of which lay decidedly in the direction of the conclusion reached in Stephens' opinion.

The obligation of Indiana here is to account for the profits and properties acquired by it, which it should have given Pan Am the opportunity to acquire in competition with it. The opportunity of prospecting for and purchasing crude producing land belonged to the *cestui*. It was even promised to the *cestui* by the definitive agreement. In line with general principles of equity it was not proper for the fiduciary to take these opportunities unto itself,

while at the same time it stayed the processes of its subsidiary directed toward the same business ends. It is not only a case of a fiduciary seizing business opportunities of the *cestui*. There is the additional factor here that the trustee at the same time kept its dominant hand upon the *cestui*, suppressing any attempt by the *cestui* to go out and compete with the trustee.

The fiduciary under such circumstances must be deemed to hold the properties and profits as a constructive trustee for the *cestui*. That is the uncompromising, rigid rule laid down in the many cases hereinbefore discussed, upon a broad foundation of wise public policy, and a clear understanding of human frailty and of its capacity to yield to temptation of profit.

The fiduciary is forbidden to enter a situation where personal interest will conflict with the interest of his principal. Indiana and its counsel deliberately took a position in this case where the interest of Indiana conflicted with the interest of Pan Am.

The other members of the board of Pan Am were laymen. It may be that they relied in good faith upon the legal opinion of Stephens. They had no right to rely upon it. Reliance was not compliance with their duties as directors of Pan Am, charged with the duty of looking out solely for the interest of Pan Am. With their knowledge of the inconsistent position which Stephens occupied, it was their duty to seek outside counsel, and their failure to do so makes them equally responsible with Indiana to account for the profits which Indiana made as a result of its conduct.

Even if we assume, therefore, that the lay directors of Indiana and Pan Am both believed in good faith that it was dangerous for Pan Am to enter the crude producing business in Texas, that belief would not be a defense to this trustee, who proceeded to buy up properties itself and from them sell crude to the *cestui* at a profit for itself. It is no defense to urge that the trustee believed the advice of counsel that the *cestui* was legally barred from availing itself of those business opportunities on its own account.

If the question involved were merely one of negligence or business judgment the erroneous legal opinion of counsel, followed in good faith, would constitute a defense for the directors. But where the opinion permits a trustee to violate its elementary fiduciary obligations, good faith in following that advice is unavailing if the advice is wrong.

Nor is it a sufficient defense to say that Pan Am itself might not have been able financially to seize these business opportunities. It is the duty of the fiduciary to help the beneficiary equip itself to avail itself of the opportunities. This is the general rule in equity. It was in this case a contractual duty as well. The

definitive agreement contained a promise by Indiana that it would use its best efforts and personnel to assist Pan Am in its program of crude production. As was pointed out in *Irving Trust Co.* v. *Deutsch* (*supra*), if directors or other fiduciaries of corporations were permitted to justify on such a theory their conduct in taking corporate business opportunities for themselves, there would always be the temptation for them to refrain from exerting their strongest efforts on behalf of the corporation; for so long as the corporation remained unable to undertake the work itself, an opportunity to profit would be open to them personally.

Under these well-settled principles of equity the defendants, except Teagle and the New Jersey defendants, should account to Pan Am for all the profits made by Indiana's subsidiary SO&G on crude produced from leases and properties acquired by SO&G in the following fields from March 28, 1933, until July 1, 1935, when Pan Production was placed in operation: East Texas (except from the Yount-Lee properties), Hastings, South Houston and that part of Turtle Bay and Tomball which was used to supply Pan Am. These fields are selected because from them crude was sold by Indiana to Pan Am for its refinery during that period. It would be logical to assume, therefore, that those fields were the ones advantageous to Pan Am for its refinery.

It is true that even if Pan Am had been left to its independent crude producing program it might not have entered these fields; and, if it had, might not have there discovered and purchased leases. It is also true that Indiana spent large sums of money exploring other fields and other pieces of property which did not yield results in the form of oil. It is impossible accurately to determine what would have happened had Pan Am been allowed to avail itself in a reasonably normal manner of its legitimate business opportunities. Because it is not known what the *cestui* would have done, however, it does not follow that what the trustee did cannot be undone. Such reasoning would palsy the arm of a court of equity and render it powerless to do justice. It would permit a faithless trustee to take advantage of his own wrong to his *cestui*. In such a situation it is just that those fields from which oil was actually sold by the trustee at a profit to the Pan Am refinery be held to constitute the business opportunities which the trustee preempted at the expense of Pan Am.

Merely accounting for the profits from the sale of crude, however, would not do full justice. These properties themselves belong, in equity, to Pan Am; and Indiana should be held to be a constructive trustee of them through its subsidiary, SO&G, for the benefit of Pan Am. Of course, Indiana is entitled to be compensated for

all the legitimate money investment which went into the acquisition of the land, such as price, allocable exploration expense, overhead, etc. These are matters which will have to be determined on an accounting.

The processes of a court of chancery will not be stayed by the artificialities of the corporate set-up of Indiana and its subsidiaries. Later in this opinion is discussed the question of the corporate structures of Indiana and Pan Am so far as they concern liability between parent and subsidiary. In the matter of crude properties, the conclusion here reached is that Indiana took profits away from Pan Am and gave them to its almost wholly owned subsidiary SO&G. Even though SO&G is not a party to this action, a decree may be entered directing Indiana to disgorge these profits and return them to Pan Am. With respect to money profits the procedure is simple. With respect to profits in kind, such as oil lands, if Indiana cannot compel SO&G to convey them to Pan Am upon reimbursement of all expenses incurred in acquiring the land, Indiana will have to pay the money equivalent of these lands.

### Conclusions As to Pipe Line Transaction.

Much testimony was taken at the trial to show that the various pipe line agreements which were entered into by Pan Am over objections of the Blaustein directors were usual and reasonable agreements. That point was also argued very forcibly in the defendants' brief. The question here, however, is not whether these agreements were reasonable. The problem is analogous, rather, to that presented in connection with crude production.

This fiduciary, Indiana, through the votes of its nominees on the board of the *cestui*, prevented the *cestui* from building its own pipe line; and instead caused a contract to be made whereby its wholly owned subsidiary would transport the crude and charge Pan Am for it. The factual result has been than Pan Am has allegedly had to pay millions of dollars more for transporting its crude from East Texas to Baytown and Texas City than it would have had to pay if a direct pipe line had been constructed.

An independent pipe line is not only a legitimate activity of an integrated oil company but is a usual and necessary one. Indeed, the definitive agreement inferentially recognizes it. While there is no definite commitment with respect to pipe lines, the inference is clear that when the parties spoke of " a complete cycle and unit in the oil business " they intended to provide the usual items of integration, which, of course, included pipe lines and other forms of transportation.

All of the cases heretofore discussed with respect to a trustee taking profits or business opportunities belonging to a *cestui* are, therefore, applicable.

This branch of the case, like the production transaction, contains two elements which make the liability of the trustee here more apparent even than in the *Guth* case (*supra*), *first*, the trustee had inferentially agreed that Pan Am would have its own pipe line transportation; *second*, the trustee then not only undertook to do the transporting itself, but at the same time, through its actual voting power on the board of Pan Am, specifically prevented Pan Am from doing it.

The disability resting upon the fiduciary with respect to taking this corporate opportunity of its *cestui* is merely an application of the general rule of law set forth in the preceding cases, which prevents a fiduciary from using its dominating and controlling position to make profits which the *cestui* should have made. In this respect the situation is no different, of course, whether the trustee be directors of a corporation as in the *Guth* and *Deutsch* cases, or whether the trustee is a dominating majority stockholder. The *Bogert* case, the *Farmers' Loan & Trust Co.* case, the *Abilene National Bank Building Co.* case, the *Missouri & Edison Electric Co.* case, and the *Calumet & Hecla Mining Co.* case, all heretofore discussed, indicate that the same legal disability results.

It has been found that the defense that there were not a sufficient number of connections available in 1933 unless these pipe line arrangements were made with HPL, was not established as a fact. The additional grounds of justification urged in the defendants' briefs, viz., flexibility of types of crude, and the necessity for a large capital investment, do not prevent liability. They do not present adequate justification for Indiana to come in and take over the transportation business at a profit to itself. The amount required for the pipe line itself was estimated to be $4,700,000, including the gathering system; and to this should be added, say the defendants, another $1,300,000 for the construction of the necessary storage, making a total capital investment of $6,000,000. While the amount of capital expenditures is ordinarily a matter of business discretion, as in the case of the controversy as to whether a 48,000- or 24,000-barrel refinery should be constructed, it never excuses a director or any other fiduciary in turning the matter into private profit for himself.

Accordingly, Indiana will have to account to Pan Am for the profits which it made as a result of this business opportunity which it took unto itself.

For the same reason it will have to account for the secret profit which it made with respect to the Winkler deal. In view of the finding that the reduction in the Winkler tariff was a consideration for, and part of the deal involved in, the new pipe line arrangements, the profit which Indiana made thereby belongs to the *cestui*. It is, in legal effect, the same as if Humble had paid so many dollars to Indiana to induce Indiana to enter into this pipe line arrangement.

In addition to the profits, Pan Am is entitled to damages from Indiana for the loss which it sustained as a result of being deprived of the right to construct its own pipe line.

Where there has been a breach of duty by the fiduciary the *cestui* is entitled not only to the profits made by the fiduciary, but also to the damages suffered as a result of this breach. The damage here is to be measured by the difference in the actual cost of transportation over what it would have cost to transport this crude by a direct line including the necessary charges for storage facilities.

This rule as to damages is clearly set forth in *Bosworth* v. *Allen* (168 N. Y. 157, 165, 166). In that case the directors of a corporation, pursuant to a preconceived plan, resigned from the board and caused to be elected thereto some dummies under their control, with the understanding that the new board of directors would make certain payments to, and enter into certain contracts with, the resigned directors. The new directors, in addition to carrying out this understanding, voted to themselves unnecessary and unearned salaries, incurred extravagant and unnecessary expenses, and also made various wasteful, and improvident contracts with other people. The relief demanded was not only that the payments made to the defendant former directors should be accounted for and returned, but also that the amount of damages sustained by the corporation by reason of these wasteful acts of the new directors be recovered. Defendants demurred upon the ground that there was a misjoinder of causes of action for accounting and for damages.

The Court of Appeals held that the directors were trustees and liable to strict account for any breach of the trustee relationship; that the corporation had the right to look to them " for the damages naturally resulting from their official misconduct;" that a court of equity had the right " to compel restitution of property withheld, with compensation for assets wasted, and to award damages for the natural consequences of the official misconduct, when such damages are claimed, in connection with equitable relief, on account of a general course of injurious action or a conspiracy to despoil the corporation." The conclusion reached was that the profits and damages all come from a common cause, and that through an accounting action " all property lost and damages caused by the

wrongful acts of the defendants " might be included. While the court found that there was a conspiracy to wreck the corporation, such a conspiracy is not essential. The fact that there was a breach of fiduciary obligation and that as a result damages were sustained by the corporation, is sufficient to impose liability.

" If the trustee uses trust property for his own purposes he is liable for any loss and accountable for any gain resulting from such use. Where he deals on his own account with a third person in acquiring an interest in the subject matter which he holds in trust, he is accountable for any profit he makes thereby. He is accountable for any bonus or commission which he may receive from a third person on account of transactions entered into by him as trustee. He is not permitted on his own account to compete unfairly with the trust." (2 Scott on Trusts, 909, § 170.25.)

" Any gains made by the trustee out of the trust fund belong to the *cestui que trust;* and the trustee must bear any losses caused by his misconduct." (4 Sutherland on Damages, [4th ed.], 4423, § 1174.)

In other words, the *cestui* must be made whole, and in addition, the trustee must pay over all the gains he has made.

" The rule in equity is, that all gain made by the trustee, by wrongful appropriation of the trust fund, shall go to the *cestui que trust,* and all the losses shall be borne by the trustee himself." (*Oliver* v. *Piatt*, 3 How. [U. S.] 333, 401; *Sullivan & Co.* v. *Ramsey*, [Tex. Civ. App.] 155 S. W. 580, 588.)

In *Hamilton-Brown Shoe Co.* v. *Wolf Brothers* (240 U. S. 251) (an action for trade-mark infringement), the court said (p. 259): " The infringer is required in equity to account for and yield up his gains to the true owner, upon a principle analogous to that which charges a trustee with the profits acquired by wrongful use of the property of the *cestui que trust.* * * * In the courts of England, the rule seems to be that a party aggrieved must elect between damages and profits, and cannot have both. In this country, it is generally held that in a proper case both damages and profits may be awarded." Similarly, in the violation of partnership fiduciary, a partner may " recover damages from his copartner which will compensate him for the loss sustained by such misconduct or negligence." (*Hollister* v. *Simonson*, 36 App. Div. 63, 65, 66; appeal dismissed, 170 N. Y. 357.)

The principle of restitution and accountability for profits is also applicable to corporate fiduciaries as well. (19 C. J. S., 159 § 784, *et seq.*). In *Red Top Cab Co.* v. *Hanchett* (48 F. [2d] 236) the defendant, who was " chief stockholder of record, director, president and general manager of plaintiff corporation," had organized

a competing concern of his own to which he diverted business belonging to the plaintiff corporation. The claim was that such acts on his part were " in violation of the fiduciary relationship existing, and that plaintiff is entitled to all of the benefits arising out of defendant's operations, as well as to damages suffered " (p. 237). After finding that " defendant, in organizing his competing business, knowingly crippled and injured the plaintiff company," the court decreed, among other things, that plaintiff " have an accounting as to and recover the profits of defendant " and " shall recover such damages as it may prove against defendant Hanchett, reference to be made to a special master to make an assessment of such damages " (pp. 238–239).

In *Gray* v. *Cornelius* (40 F. [2d] 67), where the managing officer acquired an interest in property adverse to that of his corporation and made a profit therefrom, the court held that he " must account for such profits to the corporation " (p. 69) and must " be held liable for the loss to the corporation resulting from his breach of duty " (p. 70). (See, also, *Dunnett* v. *Arn*, 71 F. [2d] 912, 918–919.)

It thus appears that dereliction by Indiana with respect to pipe line transportation resulted in profit to it and loss to Pan Am; and Indiana is strictly accountable for both.

### CONCLUSIONS AS TO CRUDE PURCHASING.

The legal effect of the situation with respect to the crude purchasing is akin to that of the crude producing properties and the pipe line agreements. Purchasing was a legitimate and necessary function of an integrated Pan Am. This function was taken from it by the action of the directors who were nominees of the majority and dominating stockholder. As a fiduciary, Indiana took this business opportunity away from the *cestui*, and in accordance with the principles of equity hereinbefore discussed, must account for the profits made thereby.

These profits include the profits on crude purchased by SCOP, which went into storage and was then resold to Pan Am. So much of these profits as came from the crude produced from properties acquired in the East Texas field by SO&G from 1933 to July 1, 1935, has already been included in the branch of the case dealing with the crude producing properties.

SCOP is also liable to account to Pan Am for the excess between the five cent marketing charge collected in 1933 and the actual cost to it for marketing during that period. Furthermore, if it develops that in subsequent years the actual cost of marketing was in fact less than the amount collected from Pan Am for marketing, the excess must likewise be returned to Pan Am. The facts with respect thereto will have to be left to an accounting.

The question of storage cost on this oil is largely academic. Whether on the accounting it is charged as part of the marketing expense of SCOP, or as part of the cost to it of the crude which it later sold to Pan Am, is immaterial, for Pan Am would have to pay for it once anyway. It would appear, however, that storage is an item which should be charged to the cost of the crude, rather than part of the marketing expense.

The arguments urged by the defendant, that Pan Am was not equipped to do its own purchasing or storing of oil, and that therefore it could not have done the necessary purchasing and storage, do not constitute a defense. As indicated in those portions of the opinion which deal with the crude properties and pipe line matters, the rule announced in the *Deutsch* case does not excuse the fiduciary in appropriating the business and profits of the *cestui* merely because the *cestui* was unable to do the work itself. Although the reasonable inference from the evidence is that Pan Am, in fact, could have built up the necessary purchasing and storage facilities, its inability to do so would not justify Indiana's making a profit therefrom for itself.

For the same reason as was discussed in connection with the pipe line agreements, the question of the reasonableness of the crude purchasing agreement is also immaterial. The relevant issue is: Did the fiduciary make a profit therefrom which belongs in equity to the *cestui?* The record indicates an affirmative answer.

## Conclusions as to the Refinery Matter.

The legal considerations involved in the issue as to the refinery are different from those involved in the crude production, crude purchasing and crude transportation matters. Here Indiana did not make any profit whatsoever. Had Pan Am awarded the processing contract to an Indiana refinery, then the claim might have been made that Indiana had no right to take this corporate opportunity which belonged to Pan Am. However, that is not the fact.

A finding is made later in this opinion that no conspiracy existed between the defendants in this transaction. Accordingly, liability cannot be predicated upon actual fraud or upon the theory that profits were made by a fiduciary at the expense of a *cestui*.

The sole question left is whether or not the defendants in this case, or any of them, were guilty of misfeasance, neglect of duty, or waste of corporate assets in doing what they did with respect to refining and processing. Liability for such conduct could be predicated upon the common-law right of any stockholder to charge directors with corporate losses resulting from violation of duty or waste of assets; or could be based specifically upon sections 60 and

61 of the General Corporation Law, which form the basis of the third cause of action of this complaint. The individual defendants who would be chargeable here, in the absence of actual conspiracy, would be only those defendant directors in office when the processing contract was signed, namely, Seubert, Barkdull, Stephens, McKeever and Carroll.

In determining whether or not the directors should have built a 48,000-barrel refinery at once, in one or two units, or whether they should have built one refinery of 24,000 barrels and entered into a processing contract for the refining of the balance of Pan Am's requirements for a period of three years, the court cannot substitute its own judgment for the judgment of the directors. The directors are the ones intrusted with running the affairs of the corporation; and if, in the course of management, they make certain business decisions in good faith, it is not the function of the court to say that it would have acted differently. In passing upon the good faith of the business judgment exercised by the directors, the court can take into consideration only the state of facts existing at the time the directors made their determination. Facts which occurred thereafter cannot form the basis of the court's conclusion unless they might reasonably have been anticipated with certainty. The wisdom of hindsight cannot be substituted for a business judgment based only upon foresight.

This has always been the rule with respect to liability of directors in minority stockholders' actions. (*Pollitz* v. *Wabash R. R. Co.*, 207 N. Y. 113, 124; *Rous* v. *Carlisle*, 14 N. Y. Supp. [2d] 498, 501, 502; *Winter* v. *Anderson*, 242 App. Div. 430, 432; *Gallagher* v. *Davison*, N. Y. L. J. June 13, 1935, p. 3045; *Karasik* v. *Pacific Eastern Corp.*, [Del. Ch.] 180 Atl. 604, 607; *Leslie* v. *Lorillard*, 110 N. Y. 519, 532.)

The defendant directors are entitled to a presumption that their acts and their judgment as related to the refinery were honest, and that they were motivated by good faith. Since no claim is made that any of the defendants, directors or Indiana, made any money out of this transaction, the burden is upon the plaintiff to overcome this presumption and actually to show, by a preponderance of the evidence, misconduct on their part. (*Benson* v. *Associated Art Press, Inc.*, 236 App. Div. 645, 646; *Cleary* v. *Higley*, 154 Misc. 158, 170, 173; affd., 246 App. Div. 698; leave to appeal denied, 270 N. Y. 673; *Karasik* v. *Pacific Eastern Corp.*, *supra*, p. 607.)

The rule is well stated in *Gamble* v. *Queens County Water Co.* (123 N. Y. 91, 99), where the court said: " To warrant the interposition of the court in favor of the minority shareholders in a corporation or joint-stock association, as against the contemplated

action of the majority, where such action is within the corporate powers, a case must be made out which plainly shows that such action is so far opposed to the true interests of the corporation itself as to lead to the clear inference that no one thus acting could have been influenced by any honest desire to secure such interests, but that he must have acted with an intent to subserve some outside purpose, regardless of the consequences to the company and in a manner inconsistent with its interests. Otherwise the court might be called upon to balance probabilities of profitable results to arise from the carrying out of the one or the other of different plans proposed by or on behalf of different shareholders in a corporation, and to decree the adoption of that line of policy which seemed to it to promise the best results, or at least to enjoin the carrying out of the opposite policy. This is no business for any court to follow."

The estimates which the board of directors had before them when they decided to vote for processing half of the requirements of Pan Am, showed that the proposed processing cost would be about $1,000,000 per year in excess of what it would cost to refine an equal quantity of crude in a second Pan Am refinery unit, if it were built. The question presented is whether the directors should be charged with liability for failure to adopt the plan to build a second unit and to make a capital investment in the obviously cheaper method of manufacture, and for committing Pan Am to a more expensive course for a period of three years.

The factors present on April 20, 1933, the date the decision was made to build a smaller refinery, which actuated the various directors in their vote have all been testified to by the directors themselves. It is true that some of the reasons testified to were not mentioned in the formal minutes of the corporation as recorded. That fact alone does not render incredible the existence of the reasons assigned by the defendants in their testimony. The minutes of a corporation are not kept with the precision of a court trial. Many things might be passing through a director's mind actuating his vote and business judgment which remain unexpressed at a meeting, or which if expressed, do not find their way onto the written page.

The chief compelling reason causing the defendants to act as they did was the state of business and the general economic and industrial conditions of the time. These have been described in great detail at the trial. Many of them are of a nature so well known as to require the court to take judicial notice of them.

While the business economy of the country was extremely low on February 17, 1933, the date the definitive contract was signed,

they grew definitely worse between that date and the middle of April. All of the banks had been closed by the new Administration on March 6, 1933. That was probably the most drastic peacetime act within recent years; but one which was imperative to save the entire banking system of the country. The various business indices, employment and payroll figures continued their decline. Charts showing business conditions, available to the directors in April, represented the economic picture which existed a few weeks before the date of the charts because of the necessary lag in their preparation. Therefore, economic graphs appearing in April would indicate a very gloomy state of affairs in business of all kinds. Earlier gains in the stock market had declined sharply during the last two weeks of February. Conditions were never worse than they were in March of 1933; and during the week of March 11, 1933, the business index of the New York *Times* fell to a record low.

The petroleum industry was no bright spot in the business panorama. Bowed down with the economic factors which weighed upon industry as a whole, the petroleum industry was harassed by a special problem — a vast over-production of crude oil in practically every important oil-producing State. The amount being produced from the oil wells was so much greater than the amount which could possibly be consumed in existing or immediately potential markets that complete chaos had resulted. Repeated attempts at amelioration by proration of production among wells had failed, as a result either of local court decisions, or of inability of the States individually to cope with the problem alone without the aid of Federal legislation.

All of these conditions were well known to all of the directors of Pan Am. They were particularly seen by Seubert, who in the middle of March had made a tour of the oil producing States, as a member of a committee of the American Petroleum Institute, to see at first hand the conditions of the oil industry in those States. His own views of the conditions he saw were expressed by him at the meeting of April fifth as follows: " More has occurred in the six weeks that have expired since the signing of the Indiana-Pan Am-American Oil-Blaustein contract to cause oil men to stop and think than has occurred in the last six years."

In the latter part of March the President of the United States called a conference of the Governors of the various oil producing States and of representatives of the oil industry generally, to consider ways and means of bringing order out of chaos in the industry. It was becoming a matter of general belief that, unless something was done by the industry to place its house in order, the government itself would have to take a hand. Although most of the special

problems of the petroleum industry centered around overproduction rather than excess refining, the problems had to be viewed as a whole.

The fact is that, in the National Industrial Recovery Act, which was signed on June 16, 1933 (48 U. S. Stat. at Large, 195), the government did take a hand. This was pursuant to a special message to the Congress by the President dated May 20, 1933, stating that the States could not do it alone. The act, in terms, related only to production in excess of legal quantities and to exorbitant pipe line charges. The Petroleum Code, adopted pursuant to the National Industrial Recovery Act, became effective August 19, 1933. It, too, represented a form of government supervision over self-control in the petroleum industry.

It is true, as urged by the plaintiffs, that some of these economic conditions were present when the definitive contract itself was signed on February 17, 1933, providing for the full size refinery in spite of the conditions. Even at that time the refineries had been operating at less than sixty per cent capacity; at least one State (Michigan) had declared a banking holiday; employment and payroll indices had shown a steady decline for three years; and the stock market was lower than at any time since the first of the year. It is also true that on March 8, 1933, which is after the banking holiday, the Pan Am board of directors ratified the definitive agreement, and passed resolutions providing for a $15,000,000 refining corporation and allocating $3,000,000 for purchasing crude properties. However, even though the signatories to the definitive agreement may have thought, on February seventeenth, that the full-sized refinery should have been built and agreed to have it built, and even though steps were taken on March eighth to progress the project, there is no reason why the directors who were chargeable with the management of the affairs of the corporation could not change their minds and alter the policy of the company in the light of the continuing economic depression, when the time came for making the final decision as to the construction of the refinery. It was their job, as directors, to use their best judgment irrespective of the definitive agreement, and, in the absence of a showing of bad faith, the presumption is that their judgment was honestly exercised.

If this were a contract action based on the definitive agreement alone, such considerations as economic conditions would be immaterial. But in this stockholders action, the test is solely the *bona fide* judgment of the directors; and the surrounding business conditions are most important.

It is also true that there was an upturn in all business after April. The April twentieth meeting made the final decision as to a processing contract. The contract itself was not signed until August 6, 1933, and it might be argued that the decision was not irrevocable until then. During the months between April twentieth and the date of the signing of the processing contract, conditions were definitely getting better, as shown by employment and payroll charts and business indices. Whether this upturn should have required a reconsideration of the decision is also a matter of business judgment, essentially within the sound discretion of the directors.

The source of supply of gasoline for Pan Am was the contract between its subsidiary Mexpet and New Jersey (Del.). That contract was coming to an end on December 31, 1933; and it was necessary to obtain a steady substitute of supply. Therefore, a definite course of action had to be adopted in time to become effective on that date. The course of action was adopted in April, 1933, and the question as to whether it was for the best interest of the company that it be changed during the three months which followed, was a serious one for the directors. During these three months there were many conferences and discussions with respect to the very technical details of the processing contract; and whether they should all have been dropped and a second refinery unit authorized in August, 1933, was a matter for the directors to decide in accordance with their own best judgment.

In determining the best method of obtaining a continuous and uninterrupted supply of refined products after December 31, 1933, the directors had three alternatives: (1) To renew the contract for the purchase of these products, if possible; (2) to construct a refinery of sufficient size to supply the entire requirements of Pan Am, which would involve at least two 24,000-barrel units, each of which would be the largest single cracking unit ever constructed throughout the world; or (3) the construction of one such unit and contracting with an established refinery to process the rest of Pan Am's needs.

In making their decision to adopt the third alternative, the defendants say that they were concerned not only with economic conditions, as above described, but also with the general feeling of impending government regulation of some kind. Even though business was improving, the directors could not be charged with knowledge that this upturn would continue as a certainty. The process of code making under the National Industrial Recovery Act was going on; and the oil code was not signed by the President until August 19, 1933. It cannot be said that the business men of the country, and particularly the oil men of the country, knew or even

definitely felt that the process of recovery which was in progress during the summer of 1933 had become fixed and complete. That government regulation of some kind was coming, either with the voluntary co-operation of the petroleum industry in a code, or without it, seems to have been in the industry's consciousness; and, of course, no one was certain as to the form it would take. It is true that the chief threat of government regulation was with respect to overproduction, but it was unknown that it would be there limited. In fact the Petroleum Code as finally signed in August, 1933, contained many provisions respecting refineries.

Other large capital expenditures were going to be required for this corporation, such as money for the purchase of crude properties, expansion of sales, pipe lines, etc. For other reasons, not all of these investments were made, as appears in other parts of this opinion. However, in considering the question as to which course to pursue as to a refinery in April, 1933, the directors were justified in taking these other expenditures into consideration. There was no conspiracy in April on the part of the directors not to make these other actual investments; and they were an important factor which the directors had to consider in determining the policy of capital outlays for the corporation.

In the exercise of their own judgment they were warranted in making these capital refinery expenditures gradually. It was for them to decide that it would be better to conserve their capital funds over the period of the processing contract rather than invest it in a second refinery unit. The directors certainly had the right to determine upon a program of gradual refinery construction such as the one they actually followed — a program which over a period of years has produced a refinery capacity of 88,000 barrels a day, almost double the amount provided for in the original definitive contract.

There were other factors which motivated the directors in their adoption of this refining program. Some of them were technical, as stated by Wilson, a refining expert, such as: the unprecedented size of the unit, incorporating new features of design; the lack of previous adequate experience with East Texas crude; the doubt as to whether the estimated yields and qualities would be eventually obtained; and the belief that, after experience with the first unit, the refinery experts would be able to design an improved second unit. Wilson testified that at the time the processing contract was under consideration the average refining costs of Indiana, including the overhead and depreciation, were over thirty cents a barrel and, excluding overhead and depreciation, over twenty cents a barrel. These figures compare favorably with the proposed processing price of twenty-two and one-half cents per barrel.

These factors had been discussed among the refinery experts and apparently, on occasions, with Seubert. Wilson also testified that for Pan Am to obtain its requirements for the first six months of 1934 while the second refinery was being built would have cost it almost $1,000,000 more than the processing charges of Humble for the corresponding period.

Whitman, who was at the time an Indiana refinery expert, also testified to doubts about the operation of the new refinery with untrained personnel, and about the ability to handle shut-downs efficiently, when necessary, in order to avoid increased costs. He was doubtful, too, about the yields of various products from the crude and about the octane number of the gasoline.

Field, a refinery expert, testified that there were considerable risks in even one 24,000-barrel combination unit in 1933; that the operation would not result in the desired yield, and that there were doubts whether it could be handled economically and efficiently from the standpoint of maintenance and repairs. He also testified that these risks could be alleviated in part, if the refinery did not produce up to expectation, by blending the products of the Humble refinery under the processing contract with the products produced in the No. 1 unit. There was this element of flexibility provided by the combination of one refining unit and a processing contract, which could not be obtained from one refinery alone; and this large unit of 24,000 barrels was itself considered somewhat experimental and the yields to be obtained therefrom problematical. There was a feeling that the mechanics and art of refining might itself change rapidly.

The experience of Indiana with its own plant at Whiting was not as helpful as the plaintiffs urge. It had only begun fully to operate about six months earlier, and had not been giving very satisfactory results. It operated with Mid-Continent crude and not East Texas crude as the Texas City refinery was going to do. The first unit at Texas City was at least fifty per cent larger than the Indiana refinery at Whiting.

The fact that the Texas City refinery did actually come up to the estimates does not preclude the existence of legitimate fears as to the outcome while the refinery was under consideration.

As discussed in detail elsewhere in this opinion in connection with the question of the liability of the New Jersey corporations, I do not find that there was any conspiracy between Indiana and New Jersey with respect to this refinery. The fact that the Blausteins did not learn until March 28, 1933, that there were doubts among the defendants as to the size of the refinery, does not deprive the directors of the right to use their discretion and business judg-

ment about it. The concealment would be very important if this were an action by Blaustein on the contract itself. But it is not material on the question of waste or violation of duty to the corporation itself, as distinct from the Blausteins as individuals.

The course of conduct of the directors showed that as soon as the first unit of the refinery proved to be a success, a second one was planned. It was finished in 1937 and put into full operation in May, 1937, at a rated capacity of 36,000 barrels a day. A third unit was planned in the latter part of 1936, and subsequent improvements detailed above were made so that the combined present refinery units have a capacity of 88,000 barrels daily.

Under the presumption of good faith, which protects the directors, and with the reasons advanced for the course of conduct pursued by the directors, I find that no cause of action has been made out against them for misfeasance or waste of corporate funds in connection with the refinery.

There is another reason why the defendants are entitled to judgment on this branch of the case. In order to impose liability upon directors for violation of their duty toward a corporation it is necessary for the plaintiff to show that the alleged violation proximately caused damage to the corporation. The defendants' contention in this case is that, even if it be assumed that there was a violation of duty with respect to the construction of refining units, no damage resulted to the corporation. In support of that contention they have introduced charts and computations prepared by refinery experts to show that from the time when the first refining unit went into operation up to date, the actual refinery construction program carried out by Pan Am has produced its required products more cheaply than if the program advocated by the Blausteins and provided for in the definitive agreement had been carried out.

The defendants' contention is correct, that the refining program adopted by the directors should be considered as a whole for the entire period over which it was placed in operation. It would not be fair to hold that, merely because in one part of the program there was a loss, for that reason there should be liability even if, in fact, the program as a whole did not result in a loss. The question is whether the gradual program of refinery construction, which was followed by the directors, was better for Pan Am than the one urged upon them by the plaintiffs. This is not a case of mitigating damages as the plaintiffs argue in their brief. It is a question of whether any damage was suffered at all. If there were none then there would be no waste of assets even if the directors had been remiss in their duty to the corporation.

The complaint is that in 1934 there should have been completed either a full 48,000-barrel refinery or two 24,000-barrel refineries. The computations submitted by the defendants are comparisons between the actual cost of the products refined, processed and purchased during the years 1934 to 1939, inclusive, on the one hand, and, on the other, the estimated cost of the same quantity and quality of products if a 48,000-barrel refinery had been constructed in 1933 (in one or two separate units), if no processing contract had been executed, and all other construction (except unit No. 1 in 1933 and unit No. 2 in 1937) had been carried out as it actually was carried out. These tabulations indicate that the actual operations were more advantageous to Pan Am than the operations would have been if carried out in the manner urged by the plaintiffs and as specified in the definitive agreement. The difference arises out of the increased cost of obtaining products of the quantity and quality actually used by Pan Am during this period (1934–1939 inclusive), which could not have been obtained under the assumption that no processing contract had been made with Humble and that one 48,000-barrel unit had been constructed in 1933 or that a second unit of 24,000 barrels had been constructed in 1933 identical with the number one unit of 24,000 barrels which was constructed during that year.

The second unit which the plaintiffs were insisting should be built at the same time that the first unit was built in 1933, and which they used as a basis for showing that the production of gasoline would have been cheaper than under the processing contract, would not have made the quantity and quality of products received by Pan Am under the Humble processing contract. Furthermore, the second unit which was actually constructed in 1937 was a larger unit than the first unit, and an improved one, producing a better quantity and quality of products than the first one. Its advanced efficiency was the result of the experience gained in the operation of the first unit. The difference in quantity and quality of yields between the supposed operations urged upon the directors by the plaintiffs (two units constructed in 1933 of 48,000-barrel total capacity) and the actual operations (consisting of No. 1 unit plus the processing contract for three years plus the second unit in 1937), is assumed by the defendants to have been purchased in the open market. It is the cost of purchasing this difference in the quantity and quality of the respective yields from those operations which provides the excess in expenditures which would have accrued to Pan Am under the refinery construction program urged by the plaintiffs. In considering these costs, the number three unit and the polymerization plant and the auxiliary equipment were all

assumed to have been constructed just as they actually were constructed subsequent to 1934. The second unit urged by the plaintiffs was assumed in these calculations to have gone into operation on June 1, 1934, and the first unit to have gone into operation on April 1, 1934.

On the trial the court was of opinion, and still is, that the proper basis of comparison between actual operations and assumed operations was one in which, outside of the first two units and the processing contract, all of the actual operations would have been duplicated in the assumed operations. The directors are assumed on such a basis to have done just what they in fact did do, except build the first two units and make the processing contract; and as to these exceptions they are assumed to have done what the Blausteins and the definitive contract called for, *i. e.*, build two units of 24,000 barrels each in 1933 (or in the alternative one of 48,000 barrels) and not make the processing contract.

It is true that the directors might have decided to build an additional unit in 1936 when Pan Am's requirements increased, or to make a processing contract therefor. But such hypotheses would be building assumptions upon assumptions in such a way that legal conclusions could not with any reasonable certainty be predicated upon them.

The bases taken were those which formed the nearest approach to the actual experience. The plaintiffs certainly could not have complained if the defendants built the 48,000-barrel refinery immediately, and then did not build anew until November, 1936, when the third unit was planned.

Plaintiffs also urge that the tabulation of comparison offered by the defendants is improper because of the prices fixed by the defendants for the assumed purchases which would have to be made by Pan Am to bring the yield from the assumed operations up to the yield from the actual operations. There was much conflicting testimony with respect to the validity of the price assumptions charged in these computations by the defendants. My conclusion is that the prices assigned were proper. For the years 1935, 1936, 1937 and 1938 the actual prices paid for gasoline by Pan Am were used, except for adjustments to give effect to octane differences. During the years 1934 and 1939 no gasoline was purchased by Pan Am; and the assumed prices, as stated in Exhibit D36 at page 22 and as buttressed by the testimony of Platt and the tables in the Oil Price Hand Book, were fair ones for the purposes of this calculation.

From the evidence I find also that the prices assumed for the purchase of Bunker C fuel oil were also fair.

The plaintiffs' contention that these prices assumed by the defendants were so high that it would have resulted in the sale of gasoline at a loss, and that, therefore, the sales would have been curtailed, is contrary to the experience of the company, even assuming that the " net back to the Gulf " calculations contained in Exhibit 692 are correct in spite of the necessarily arbitrary allocation of many items of fixed expense.

Therefore, on the refinery branch of the case, the defendants are entitled to judgment.

### SUBSIDIARIES OF INDIANA AND PAN AM.

None of the intercorporate contracts heretofore discussed relative to the refinery, pipe line, and crude oil purchasing matters were directly executed by or between Pan Am and Indiana themselves. They were between PAPL or Pan Refining, and SCOP, SPL or SO&G, their respective wholly owned subsidiaries (except SO&G which is over ninety-nine per cent owned by Indiana).

None of these subsidiaries is a party to this action. Nevertheless, claim the plaintiffs, Indiana must account to Pan Am for the damages done to Pan Am and its subsidiaries, and also for the profits made by the Indiana subsidiaries. Indiana, on the other hand, contends that since the damages, if there were any, accrued to Pan Am's subsidiaries and not to Pan Am itself, they can be recovered only in a proper action brought therefor by the damaged subsidiaries themselves; and as to profits made on the intercorporate contracts, Indiana urges that since they were made by Indiana's subsidiaries SO&G, SPL and SCOP, and not by Indiana itself, Indiana is not accountable for those profits.

The question with respect to the subsidiaries is divided into two parts: (1) That relating to SCOP, SPL and SO&G, the defendant Indiana's subsidiaries, and (2) that relating to Pan Am's subsidiaries, PAPL and Pan Refining.

It would have been practically impossible from the point of view of acquiring jurisdiction in this case to have joined all the subsidiaries of Indiana as defendants. To observe the formal, legal, distinctions between the parent and the subsidiaries, and to hold that the presence of the subsidiaries in the action is necessary for the entry of a decree directing Indiana to restore the profits made by them as a result of Indiana's domination, would be to work an injustice to Pan Am and an unmerited enrichment to Indiana. When such a result is apparent, equity frequently disregards corporate entities even where the subsidiaries are not mere instrumentalities of the parent. (See *Rapid Transit Subway Constr. Co.* v. *City of New York*, 259 N. Y. 472; *Berkey* v. *Third*

*Ave. R. Co.*, 244 id. 84, 95; *Taylor* v. *Standard Gas & Electric Co.*, 306 U. S. 307, 322; *Pepper* v. *Litton*, 308 id. 295.)

Where the subsidiaries are mere instruments or departments of the parent, as in this case, however, equity will completely disregard the legal separation of the various corporate entities.

The question of liability of parent corporations for the torts and contracts of their subsidiaries has been the subject of many court opinions, and extended discussion by text writers and law review contributors. The conclusions reached by them are not always consistent.

Frank admission as to the indefinite state of the law is made by many of the writers, viz.: " After considering the various facts indicating identity of the corporations and direct intervention they have decided according to their subjective idea of ' avoiding an inequitable result.' As yet the subject is covered with a ' mist of metaphors.' Until the courts stop to analyze with more particularity the factors motivating their decisions before lapsing into phrases such as ' *alter ego* ' or ' adjunct ' or ' instrumentality ' there seems little hope of making prediction more certain than the foregoing." (Insulation from Liability through Subsidiary Corporations, by Douglas and Shanks, 39 Yale L. J. 193, 218.)

The plaintiffs' claim is that " Indiana dominated and managed the Stanolind companies to such an extent that it is brought within the strict rule of the cases which entirely disregard the corporate entity of the subsidiaries; " that under the factual set-up of that group the subsidiaries were not " unrelated independent corporations each of which had a separate function, but were an integrated unit," with Indiana the co-ordinating director and each of the subsidiaries merely a department. Indiana contends on the other hand that the relationship between them " meets every test ever suggested by the cases for keeping corporate entities separate, distinct and independent," and that their subsidiaries " have neither been dominated by Indiana nor used as instrumentalities by Indiana."

My conclusion is that neither SCOP, SPL nor SO&G was an independent entity apart from Indiana; that each was a department or division of the parent corporation, having a certain autonomy with respect to routine matters, but almost wholly dependent upon Indiana as a part in the great machine making up the single enterprise known as Indiana. That is why in the course of this opinion the name Indiana may have been at times used interchangeably with the names of the subsidiaries.

The testimony shows that the whole system comprised but a single integrated company, and that each subsidiary was merely

carrying out one of the usual functions of an integrated company. (1) SCOP's primary function was to supply crude to the Indiana refineries, and to accumulate sufficient storage oil to insure the Indiana refineries against shortage so as to maintain the refining which is a major function of the parent, Indiana; (2) SPL was " in effect a plant facility of " Indiana and " an important department in the transportation of Indiana's crude; " (3) Peake was a director of SPL and SCOP and vice-president of Indiana in charge of transportation and production whose duty it was " to correlate the activities of the producing subsidiary " and " to supervise the activities of the crude oil purchasing company and the pipe line company; " (4) Indiana's officers and directors referred to the subsidiaries from time to time in their testimony and in documents and correspondence as parts of Indiana; (5) Seubert, Barkdull, Stephens, Peake and Bullock, while directors of Indiana, constituted a major part of the board of SCOP and SPL and directed their destinies; (6) Indiana's directors were " all department heads " and when questions arose, such as financing SO&G's activities, they would have " informal discussions " about them. These discussions would also take place when it was " a refining matter, a production matter, a pipe line matter, a market matter," although Indiana itself had no pipe lines and did no producing, except through subsidiaries. Each of the Indiana's vice-presidents (except the executive vice-president, Barkdull) was " in charge of some particular activity such as manufacturing, sales, production, transportation." Peake looked " after production matters and transportation matters " and was " the general man * * * involving the co-operation between the producing activities and the refinery and the pipe lines. He had a broad assignment; " (7) Peake, from time to time, gave instructions to SCOP as to the work to be pursued, as for instance in 1933 with respect to the survey of the possibility of getting connections of East Texas crude; and while making connections SCOP would report to Peake " constantly; " (8) Peake was active in the pipe line negotiations between Humble and SCOP, and generally took an active part in the management of SCOP, although at the time (1933) he was not an officer of either SCOP or SPL; Peake was the one who presented the SCOP and SPL pipe line proposals to Pan Am and later handled them, although he was not an officer of either; (9) Barkdull, as treasurer of Indiana, gave directions and instructions to the Indiana subsidiaries as to accounting procedure. Since 1933 he received semi-monthly news letters from SO&G. These letters were also sent to Seubert, as were similar reports from SCOP. Seubert also received regular reports from SPL relating to wages and salaries and appropriations.

Similar statements were regularly received by him and Barkdull and Peake from SO&G; (10) although SCOP had its own legal department, which performed services for all the Stanolind companies, Stephens was consulted as to the employment of their head attorneys, and as to the organization and policies of that department; (11) even before Peake became chairman of the board of SO&G, he attended the operating committee's meetings on occasion, and gave his opinion as to matters before the meetings; (12) it was shown that Indiana financed almost every major operation of SO&G, and although Indiana maintained that it was only the " banker " for that subsidiary, sufficient evidence was adduced to show that it took a much more active hand than that in its activities, such as (a) " requesting " SO&G to discontinue certain drilling and purchasing operations prior to 1933 and then allowing SO&G to resume thereafter when it was " able to borrow additional money from " Indiana; (b) the semi-annual and monthly budgets of SO&G were delivered to Peake, Barkdull and Seubert as part of the SO&G's program; and they were discussed by Prior and Peake, Barkdull and Seubert, since Indiana was " financing " SO&G. These budgets were generally informative, and gave Indiana a minute and detailed picture of what was being done or contemplated by SO&G. They were ofttimes accompanied with reports of details of plans which were discussed minutely between them. These budgets, semi-annual and monthly, formed the basis on which Indiana advanced money quite regularly to SO&G, and also served to keep Indiana informed of all the work of SO&G; (c) the record is replete with evidence that on nearly every major transaction, SO&G first obtained special authorization from the Indiana executives. Many of these were discussed at operating conferences attended usually by Seubert, Barkdull, Stephens and Peake; or authority was obtained by correspondence. The Yount-Lee purchase was handled almost entirely by Indiana employees and officers; (13) Indiana made advances of large sums of money to SCOP and SPL also.

The effect of large business corporations conducting activities in the manner in which Indiana conducted its affairs through these subsidiaries is pointed out in the case of *Detroit Motor Appliance Co.* v. *General Motors Corp.* (5 F. Supp. 27, 30), wherein the court said: " The cumulative effect of all the facts is to demonstrate rather conclusively to the court that each wholly owned subsidiary of the General Motors Corporation mentioned is merely a corporate agent for that company in the latter's operation and transaction of its general business. Each of them is engaged in the

sale and distribution of its products. Each of them is directly controlled by its executive officers. The only corporate function of each of them is the promotion of the business of the General Motors Corporation as directed by the latter's officers in the distribution of its products." That court adopted as appropriate the language of the opinion in *Industrial Research Corp.* v. *General Motors Corp.* (29 F. [2d] 623, 627), as follows: " It is against sound policy, when a corporation has grown so large, and it has entered into activities so various and so generally distributed, that it finds itself compelled to operate through many subsidiaries, doing nothing directly itself in carrying on its business, to permit it to enjoy exclusively the fruits of such subsidiary activity and to escape the concomitant responsibilities flowing therefrom," and concluded (p. 31): " This decision is in line with the general rule in such cases to the effect that where stock ownership control of a subsidiary corporation is resorted to, not for the purpose of participating in the affairs of the corporation in the normal and usual manner of a stockholder, but for the purpose of so controlling a subsidiary company that it becomes a mere agency of the owning company, the latter may not escape liability for the acts of the subsidiary. Corporations may be agents of other corporations just as readily as individuals, and apparently it is much more feasible for General Motors Corporation to have corporate agents with widespread organizations than to have individual agents with their natural human limitations."

The conclusion thus reached is the same as in *United States* v. *Reading Co.* (253 U. S. 26, 62, 63), where the court said: " where such ownership of stock is resorted to, not for the purpose of participating in the affairs of the corporation in which it is held in a manner normal and usual with stockholders, but for the purpose of making it a mere agent, or instrumentality or department of another company, the courts will look through the forms to the realities of the relation between the companies as if the corporate agency did not exist and will deal with them as the justice of the case may require."

Even more clearly in this principle expressed in *Martin* v. *Martin Co.* (10 Del. Ch. 211, 217; 88 A. 612): " It is fair to conclude that the defendant company and the other companies are being conducted together, the separate corporate entities being maintained for some useful purpose, in place of a legal consolidation or merger of all into one corporation. The controlling feature is the existence of an indirect consolidation of several distinct corporations, co-operating and allied for a common purpose, one of the corporations by ownership of stock, by identity of the managing officers

and by financial support, controlling the other allied corporations. It is a fair conclusion, then, that the latter are the agents, or instrumentalities, of the former in carrying out an enterprise common to all."

The reasoning of the cases in other jurisdictions is no different from the underlying principles behind the rule adopted in this State: " Dominion may be so complete, interference so obtrusive, that by the general rules of agency the parent will be a principal and the subsidiary an agent. Where control is less than this, we are remitted to the tests of honesty and justice (Ballantine, Parent & Subsidiary Corporations, 14 Calif. Law Review, 12, 18, 19, 20). The logical consistency of the juridical conception will indeed be sacrificed at times when the sacrifice is essential to the end that some accepted public policy may be defended or upheld. This is so, for illustration, though agency in any proper sense is lacking, where the attempted separation between parent and subsidiary will work a fraud upon the law (*Chicago, etc., Ry. Co.* v. *Minn. Civic Assn.*, 247 U. S. 490; *United States* v. *Reading Company*, 253 U. S. 26, 61, 63). At such times unity is ascribed to parts which, at least for many purposes, retain an independent life, for the reason that only thus can we overcome a perversion of the privilege to do business in a corporate form." (CARDOZO, J., in *Berkey* v. *Third Avenue Ry. Co.*, 244 N. Y. 84, 95.)

And so it was that this " unity " was ascribed to parts completely dominated and controlled, in order to effect a just result and to overcome a perversion of the privilege to do business in a corporate form, in order to hold a parent liable, in *Dobbins* v. *Pratt Chuck Co.* (242 N. Y. 106).

The result reached in *Bankers Trust Co.* v. *Dennis* (256 App. Div. 495; affd., 282 N. Y. 635) was based upon lack of proof. " Without proof that the corporation was used as a mere department or instrumentality of the partnership to perpetrate fraud or some other breach of duty, the corporate veil could not be pierced " (p. 506). Similarly, the conclusion reached in *Lowendahl* v. *Baltimore & Ohio R. R. Co.* (272 N. Y. 360, 365) was based upon failure of sufficient proof. " The Appellate Division is correct in holding on the weight of evidence that the transfer was made by Walter Van Bokkelen and L. Van Bokkelen, Inc., an independent corporate entity, which was not the agent or instrumentality of defendants within the doctrine of *Berkey* v. *Third Avenue Ry. Co.* (244 N. Y. 84) and *Rapid Transit Subway Constr. Co.* v. *City of New York* (259 N. Y. 472)."

But where, as here, the proof is sufficient, although the technical legal requirements and " corporate rituals " of separate entity have been complied with, the parent will be held.

For additional cases bearing out this general principle, see *Hart Steel Co.* v. *Railroad Supply Co.* (244 U. S. 294); *Gulf Oil Corporation* v. *Lewellyn* (248 id. 71); *Pagel, Horton & Co., Inc.,* v. *Harmon Paper Co.* (236 App. Div. 47, 51); *Kingston Dry Dock Co.* v. *Lake Champlain Transfer Co.* (31 F. [2d] 265, 267); *Davis* v. *Alexander* (269 U. S. 114, 117); *Commerce Trust Co.* v. *Woodbury* (77 F. [2d] 478, 487).

There can be no question that Indiana knew what its subsidiaries were doing in connection with Pan Am matters, and that the subsidiaries knew what Indiana was doing in connection with them. They operated together in order to accomplish the ends sought. Under such circumstances they would both seem to be jointly and severally liable for the profits and the damages caused by the breach of the fiduciary obligation, under the well recognized rule of liability devolving upon joint tort feasors.

In the final analysis the question of parental liability for acts of the subsidiaries comes down " to the tests of honesty and justice." (*Berkey* v. *Third Avenue Railway Co., supra,* p. 95.) Stated otherwise: " Where control is exercised not in the manner normal and usual with stockholders, but so as to make a corporation a mere instrumentality or agent, the corporate entity will be disregarded if to do otherwise would produce an inequitable result. So runs the test which is said to determine the liability of parent or affiliated corporations. * * * What the formula comes down to, once shorn of verbiage about control, instrumentality, agency and corporate entity, is that liability is imposed to reach an equitable result. Even thus shorn, however, the formula may have some value; it indicates that the courts have a much greater latitude in shaping the law of inter-corporate liability than would be the case if the question merely involved application of a mechanical rule." (Latty, Subsidiaries and Affiliated Corporations, p. 191.)

The facts in this case compel the conclusion, whether based upon the use of the term " agency," " instrumentality," or " department," or upon the attempt to arrive at " an equitable result," that Indiana is liable for the injury to Pan Am caused by its subsidiaries.

But the foregoing discussion serves merely to buttress and fortify Indiana's liability, for the tort in this case was committed by the parent itself using its subsidiaries as the means to accomplish the desired action. This is not the usual case where the subsidiary has committed the tort or breach of contract and the parent is sought to be held responsible for it. It was the dominant stockholder, Indiana, which committed the wrong and caused Pan Am to take the course it did with respect to production, pipe lines

and purchasing. The majority of the Pan Am board, placed there by Indiana, are the ones who determined the policy with respect to those activities now complained of by the plaintiffs. SPL, SCOP and SO&G had no part in the formulation of the policy voted by the dominant directors of Pan Am. These Pan Am directors, affiliated so closely with Indiana, after deciding on a course of conduct, caused the several contracts to be made with Indiana's subsidiaries. The latter were told what the arrangements were to be, and they were the tools used by Indiana to fashion the profitable structure that resulted. Whatever remedy, therefore, is necessary to correct the wrong done, should be directed against Indiana as the perpetrator of the breach of duty. The loss to Pan Am and the profit to the Indiana subsidiaries resulted from the contracts; but the origin of these contracts is to be found in the action of the Indiana representatives on the Pan Am board.

Consequently, the parent in this case is the party primarily responsible and accountable, although the fruits of the wrong went, in the first instance, to the subsidiaries. These circumstances permit a direct recovery against the parent. In their law brief (p. 130) defendants say: " There are, of course, cases in which a parent corporation is held liable on the theory that it, itself, is responsible for the tort which caused the damage. In spite of any loose wording of the decisions on this subject, liability is there imposed on the parent corporation by reason of its own act." This is such a case. Having committed the acts, Indiana cannot absolve itself on showing that the subsidiaries profited or obtained the assets and not itself.

The second part of this argument of the defendants is that the loss, being that of the Pan Am subsidiaries, can only be recovered by them in an action which PAPL and Pan Refining are parties plaintiff. The tort committed by Indiana, however, was directed at Pan Am itself and not at its subsidiaries. That the latter and not Pan Am were parties to the contracts is a mere circumstance in the perpetration of the act.

In fact, Pan Production was not organized until two years after the wrong was done; and the other subsidiaries did not really function until the tort had been fully decided upon by the board. The Pan Am subsidiary corporations were organized merely to carry on the necessary activities of the company. That the board chose this course rather than the creation of separate departments within Pan Am is a matter of business policy. But these separate corporations were meant to be, and actually were, no more than business conveniences. They were never considered separate and distinct corporations in the sense that they were independent of

Pan Am; they were merely performing certain functions of and for Pan Am, and were integral parts of Pan Am. The breach of trust by Indiana did not affect the subsidiaries of Pan Am as such, for they were not the *cestuis*. It was Pan Am itself that was hamstrung by Indiana's violation of duty; and hence Pan Am is the proper party plaintiff.

If there were breaches of the contracts between the various subsidiaries of both groups, then the signatories thereto (the subsidiaries) might be necessary parties. But this is not that kind of action. Here the suit is for the breach of duty by Indiana — its duty to Pan Am; and it is Pan Am that is entitled to full redress. Although Pan Am Refining and PAPL might have been proper parties to this suit, they certainly are not necessary parties. Equity can give full relief without them.

### DEFENDANTS NEW JERSEY AND TEAGLE.

Recovery has been sought against New Jersey and Teagle on two separate theories: (1) That they conspired with Indiana and the individual directors of Pan Am to prevent the integration of Pan Am, to divert its assets to New Jersey and its subsidiaries, and to destroy Pan Am's competitive standing with New Jersey; (2) that they knowingly took part in the breach of trust by Indiana and the majority directors toward Pan Am, and that they derived profits from this faithlessness, for which they are liable to account under the doctrine of *Irving Trust Co.* v. *Deutsch* (*supra*).

As to both of these contentions the plaintiff has the burden of proof. Neither New Jersey nor Teagle were in any sense fiduciaries of Pan Am. It is not sufficient to show merely that New Jersey or its subsidiaries made a profit at the expense of Pan Am. All of the items charged against New Jersey and Teagle must be actually proved; and no presumption or change in the burden of proof arises here as in the case of the complaints against the fiduciary, Indiana.

I find that there was no conspiracy between New Jersey or Teagle and Indiana to damage Pan Am for competitive reasons or any other reason.

The plaintiffs claim that in 1933 the Rockefellers (father, son and their business and philanthropic interests) were the largest stockholders of both Indiana and New Jersey, owning respectively 12.89 per cent and 16.53 per cent of the outstanding shares of each. They assert that these large stockholders were consulted, from time to time, by the officials of New Jersey; that they brought about concerted action between the two corporations, since New Jersey was the original parent of Indiana; and that Indiana took

" suggestions from New Jersey." The plaintiffs predicate their claim of combination of the two companies upon the fact that these large common stockholders would profit much more by increased income to New Jersey and Humble than to Indiana and Pan Am; and that, therefore, they caused New Jersey and Indiana to adopt the course they did — against the interest of Pan Am.

There is not adequate proof, however, that these large stockholders common to New Jersey and Indiana, controlled or directed or manipulated the actions of either of these corporations in order to cause them to act in concert with each other with respect to Pan Am matters. No reasonable inference can be drawn from the record that they caused Indiana or its directors to divert any assets of Pan Am to New Jersey or its subsidiaries; the direct and uncontradicted testimony in the case is to the contrary, as given by Teagle, Farish, Seubert. The evidence does not permit any inference that the affairs of Indiana and New Jersey are conducted with a common interest.

The sale of Pan Am's foreign assets to New Jersey on April 30, 1932, does not indicate such conspiracy. It was ultimately ratified expressly or impliedly by all the stockholders. It came primarily as the result of a threatened embargo, which later materialized, under which Pan Am's imported supply of gas and oil from its Aruba refinery would have been substantially cut off. Pan Am had to look elsewhere for supplies. It approached several of the large companies having American production, including New Jersey. From these negotiations came the proposal to sell Pan Am's foreign properties. The proposal apparently did not come from any stockholder of Indiana or New Jersey.

No inference of conspiracy against Pan Am can be drawn from the so-called unpublished " secret options." If they may be considered to have the force of a contract at all, they gave Pan Am the right to get rid of its domestic fuel oil marketing facilities, if it found it could not get the necessary supply of fuel oil at the end of the existing fuel oil contract period, in which event its marketing facilities would be largely worthless. They also specifically left Pan Am free to include the gasoline facilities in any merger with Amoco; and by a subsequent instrument the fuel oil facilities were also permitted to be included in such merger.

Plaintiffs point out that New Jersey had two very powerful motives in seeking to conspire with Indiana to damage Pan Am through a breach of Indiana's fiduciary obligations: (1) To remove, or, at least, control the vigorous competition in selling gasoline and fuel oil along the Eastern seaboard which was being presented by Amoco and Pan Am respectively; (2) to cast on Pan Am the

burden, so far as possible, of taking New Jersey's domestic production, since the purchase of the Pan Am foreign properties had dislocated her domestic production of gasoline.

These motives existed. But their existence does not prove a conspiracy. Although conspirators do not generally write down their agreement or indeed give verbal expression to it, there must be some proof of a meeting of minds to do certain things in concert — to combine efforts to a common end. Such proof is here missing. There is only suspicion.

I also find no proof of conspiracy between Indiana and New Jersey from the gasoline overcharge matter, the Petro settlement, or the Bunker C fuel oil matter, all of which form a part of the complaint and supplemental complaint.

In passing upon this evidence, it appears most significant that for every Pan Am dollar which is charged to have been consciously diverted by Indiana to New Jersey, Indiana stood to lose about seventy cents based on its stockholdings in Pan Am, and to gain only seven cents based on its stockholdings in New Jersey (excluding even the fact that New Jersey owned only 72 per cent and not 100 per cent of Humble). This fact renders quite incredible that Indiana would be willing deliberately to divert Pan Am property to New Jersey merely to help New Jersey without corresponding benefit to itself. The plaintiff's argument based upon the comparative profits to the large stockholders from the two companies is far-fetched; and is based upon an assumption, which is unwarranted by the evidence, that the common stockholders managed or controlled both corporations. The evidence shows that there are no common officers or directors between Indiana and Pan Am and their subsidiaries on the one hand and New Jersey and its subsidiaries on the other.

With respect to the processing contract, so far as New Jersey and Teagle were concerned it was a business proposition, in which they were trying to get needed business at as good a price as possible. Indiana was not directly profiting from this processing business in any way. Its seven per cent stockholding in New Jersey was more than offset by its seventy per cent stockholding in Pan Am. The processing contract finally arrived at was the result of extended negotiations and continued vigorous bargaining which were commenced on January 11, 1933, even before the definitive agreement was signed. From it no inference of conspiracy, fraud or overreaching can be drawn. The refinery matter did not present a situation where the fiduciary, Indiana, was making a profit at the expense of Pan Am, and where New Jersey was knowingly co-operating with it in its breach of trust. Accordingly no liability attaches to New Jersey arising out of the processing contract.

There is another reason why this conclusion must be reached. It is based on the separateness of New Jersey and Humble as corporate entities. The processing contracts of August 5, 1933, and the supplementary contracts of April 1, 1935, and January 1, 1936, were made and performed not by New Jersey but by Humble Oil and Refining Company. Since June 7, 1933, there have been no common officers or directors between these two companies. New Jersey is a holding company only and so far as the evidence shows, its relationship with Humble is confined to a seventy-two per cent ownership of the capital stock of Humble.

Even assuming that Humble was guilty of conspiracy or over-reaching which damaged Pan Am and which might give rise to a cause of action against it, the question remains as to whether New Jersey could be charged with liability for such tort. This question of inter-corporate liability here presented is quite different from the problem involved in the relationship between Indiana and the Stanolind Companies, or Pan Am and its own subsidiaries. Practically all of the elements showing domination and control by Indiana of its subsidiaries are absent from the relationship between New Jersey and Humble. There is no management or attempt at management of Humble by New Jersey, and the officers of Humble, so far as the proof shows, were in complete control and management of the business of Humble. The question between New Jersey and Humble is whether the connection between the two is of a nature to make the parent liable for the tort of the subsidiary. Stock ownership alone is insufficient to make the corporate owner of the stock liable for claims against the corporation whose stock is so owned, whether the claim be in contract or in tort. (*Lowendahl* v. *Baltimore & Ohio R. R. Co.*, 247 App. Div. 144; affd., 272 N. Y. 360; reargument denied, 273 N. Y. 584; *Berkey* v. *Third Avenue R. R. Co.*, 244 id. 84.)

The evidence fails to disclose any domination or control by New Jersey of Humble. It is persuasive that the Texas courts (*State* v. *Humble Oil & Refining Co.*, [Tex. Civ. App.] 263 S. W. 319, 325, writ of error denied, 115 Tex. 619) have held that New Jersey does not control and manage Humble.

With respect to the pipe line contract, a somewhat different situation exists. I have already held that a case has been made out against the dominating stockholder, Indiana, as a fiduciary, for taking unto itself profits resulting from certain contracts made with its *cestui*, Pan Am. New Jersey's cooperation was essential in order to use the Indiana pipe line to bring East Texas crude to the Pan Am refinery. Such co-operation of New Jersey was forthcoming, and, indeed, urgently pressed.

In this respect the pipe line transaction differs from the processing transaction. In the former the fiduciary, Indiana, was making a profit at the expense of the *cestui* and New Jersey was co-operating with it; not so in the latter, where the most that can be claimed as against the directors was negligence and waste, but no illegal profits.

The plaintiff claims that these facts make the defendant New Jersey liable under the doctrine of *Irving Trust Co.* v. *Deutsch* and *Jackson* v. *Smith* (*supra*), " that one who knowingly joins a fiduciary in an enterprise where the personal interest of the latter is or may be antagonistic to his trust becomes jointly and severally liable with him for the profits of the enterprise." (*Irving Trust Co.* v. *Deutsch*, at p. 125.)

However, even in the pipe line transaction no liability should attach to New Jersey or Teagle for the following three reasons:

1. As heretofore pointed out the corporate relationship between New Jersey and Humble do not give rise to liability on behalf of the parent for the tort of the subsidiary.

2. The plaintiff has not sustained the burden of proving that New Jersey or Humble knew enough of the provisions of the arrangements between Pan Am and Indiana with respect to pipe line matters or crude production to indicate that they were conscious participants in a breach of trust with respect thereto.

It does not appear from the record that the making of the pipe line contracts was suggested or dictated by New Jersey to Humble. The negotiations with respect to connections in the East Texas field were carried on not by New Jersey, but by Humble as a separate corporation.

It is true that on June 27, 1933, Farish was present at the meeting between the Humble and Indiana representatives relating to the pipe line and connections matter. That is not enough to make New Jersey a party to the transaction. Farish was there because he had taken part in the original negotiations commenced in April, at which time he was the chief executive of Humble. By June twenty-seventh Farish was no longer with Humble, but had become chairman of the New Jersey board of directors. There is no adequate proof, however, that he participated in the June twenty-seventh conference as a New Jersey official.

For the foregoing reasons, Teagle, New Jersey (Del.) and New Jersey are entitled to judgment. Guilty knowledge is necessary under the doctrine of *Irving Trust Co.* v. *Deutsch* (*supra*). The court there absolved one defendant because he was not shown to have had affirmative knowledge that the fiduciary was adopting an inconsistent course of conduct.

3. New Jersey and Humble were both in a position analogous to Reynolds in the *Deutsch* case. Humble had the right to sell its pipe line service and its crude to whomever it could, just as the court there said that Reynolds could. It was not joining in the profits being made by Indiana. It was on the other side of the transaction, selling its products in its regular line of business. Since it was not in any conspiracy to deprive Pan Am of any of its assets, it cannot be held to an accounting of any of the profits which Indiana made.

## RATIFICATION AND ACQUIESCENCE.

The defendants' contention that the Blausteins ratified the various acts of the majority directors cannot be sustained. The record shows clearly that the plaintiffs objected continuously to those acts which were contrary to the understanding embodied in the definitive agreement, and which prevented or delayed the complete integration of Pan Am as an independent entity. Their conduct throughout was entirely inconsistent with ratification or acquiescence.

The fact that the Blausteins continued to vote for these directors does not indicate any ratification. Under the terms of the definitive agreement, it was understood that the six nominees of the Indiana corporation would continue to be named by Indiana, and that only three of the board were to be named by the Blausteins.

Furthermore, the defense of ratification and acquiescence with respect to the production and pipe line matters cannot be sustained, for the additional reason that the majority directors were representing to the Blausteins that the anti-trust laws of Texas and the unavailability of connections in the East Texas field made it impossible for Pan Am to go into these respective branches of the business. The finding hereinbefore made that these representations were not true would prevent a conclusion of ratification being drawn from any acts which the Blausteins did in reliance upon such untrue representations.

Besides, the defense of ratification and acquiescence is not available against the intervenors, who have the right to urge the claim on their own behalf, irrespective of any disability which attaches to the original plaintiffs. (*Hanna* v. *Lyon*, 179 N. Y. 107; *Maas* v. *Sullivan*, 124 Misc. 295; affd., 213 App. Div. 820; *Brinckerhoff* v. *Bostwick*, 99 N. Y. 185, 195.) It is the corporation, Pan Am, which is the real plaintiff. Its rights can be urged by the intervenor with the same legal effect as by the original plaintiffs.

### BUNKER C FUEL OIL.

As hereinbefore shown, as a part of the 1932 foreign sale by Pan Am, Mexpet its subsidiary, and New Jersey (Del.) entered into a contract whereby the latter agreed to sell the former all its requirements of Bunker C fuel oil up to 16,500,000 barrels per year at a guaranteed margin of ten cents to fifteen cents per barrel. It was for an indefinite period, subject to cancellation, however, on or after April thirtieth of any year after 1936 by giving one-year notice. New Jersey (Del.) assigned part of this contract to Humble. In April, 1936, New Jersey (Del.) and Humble canceled the contract effective April 30, 1937.

Steps were taken by the directors of Pan Am to obtain a renewal of this contract. After lengthy negotiations, detailed in the record, a renewal contract for 10,000,000 barrels for the year 1937 was made at a smaller margin. The next year, after negotiations, a contract for a smaller number of barrels was executed; and the following year a contract for 3,500,000 barrels with options on an additional 750,000 barrels was approved.

The plaintiffs' claims are: (1) That the defendants prevented the negotiation of a new contract for fuel oil after receipt of the cancellation, except for a higher price and reduced amounts than in the canceled contract; (2) that prior to the cancellation, the defendants did nothing to secure a new source of supply of fuel oil; and (3) that New Jersey (Del.) wrongfully appropriated some of the customers of Mexpet.

There is no charge here, nor can there be, that Indiana or any of the directors of Pan Am made any profits for themselves as a result of the transaction. The most that can be claimed is that the directors were negligent and wasted the assets of Pan Am in two respects: (1) That they did nothing between 1933 and the date of the receipt of notice of cancellation of the 1932 fuel oil contract, to obtain other sources of supply; and (2) that after the receipt of the notice of cancellation in April, 1936, to take effect April 30, 1937, they did not exercise due diligence to obtain a complete renewal of the contract without change in quantity or amount.

With respect to the negligence before 1936, there is nothing to show that the directors should have known of the impending cancellation or what they could have done so far in advance, to get other supplies, even assuming that the vague testimony of the plaintiff can be said to have been a notice or demand that something be done.

With respect to the conduct of the directors after 1936, all due diligence seems to have been pursued. Besides, in 1937, Exhibit

552 shows that the deduction of 6,500,000 barrels made by Jersey was more than offset by 7,200,000 barrels obtained by Pan Am by purchase, by its own refinery, and by the processing arrangement with Humble.

With respect to the customers it is not clear that their names were actually furnished to New Jersey (Del.) by Mexpet. The evidence furthermore does not sustain the plaintiffs' burden of proof that any of the Mexpet customers of fuel oil were obtained by New Jersey in any illegal manner or as a result of anything but lawful competition.

With respect to this item judgment is directed for the defendants.

### PETRO SETTLEMENT.

Pan Am owned a fifty per cent interest in Petroleum Heat & Power Co. (Petro) which was a large seller of Bunker C fuel oil. Petro bought its oil from Mexpet, which in turn had been purchasing it from New Jersey (Del.). The contract price between Petro and Mexpet was to be based upon the lowest spot price charged by Mexpet. Petro claimed that Mexpet had overcharged it in certain instances, because Mexpet had made spot sales to large shipping companies at lower prices than the contract price with such companies, and that Petro had not received the benefit of this lower price. In case this claim was valid and Mexpet had to refund some part of this purchase price, it would have a claim against New Jersey for this refund under its contract with New Jersey.

The claim asserted by Petro was, under different computations, from $600,000 to $2,000,000. After lengthy negotiations it was settled for $400,000, and New Jersey reimbursed Mexpet in the sum of $200,000.

I find that the settlement was fair and reasonable. If the action against Mexpet had been brought in Massachusetts, as was probable, so that Mexpet could not cross claim against New Jersey in the same action, there was no certainty that Mexpet could have escaped all liability. If the action against Mexpet and the action by Mexpet against New Jersey proceeded simultaneously in order to avoid the Statute of Limitations, Mexpet would have to be taking inconsistent positions in the two suits. Under the circumstances, the settlement is no basis for liability; and the defendants are entitled to judgment on this branch of the case.

### MOTION AS TO CERTAIN EXHIBITS AND EVIDENCE.

At the close of the plaintiffs' case and of the entire case the plaintiffs offered in evidence against all defendants certain exhibits and testimony which had been admitted during the trial only against some of the defendants. Decision was reserved on the offer.

The basis for the offer as to most of the exhibits was that a conspiracy had been proved between them all to do the acts alleged. If an actual conspiracy between the defendants had been established, then all the conversations and writings by one or more of the conspirators in the course of the conspiracy and in furtherance of its purposes would be admissible against all the members of the conspiracy. (*Miller* v. *Barber*, 4 Hun, 802, affd., 66 N. Y. 558; *Brackett* v. *Griswold*, 112 id. 454; *Hornstein* v. *Podwitz*, 226 App. Div. 53, 54; appeal dismissed, 254 N. Y. 443; *Voisin* v. *Commercial Mutual Ins. Co.*, 60 App. Div. 139, 149; *Dewey* v. *Moyer*, 72 N. Y. 70, 80.)

The reason for the rule that the acts and declarations of the other conspirators are admitted as evidence against each other is " that by the act of conspiring together, they have jointly assumed to themselves, as a body, the attribute of individuality, so far as regards the prosecution of the common design; thus rendering whatever is done or said by any one, in furtherance of that design, a part of the *res gestæ*, and, therefore, the act of all." (*Moers* v. *Morro*, 29 Barb. 361, 362.) In order, however, for this principle to apply, " the conspiracy must be first shown." (2 Wharton on Evidence [3d ed.], § 1205.) Unless the conspiracy is thus shown, the evidence is inadmissible. (*Osborn* v. *Robbins*, 7 Lans. 44, 45.)

Here, however, I have found that no such conspiracy as alleged has been proven.

The plaintiffs contend that even in the absence of a formal conspiracy as generally understood, the exhibits and oral evidence are admissible against the defendants as joint tort feasors or participants in a breach of trust. That contention is not valid. The fact that Indiana violated its fiduciary obligation makes liable for the results of that violation, the directors of Pan Am who acquiesced and co-operated in the wrongdoing. But the proof against Indiana to show the breach is not admissible against other individuals who had no part in the conversation or writing which constituted the proof. Against them it would be hearsay. They cannot be bound by it in the absence of an actual conspiracy.

I, therefore, deny the motion of plaintiffs with respect to the following exhibits and testimony included in their motion: 16, 59, 80, 81, 82, 84, 87, 95–103, 106–109, 111, 112, 113, 114, 115, 116, 119, 120, 121, 134, 135, 136, 137, 141, 149, 153, 164, 165, 168–174, 194, 195–197, 198–201, 209, 210, 213, 214, 216, 219, 221, 224, 225–231, 241, 242, 342–348, 354, 355, 356, 356A, 378, 380–389, 392, 397, 398, 399, 402, 403, 406, 407, 408, 410, 414, 416, 417, 418, 420, 421, 422, 424, 425–428, 466, 469, 478, 528, 539, 543, 546, 547, 551, 554; Items A, B, C, and D of testimony.

Exhibits 38, 41, 47 and 50, Minutes of informal meetings held in March, 1933, kept by Carroll. Some of these have been used by both sides in their briefs as though in evidence against all the parties although they were only marked as against Carroll. However, Carroll testified they were accurate.

Exhibit 47 was specifically stated by McKeever to be accurate. Several witnesses have testified substantially to the same effect as these memoranda. Exhibits 47 and 50 were shown to Seubert and Exhibit 41 was sent to him by Carroll. Under the circumstances, they will be received as against all the parties present at the meetings. Practically all of the contents of these memoranda are in the record through the oral testimony of other witnesses.

Exhibit 60 is excluded against defendants other than Indiana and Stephens except as to the letters received by Seubert, and they are received as against him.

Exhibit 78 is received only against Indiana (in addition to Barkdull) on the ground that it was represented by Barkdull in the transaction.

Exhibits 104 and 105 are received only against Seubert (in addition to Stephens and Indiana), as they were received by him.

Exhibit 133 is received as against Indiana and Seubert (in addition to New Jersey, New Jersey [Del.] and Teagle).

Exhibit 142 is also received against Seubert, Wilson, McKeever, Barkdull, Carroll and Stephens, all of whom were present.

Exhibit 377 is received also against Seubert in so far as the meeting of January 26, 1938 is concerned, as he was present thereat.

Exhibit 550 is received also against the individual defendants.

Defendants' motion to strike out certain exhibits and evidence is denied.

## Relief.

It should be emphasized that there is no claim, and no finding, that any of the individual defendants profited personally in any way in any of these transactions. The individual directors defendants are being held liable not because they received any part of the profits themselves or because they took over for themselves any business opportunities of Pan Am; but on the ground that they appropriated for Indiana the transactions and profits herein discussed.

The plaintiffs, suing on behalf of Pan Am, are entitled to a decree directing the following:

1. That the defendant Indiana account for and pay over to Pan Am the profits made by SO&G on all crude oil sold to Pan Am through SCOP or otherwise since April 1, 1933 to the date of the final decree, which was produced from oil properties acquired by SO&G subsequent to April 1, 1933, and up to July 1, 1935, (the date

Turner was appointed and Pan Am was in position to compete with SO&G) in the East Texas field and in the Gulf Coast area, excluding the Yount-Lee properties. On this item the defendants Seubert, Barkdull, Stephens, McKeever and Carroll are also liable. Wilson, who became a director only on November 24, 1934, at which time the production controversy was practically at an end, is not liable on this branch of the case.

2. That the defendant Indiana be decreed to be a trustee of and directed to transfer to Pan Am all oil properties acquired by SO&G in the East Texas field from April 1, 1933, to July 1, 1935 (excluding the Yount-Lee properties) and all oil properties acquired by SO&G between April 1, 1933, and July 1, 1935, in Hastings, South Houston and that part of Turtle Bay and Tomball fields which were used to supply crude to Pan Am, upon proper reimbursement to Indiana by Pan Am of all the cost thereof; or, in the alternative, if this cannot be done, to pay Pan Am the reasonable value thereof including the potential value of the reserves.

3. That the defendant Indiana account for and pay over to Pan Am all the profits made by Indiana or its subsidiaries from the sale of crude oil from April 1, 1933, to the date of the entry of the final decree, to any person or corporation other than Pan Am, which was produced from the oil properties acquired by SO&G or Indiana in the East Texas field from April 1, 1933, to July 1, 1935 (excluding the Yount-Lee properties), and also from all oil properties acquired by SO&G between April 1, 1933, and July 1, 1935, in Hastings, South Houston and that part of Turtle Bay and Tomball fields which were used to supply crude to Pan Am. Defendants Seubert, Barkdull, Stephens, McKeever and Carroll are also liable in this accounting. Wilson is not liable for the reason mentioned in paragraph 1.

4. That the defendant Indiana account for and pay over to Pan Am all profits made by Indiana or its subsidiaries on all crude oil purchased by either of them and resold to Pan Am from April 1, 1933, to the date of the entry of the final decree. Defendants Seubert, Barkdull, McKeever and Carroll are also liable on such accounting. The defendants Stephens and Wilson are also liable, respectively, from May 1, 1933, and November 24, 1934, the dates of their election to the board.

5. That the defendants Indiana, Seubert, Barkdull, Stephens, McKeever and Carroll account for and pay over to Pan Am all damages which have accrued to Pan Am from April 1, 1933, to the date of the entry of the final decree by reason of the failure and refusal to permit Pan Am to construct its own gathering system and direct pipe line from the East Texas field. Wilson is liable only for

so much of these damages as have accrued since November 24, 1934.

6. That the defendant Indiana account for and pay over to Pan Am the benefits accruing to it by virtue of the contract dated September 28, 1933, reducing Indiana's cost in the transportation of Winkler crude.

7. That the defendants have judgment on the merits with respect to the refinery matter, the Bunker C fuel oil matter and the Petro settlement matter.

In addition to the foregoing, the plaintiffs in their brief have made request for further permanent relief, in several forms, which cannot be granted. The majority stockholder, Indiana, is entitled to retain its stock in the subsidiary, Pan Am, and is entitled to vote its stock in any legal manner and for any legal purpose it wishes. The only limitation is that its rights with respect to that stock are circumscribed by its obligations as a trustee to Pan Am and to the Pan Am minority stockholders.

For that reason the court will not, even if it had the power, forbid the voting by the majority stockholder of the stock which it holds in the subsidiary corporation, or direct the stockholder to transfer its stock to a representative of the court, or permit the voting of the stock only on condition that independent directors be selected, or direct Indiana to dispose of its stock in Pan Am by distribution among its stockholders, all of which are suggested by the plaintiffs Such a decree would deprive Indiana of its property rights in the stock of Pan Am.

On the other hand, merely accounting for profits and damages will not, in itself, prevent Indiana from continuing to use its dominating power over Pan Am to take from Pan Am its legitimate business opportunities and give them to its own subsidiaries. To that extent the plaintiffs are entitled to injunctive relief, as follows:

(a) Restraining the defendants from taking any action which would interfere with the free competition between Pan Am and its subsidiaries and any of the subsidiaries of Indiana in connection with the purchase of crude or the purchase of crude producing properties;

(b) Restraining the defendants from preventing Pan Am from establishing its own crude oil purchasing department;

(c) Restraining the defendants from diverting any legitimate business opportunities of Pan Am to the use of Indiana or its subsidiaries.

The pipe line matter presents added difficulties. It may be that at this late date it would be inadvisable for Pan Am to incur the expense of constructing a separate pipe line of its own. On the other hand, Indiana cannot continue to make profits year after

year as the result of the initial wrong which it committed against Pan Am by refusing to permit the construction of a pipe line of its own, and appropriating to itself that business opportunity. With this difficulty in mind, the court desires memoranda from counsel as to the best method of treating the pipe line arrangement without unduly injuring Pan Am or Indiana.

Motion to dismiss intervenors' causes of action is denied.

The court wishes again to thank counsel on both sides for the very careful and minute preparation of the complicated and voluminous facts presented during the course of the trial, and for the careful, detailed and painstaking briefs which were submitted to assist the court. Without the meticulous preparation for trial which was evident in this case, the trial would have consumed a much longer time than it actually did.

Settle interlocutory judgment no later than June 20, 1940, in accordance with this opinion, which shall also provide for the appointment of Hon. Clarence J. Shearn, of 1 Wall street, New York city, as referee.